```
0001
 1              IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF GEORGIA
 2                       ALBANY DIVISION
 3   MICHAEL NEWCOMB and KATHY  :
     NEWCOMB,                    :
 4                   Plaintiffs :  CIVIL ACTION FILE NO.:
                                :
 5              vs.             :  1:15-CV-00080-LJA
                                :
 6   SPRING CREEK COOLER, INC.; :
     SPRING CREEK PRODUCE, LLC; :
 7   SF FARMS, INC.; SF EXPORTS,:
     INC.; T & L FARMS, INC.;   :
 8   TERRIL SCOTT PROPERTIES,   :
     LLC; TERRIL SCOTT FARMS,   :
 9   LLC; WALDINE B. SCOTT      :
     FARMS, LLC; EDDIE T. SCOTT :
10   FARMS, LLC; T S EQUIPMENT  :
     LEASING, LLC; L & W FARMS, :
11   LP; TERRIL SCOTT; and JOHN :
     DOE, Name Unknown, Address :
12   Unknown,                   :
                     Defendants :
13
14        VIDEOTAPE DEPOSITION OF PAUL W. HORCHOS, D.O.
15
16                    Taken in the offices of
17   Northeastern Rehabilitation Associates, Morgan
18   Medical Complex, 5 Morgan Highway, Suite 4,
19   Scranton, Pennsylvania, on Wednesday, February 15,
20   2017, commencing at 4:22 p.m., before Steven R.
21   Mack, Registered Merit Reporter, and Tim Art,
22   Videographer.
23            GALLAGHER REPORTING & VIDEO, LLC
                    Mill Run Office Center
24            1275 Glenlivet Drive, Suite 100
                    Allentown, PA  18106
25            (610)439-0504 / (800)366-2980
              GallagherReporting@Verizon.net
0002
 1   APPEARANCES:
 2                THE HELMS LAW FIRM
                  By:  J. JEFFREY HELMS, JR., ESQ.
 3                10 North College Street
                  Homerville, GA 31634
 4                jeffhelms@helmslaw.com
                   -- For the Plaintiffs
 5
                  GARDNER WILLIS SWEAT PLAIRE & PICKETT, LLP
```

```
 6              By:  MARK L. PICKETT, ESQ.
                2408 Westgate Drive
 7              Albany, GA 31707
                mark.pickett@gwspplaw.com
 8                -- For the Defendants
 9
10
11
12
13
14
15
16
17
18
19                      * * *
20         GALLAGHER REPORTING & VIDEO, LLC
21              Mill Run Office Center
22         1275 Glenlivet Drive, Suite 100
23              Allentown, PA  18106
24         (610)439-0504 / (800)366-2980
25         GallagherReporting@Verizon.net
0003
```

```
 1              INDEX TO WITNESSES
 2  PAUL W. HORCHOS, D.O.
 3      By Mr. Helms  (Direct)                 5
        By Mr. Pickett  (Cross)              51
 4      By Mr. Helms  (Redirect)            74
        By Mr. Pickett  (Recross)           86
 5      By Mr. Helms  (Redirect)            92
 6
 7              INDEX TO EXHIBITS
 8    Plaintiff 1    Diagram depicting sections of  19
                     the brain
 9
10              INDEX TO OBJECTIONS
11         Attorney Pickett        12, 19, 75, 79
                                   80, 82, 83, 84
12                                     86, 92
13         Attorney Helms                   67
```

```
14
15
16
17
18
19
20
21
22
23
```

```
24
25
0004
 1                    (Plaintiff Exhibit No. 1 was
 2  marked for identification.)
 3                    THE VIDEOGRAPHER:  The date today
 4  is February 15, 2017, and the time is 4:22 p.m.
 5  This is the videotape deposition of Paul W. Horchos,
 6  D.O., taken in the matter of Michael Newcomb and
 7  Kathy Newcomb v. Spring Creek Cooler, Inc., et al.,
 8  filed in the United States District Court, Middle
 9  District of Georgia, Albany Division, Case
10  No. 1:15-CV-00080-LJA.  This deposition is being
11  held at Northeast Rehabilitation Associates, P.C.,
12  at 5 Morgan Highway in Scranton, Pennsylvania.
13                    My name is Tim Art, and I am the
14  videographer.  I am with Gallagher Reporting &
15  Video.  The court reporter is Steve Mack.
16                    At this time will counsel please
17  state their appearances for the record, after which
18  the court reporter may swear in the deponent.
19                    MR. HELMS:  Jeff Helms, and I
20  represent Mr. and Ms. Newcomb.
21                    MR. PICKETT:  And I'm Mark
22  Pickett, and I represent Spring Creek Cooler and the
23  other defendants in this case.
24                         * * *
25                    PAUL W. HORCHOS, D.O., having been
0005
 1  duly sworn, was examined and testified as follows:
 2                    DIRECT EXAMINATION
 3  BY MR. HELMS:
 4  Q.         Doctor, good afternoon.  How are you
 5  doing?
 6  A.         Good.  Thank you.
 7  Q.         Good.  We met earlier.  I'm Jeff Helms,
 8  and I represent the Newcombs.
 9                    If you could, let's get started by
10  you introducing yourself to the jury by telling them
11  your full name, and tell us what you do for a
12  profession.
13  A.         My name is Paul William Horchos.  I'm
14  almost 50 years old.  I've been in practice here at
15  Northeast Rehabilitation doing physical medicine and
16  rehabilitation for about the last 20 years.  I work
17  here seeing patients that have suffered from
18  musculoskeletal injuries, neurological injuries,
19  cerebral concussions, and traumatic brain injuries.
20                    I have a full-time practice.  I
21  see about 25 patients a day.  I have a hospital
```

22  practice that I maintain, and I go to the hospital
23  in the morning to see rehabilitation patients as
24  well.
25                      Currently my practice is about 60
0006
 1  to 70 percent traumatic brain injury or concussions.
 2  It's really blossomed over the course of the last
 3  five years, and that's -- that's when I decided to
 4  become board-certified in brain injury, and I was
 5  board-certified in brain injury medicine in 2014.
 6                      I work with several of the local
 7  high schools and colleges, helping them work out
 8  their concussion protocols and their return-to-play
 9  protocols.  I do do assessments for the Veterans
10  Association for blast injuries and traumatic brain
11  injuries for them, helping to determine the nature
12  of the injury and the severity of the injury.
13                      What else would you like to know?
14  Q.          That's -- that's interesting and good to
15  know.  I appreciate it.  It's a mouthful.
16                      I want to break that down just a
17  little bit.  You went to medical school, you got a
18  license to practice medicine here in Pennsylvania?
19  A.          Correct.
20  Q.          And you've been practicing medicine in
21  Pennsylvania for how long?  Did you say 20 years?
22  A.          Twenty years.  Since 1997.
23  Q.          You mentioned board certifications in
24  certain specialties, and I want you to explain those
25  to the jury about board certifications.
0007
 1                      I think the first is in physiatric
 2  medicine and rehabilitation medicine; is that right?
 3  A.          Right.  Well, I mean getting -- getting
 4  board-certified means that you have to pass a test,
 5  and in all honesty, they're probably the hardest
 6  tests I've ever taken.  So --
 7  Q.          Those are -- those are national tests
 8  that --
 9  A.          Correct.
10  Q.          -- you have to take?
11  A.          They're national tests that you have to
12  go to a special testing center, and they put
13  headphones on you and you have to sit in like a --
14  you know, in like a little cubicle all day long and
15  take this test.
16                      But -- so I took the board
17  certification for physical medicine and
18  rehabilitation once, passed it, and then ten years
19  later I had to take it again, as that's part of the

20  rules.  I took it again and I passed it.  So I'm
21  board-certified twice in -- in physical medicine and
22  rehabilitation.
23                  I'm board-certified in disability
24  evaluating medicine, so I evaluate patients for
25  disability claims as well.  I was eval -- I was
0008
1  board-certified for that and then recertified.
2                  And then, like I said, in 2014 I
3  took the national board certification for traumatic
4  brain injury, which consisted of traumatic brain
5  injury certification for both physical medicine and
6  rehabilitation and for neurology.
7  Q.          And is that -- is that a subspecialty of
8  the physical rehabilitation board certification?
9  A.          Yes.
10  Q.          And again is that a test that's
11  administered nationwide to people who want to have a
12  subspecialty in brain injury?
13  A.          Correct.  Oh, and I mean one thing that
14  I did forget to mention is that, you know, I've
15  always been interested in traumatic brain injury,
16  and when I trained, I trained at Moss Rehabilitation
17  Hospital in Philadelphia, which is one of the
18  preeminent traumatic brain injury centers in the
19  country, and that's where I had exposure to
20  traumatic brain injuries and had become interested
21  in that.
22                  And -- and over the course of my
23  practice I've tried to drive it more towards
24  neurological rehabilitation, which is exactly what
25  that is; and when I had the opportunity to take the
0009
1  board certification in 2014, I jumped at it.
2  Q.          When you say neurological injuries, what
3  all parts of the body are you talking about when
4  you -- when somebody has a neurological injury?
5  A.          Well, neurological injury meaning
6  neurological rehabilitation, so rehabilitation of
7  their brain, rehabilitation of their cognitive
8  function, rehabilitation of their visual and
9  vestibular function, that's what I'm talking about.
10  Q.          You practice here in Scranton?  Are we
11  in Scranton; is that right?
12  A.          Correct, Scranton, Pennsylvania.
13  Q.          How many physicians practice with you
14  here?
15  A.          Twelve other physicians.
16  Q.          And the name of your practice is
17  Northeastern Rehabilitation Associates; is that

18  right?
19  A.          That is correct.
20  Q.          How about the hospitals that you have
21  privileges with or work with in the area?
22  A.          Well, I -- I have privileges with the
23  three major hospitals here in Scranton.  One is in
24  the Geisinger network, the other two are
25  independent.  One is called Moses Taylor, the other
0010
 1  is called Regional Hospital.
 2                    I run the rehabilitation inpatient
 3  unit at Regional Hospital, a 15-bed rehab unit.
 4  Those are -- those patients are under my -- under my
 5  care.
 6                    And I also do consults in the
 7  hospital.  I do consults during the week, I do
 8  consults on the weekends at these various hospitals
 9  as -- as I'm called to do so.  Geisinger CMC in
10  particular is a trauma center, so I see traumatic
11  brain injury patients that come in there acutely.
12  Q.          Getting down to what we're going to talk
13  about today, you've seen a gentleman by the name of
14  Mr. Michael Newcomb?
15  A.          Correct.
16  Q.          How did he come about seeing you?
17  A.          He was sent to see me by Attorney Don
18  Ligorio.
19  Q.          And the purpose of you seeing
20  Mr. Newcomb was what?  What was the purpose of that?
21  A.          Attorney Don Ligorio wanted me to
22  quantify exactly what was wrong with him, what his
23  diagnoses were, and what I thought about his
24  injuries.
25  Q.          Okay.  Is that called an independent
0011
 1  medical examination?
 2  A.          Yes.
 3  Q.          And you're board-certified in order to
 4  do that?
 5  A.          Correct.
 6  Q.          You follow a certain type of
 7  methodology; is that right?
 8  A.          Correct.
 9  Q.          And to assess Mr. Newcomb to see whether
10  or not he's had a brain injury did you follow a
11  methodology and test him on that?
12  A.          Yes.
13  Q.          And is that methodology, has it been
14  peer-reviewed?
15  A.          Right.  The methodology that I utilize

16    is a methodology that was developed at the
17    University of Pittsburgh Medical Center in
18    association with the Pittsburgh Steelers, so that's
19    really where the -- where the impact test was
20    invented.  You may have heard of when people pass or
21    fail a concussion test.  That's called an impact
22    test.
23                        And so they invented that there,
24    but they also invented management and treatment of
25    cerebral concussions based upon that, that
0012
 1    methodology, and I employ that during my evaluation
 2    here.
 3    Q.          And you employed that evaluation when
 4    you did the examination of Mr. Newcomb I take it?
 5    A.          Correct.
 6    Q.          Yeah.  And that's a -- that's a
 7    scientifically medically-based methodology?
 8    A.          That's correct.
 9                        MR. PICKETT:  Object to leading.
10    Q.          Is that a scientifically med --
11    medicine-based methodology?
12                        MR. PICKETT:  Object to leading.
13    Q.          That you could go ahead and answer.
14    A.          Well, what I would say is I would say
15    that there's been multiple peer-reviewed articles
16    that have been published regarding the validity of
17    these -- this testing and these train -- and these
18    treatment methods which base -- are based upon
19    what's called the VOMs, visual/ocular -- V-O-M?
20    Visual-ocular motility testing.
21                        And so it's basically looking at
22    their balance and their visual function and how --
23    how that -- how they -- how they respond to
24    provocation of those sorts of testing activities.
25    Q.          If you could, and you got a report in
0013
 1    front of you, and just walk through it as much as
 2    you need to -- or refer to it as you walk us through
 3    this, but just walk the jury through what you did to
 4    arrive -- or to carry out this examination of
 5    Mr. Newcomb.  And you arrived at some opinions based
 6    on that examination, didn't you?
 7    A.          That's correct.
 8    Q.          All right.  Just walk us through that if
 9    you could, what you do in the regular course when
10    you're asked to evaluate somebody like Mr. Newcomb.
11    A.          Well, Mr. Newcomb came into the office
12    for this evaluation.  I believe that some of the
13    family members were with him.  And I asked him

14  various questions about his -- his injury.  I asked
15  him about how it occurred, I asked him about what he
16  experienced at the time of his injury.
17                I asked him what kind of treatment
18  op -- what kind of treatment he went through, what
19  kind of treatment was offered to him, what he --
20  what he decided to do, what he -- what he may have
21  decided not to do with regards to his treatment, and
22  what kind of ongoing symptoms he was suffering from
23  at this point in time.
24                That was basically the line of my
25  questioning, and --
0014
 1  Q.        You took a history from him I guess is
 2  what it's called?
 3  A.        Well, that's --
 4  Q.        Yeah.
 5  A.        -- that's what I'm saying, right.
 6  Q.        Yeah.
 7  A.        So that's the methodology though of what
 8  I've done.
 9  Q.        Yeah.  How much time did you spend with
10  Mr. Newcomb questioning him about what happened to
11  him, what's been the effect of his injury?
12  A.        About 40 minutes.
13  Q.        And did you review medical records along
14  with interviewing and examining Mr. Newcomb?
15  A.        Yes.
16  Q.        And how much time did you spend doing
17  that?
18  A.        About three hours.
19  Q.        And the records that you reviewed that
20  jump to your mind that were most important that
21  helped you arrive at your opinions about
22  Mr. Newcomb, which ones were those?
23  A.        Well, I mean the problem -- the reason
24  you might want -- the reason why it takes three
25  hours to review is because you don't know what's on
0015
 1  any one page, so you have to go through every single
 2  page.
 3                You know, so I'm sitting at home
 4  and going through it, and my kids are like, "Dad,
 5  you're going to read that whole thing?"  And I'm
 6  like, "Yeah."  You got to.
 7                You know, so if you're asking me
 8  what really stands out?
 9  Q.        Yes.
10  A.        I suppose the imaging studies stand out
11  to me, but -- but everything I think, you know, is

12  important to the story.
13  Q.          Yeah.  Let's go back and ask, what did
14  Mr. Newcomb tell you about how he was injured?
15  A.          Mr. Newcomb told me that he was on a
16  loading bay.  And the back of his truck I guess was
17  up to the loading bay and he was standing there; and
18  a forklift had a load on the forks, and I guess the
19  operator didn't see him; and it swung, and as it
20  swung around it caught Mr. Newcomb and threw him in
21  the air; and unfortunately, he -- well,
22  unfortunately or fortunately, he struck the corner
23  of the back of his trailer, hitting his head on this
24  hinge that was holding the -- the door to the back
25  of the trailer.
0016
1  Q.          Did you see a scar of where that had
2  happened?
3  A.          You can't miss it.
4  Q.          Yeah.
5  A.          So yes.  The answer is yes.
6  Q.          Okay.  All right.  What did he tell you
7  about the -- how he felt afterwards that was
8  important to helping you come to your opinions and
9  based upon your -- that was part of your
10  examination, the history of it, what did he describe
11  to you about his physical condition that was
12  important to you after the injury?
13  A.          Well, when we -- when we look at people
14  who may or may not have suffered from a concussion
15  injury, you look for acute findings, and acute
16  findings in this particular situation are dizziness
17  and some disorientation, fatigue, sleepiness.  Those
18  kinds of things that he was complaining about are
19  typical following a cerebral concussion or a brain
20  injury.
21  Q.          Those are consistent with somebody who's
22  got -- suffered a brain injury?
23  A.          Correct.
24  Q.          Yeah.  You knew that he eventually had
25  surgery with Dr. Azeredo at Geisinger; is that
0017
1  right?
2  A.          I do.
3  Q.          Yeah.  And you mentioned some of the,
4  what you said, scans or radiology tests that were
5  done --
6  A.          Correct.
7  Q.          -- on Mr. Newcomb.  Can you tell us
8  about those.  Did you actually look at the films as
9  they used to say themselves, or now they're

```
10   digitized on a computer --
11   A.          Correct.
12   Q.          -- plus read the reports?
13   A.          Right, I looked at the disks and I read
14   the reports.
15   Q.          Okay.  And what did the disks
16   themselves, the films themselves reveal to you that
17   you saw, that was important based upon your
18   examination and opinions you reach?
19   A.          Well, one -- one study that was
20   important was the -- was the CT scan of his head
21   that revealed that there was fluid in his left ear,
22   a large amount of fluid in his left ear.  And
23   obviously that's not normal, and it went along with
24   Mr. Newcomb's complaints that he was having a
25   hearing impairment, progressive hearing loss.
0018
 1                   So cerebrospinal fluid, unlike
 2   other types of fluid, has glucose in it, so when
 3   you -- when they tapped it and looked at the fluid,
 4   they were able to identify that it in fact was
 5   cerebrospinal fluid or what we know as brain fluid.
 6                   So the fact that there was brain
 7   fluid inside of the ear on the inside part of the --
 8   of the eardrum indicates that there was trauma and a
 9   rip inside of the brain to the dura.
10                   So that -- that doesn't happen
11   with insignificant trauma.  That happens with a --
12   with a pretty solid force, so it tells you something
13   about the amount of force that hit the patient, or
14   that the patient experience -- that the patient's
15   brain experienced.
16                   The other study that is of
17   importance in my opinion was the MRI scan that was
18   done in 2014 of his brain, and that one showed that
19   there was significant high-intensity abnormalities
20   in the -- in the left parietotemporal region, and
21   also showed that there was evidence of
22   encephalomalacia.  So encephalomalacia is --
23   Q.          Now, those are some big words, so break
24   those down for us if you could.
25   A.          Yeah.  So the high-intensity zones, what
0019
 1   that basically means is it means that there's areas
 2   of inflammation in the brain.  So just like if we
 3   took a scan of you ankle if you had sprained your
 4   ankle, you would see some increased inflammation
 5   there.
 6                   So there was areas of increased
 7   inflammation in the brain, which is not good.
```

```
 8   Inflammation in the brain indicates that there's
 9   injury.  And --
10   Q.          Let me just stop you right there if I
11   could.  I want to ask you to look at Plaintiff's
12   Exhibit No. 1 here that we looked at earlier.
13   A.          Right.
14   Q.          Just tell us before you show the jury --
15               MR. HELMS:  That's right.  We'll
16   do --
17               MR. PICKETT:  Just for the record,
18   we -- we object to Plaintiff's --
19               MR. HELMS:  Yeah.
20               MR. PICKETT:  Is Plaintiff 1 is
21   the exhibit?
22               MR. HELMS:  That's right, yeah.
23               MR. PICKETT:  Okay.
24               THE WITNESS:  All right.  So --
25
0020
 1   BY MR. HELMS:
 2   Q.          Let -- let me just ask you a few
 3   questions.
 4   A.          Sure.
 5   Q.          What is this?
 6   A.          This is a picture of a brain.
 7   Q.          Okay.  Is it a -- is it an accurate
 8   representation of the human brain?
 9   A.          Yes.
10   Q.          Will this help you explain your
11   testimony to the jury about the areas of
12   Mr. Newcomb's brain that was injured?
13   A.          I think it would help, yeah.
14   Q.          Yeah.  Okay.  Okay.
15   A.          All right.  So this --
16   Q.          The areas you were talking about that
17   had the inflammation.
18   A.          Well, I think first I have to orient --
19   Q.          Yeah.
20   A.          -- people a little bit.
21   Q.          Please.
22   A.          Okay.  So this is a brain.  Okay?  This
23   is the front of the brain, so your eyes would be
24   right here.  This would be the back of the brain.
25   Okay?  And this here would be the brainstem, and
0021
 1   that turns into the spinal cord that goes down, down
 2   the -- down the spine into the back.  Okay?
 3               So the areas that I'm talking
 4   about is this area right here showed that there was
 5   injury.  Okay, that's right over the ear, right
```

```
 6  there.
 7                    And then the other place that we
 8  see some evidence of injury is -- let me see
 9  before -- I don't want to misspeak.  And then the
10  other place that we see it is in the temporal lobe,
11  so down here, where we actually see this
12  encephalomalacia.
13                    So up here what you see is you see
14  evidence of inflammation.  Okay?  Inflammation means
15  swelling and injury to the brain.  Now, that's not a
16  good thing, and if you have inflammation in the
17  brain, it causes dysfunction, it causes impairment
18  of -- of thought.  It can sometimes cause seizure
19  disorder, those sorts of things.
20                    Encephalomalacia is a large word,
21  you're right, and what that basically means is it
22  means area of brain that has been damaged and then
23  subsequently just absorbed.  Okay?
24                    So what it really is, is it means
25  kind of like a hole in the brain, and so down here
0022
 1  you have some evidence of what we would call like
 2  Swiss-cheesing of the brain, so you have these
 3  little holes in the brain tissue.  Okay?  And what
 4  that means is it means that those areas where the
 5  Swiss cheese holes are is they -- it's dead brain
 6  tissue.
 7  Q.        And you could see that on the MRI?
 8  A.        Yes.
 9  Q.        Okay.  All right.  Jumping around just a
10  little bit here, I see on your CV you're a
11  consulting physician for Geisinger; is that right?
12  A.        Correct.
13  Q.        And what does that mean?
14  A.        That means that if they want me to do a
15  consult, I come down there and do it at the
16  hospital.  I did four of them this weekend.
17  Q.        Have you been down to the hospital where
18  Dr. Azeredo practices in Danville?
19  A.        Thankfully, I've had no reason to go
20  there, no.
21  Q.        Okay.
22  A.        Because that's about an hour and a half
23  away.
24  Q.        Okay.  They have a clinic that's up here
25  in Scranton?
0023
 1  A.        Right.
 2  Q.        Yes.
 3  A.        Right.
```

```
 4   Q.          Okay.  Geisinger does, yes?
 5   A.          Yeah, Geisinger is a network of
 6   hospitals.  They have, I don't know, maybe -- maybe
 7   ten hospitals in the area.
 8   Q.          It's a big operation, isn't it?
 9   A.          Correct.  And that's sort of the --
10   that's sort of the mecca, if you will, in Danville.
11   That's where it all started.
12   Q.          You read the reports of Dr. Azeredo and
13   Dr. Toms, the neurosurgeon, and if you could, just
14   generally summarize and describe for the jury the
15   type of surgery that Mr. Newcomb underwent.
16   A.          Well, the brain is a delicate structure,
17   and although it has its own built-in helmet, right?
18   That's what our skull is.  If the brain didn't have
19   fluid around it, it would tend to bang into the
20   skull, and that would be bad.  So the cerebrospinal
21   fluid, or CSF as it's known, is this fluid that --
22   that surrounds the brain, both on the sides and on
23   the top and underneath, and it basically kind of
24   creates a cushion for the brain inside of the skull.
25                   And especially on the underside of
0024
 1   the skull.  The underside of the skull has sharp
 2   edges that kind of stick up in various locations,
 3   and so if the brain kind of rubs against those sharp
 4   edges, sometimes it can have injury.
 5                   And there was a structure there
 6   that was -- that was ripped, causing a tear in
 7   the -- in the dura; and the dura is the -- is the
 8   coating that keeps all that CSF in its proper
 9   location.  And when that happened, it dripped out
10   into the ear canal, and it was caught by the eardrum
11   in the ear.  So it would have been dripping out of
12   his ear if there had been a hole in his eardrum, but
13   as it was, it just kind of built up behind there,
14   but it's not supposed to be there.
15                   And so the surgery that -- that
16   the doctors at Danville did is they repaired that
17   leak.  And that's very important, because if you
18   have a leak like that persisting, it will cause
19   significant damage to the brain, it will cause
20   ongoing headaches.
21   Q.          Now, in your report, if you'll look at
22   that, you talk about symptomology?  You have a whole
23   section where you talk about symptomology.
24   A.          Right.
25   Q.          And describe that.  What do you mean by
0025
 1   that and -- and what were your findings under the
```

```
 2  section of symptomology?
 3  A.         Well, I said to the patient, What do you
 4  suffer from; what makes you feel different from
 5  being normal?  And he told me that -- that he
 6  suffers from a headache most of the time.  He told
 7  me that he had been through a lot of treatments for
 8  the headache but hadn't gotten any better.  He told
 9  me that he's very grouchy, used the words
10  insufferable.  He gets mad about stupid things,
11  things that he thought that he never would get mad
12  about before.
13              He doesn't like bright light.
14  It's called photophobia.
15  Q.         I was going to ask you about that.  You
16  used the word photophobia and phonophobia.
17  A.         Right.  Photophobia doesn't like bright
18  light, so sometimes fluorescent lights can be
19  bothersome.  Headlights can certainly be bothersome,
20  especially the modern newfangled ones that are so
21  bright.  And sun of course can be -- can be
22  disturbing.
23              So it's a -- it's a phenomena
24  that, you know, you might think might be able to be
25  treated with -- with sunglasses or maybe with a hat,
0026
 1  but it's funny.  It's just -- it's an issue that --
 2  that's difficult to treat, photophobia, and patients
 3  tend to just sort of change their lifestyle.  They
 4  tend to stay in darker areas; they tend to not go
 5  out in order to prevent that from happening because
 6  they -- the phono -- photophobia gives them a
 7  headache and it makes them feel uncomfortable.
 8              The same thing with phonophobia.
 9  It just basically means that patients don't like
10  like loud noise or, you know, kids playing in the
11  room, you know, anything like that.  And that also
12  was bothersome to him, and it was something that was
13  never bothersome to him before.
14              He also has issues with regards to
15  his visual function in the left eye.  He has
16  dizziness.  And he sometimes gets nausea and
17  actually throws up without any kind of provocation.
18  In other words, he's not throwing up because he ate
19  a bad clam or something like that; he just throws up
20  because he just throws up.
21  Q.         Is that a symptom of people who have
22  brain injuries?
23  A.         I have found that oftentimes it's a
24  symptom that's associated with vestibular
25  dysfunction or dizziness that goes along with the
```

0027
1  brain injury.  So in other words, they -- they may
2  not realize it, but something may drive their
3  dizziness suddenly, and as a result of that they --
4  they feel nauseous and may sometimes throw up.
5  Q.        I interrupted you there, but I just want
6  to ask you about something.  You have a section in
7  your report, you talk about aggravating factors, on
8  the next page.
9  A.        Right.
10 Q.        Where did these aggravating factors come
11 from?
12 A.        You mean in this patient's condition?
13 Q.        How did you find out about these
14 aggravating factors?  Is this what he told you, or
15 is this what his family told you or . . .
16 A.        Yeah, I said -- I said, What -- what
17 makes you unhappy or what makes you feel -- feel
18 poorly; and he said that he doesn't feel well when
19 he's with a lot of different people and he has to
20 manage those situations.  He told me that it makes
21 him feel uncomfortable.
22          He doesn't like it when there's
23 multiple conversations taking place, and multiple
24 conversations could be, you know, like the dinner
25 table where various people could be having
0028
1  conversations at the same time.
2          And you and I don't think about it
3  all too much, but we're able to -- part of what's
4  important about -- about our brains when they're
5  healthy is that we're able to suppress information
6  that we don't want to hear.  So somebody else might
7  be talking over there, and we're just trying not to
8  pay attention to it.
9          Sometimes when you have a brain
10 injury, it impairs that ability to suppress that
11 other information, so when other people are talking
12 around you, it keeps interrupting your own
13 conversation; you can't ignore it.
14 Q.        You talk about a family member or family
15 members have attended the examination.  Is that
16 something that normally happens when you have
17 somebody that has a brain injury, talk to the family
18 members about how some --
19 A.        It's very helpful.
20 Q.        Yeah.
21 A.        I mean oftentimes you ask questions that
22 the fam -- that the patient themselves may not
23 recall or may not be able to answer with, you know,

24 good confidence, so it gives you some corroboration.
25 Q.          Now, in this case you looked at his past
0029
 1 medical history.  Based on the information you had
 2 available to you about his past medical history, did
 3 you see anything that was relevant or significant to
 4 you as it relates to the injury he suffered back in
 5 June of 2013?
 6 A.          No, I don't think so, but I mean -- but,
 7 you know, he's not a babe.  I mean he's -- you know,
 8 he's had a few things wrong with him, you know,
 9 he's --
10 Q.          He's been a working man, huh?
11 A.          Yeah.
12 Q.          Yeah.
13 A.          Yeah.  So I mean that's -- that was the
14 only thing that I took away from it is that, you
15 know, he -- he has got a few miles on him.
16 Q.          Now, we talked about the medical record
17 review that you did, the diagnostic reviews that you
18 did.  You did a couple of exams yourself, physical
19 examinations or exams yourself about his eyesight
20 and his hearing and his smell.  Is this a good time
21 to talk about those?
22 A.          Yes, I think so.
23 Q.          All right.  Tell us what those exams
24 were you did on each aspect of it and why it was
25 important to you in the opinions that you've arrived
0030
 1 at in this case.
 2 A.          Well, I'm interested in his visual
 3 function because the -- the visual connections
 4 are -- are extensive.  And I'm going to use this
 5 picture again.
 6 Q.          Yes, please.
 7 A.          Is that okay?
 8 Q.          Yeah.
 9 A.          So if the eyes are up here, the part of
10 the brain that actually processes visual information
11 is all the way in the back.  Okay.  So this pink
12 area back here called the occipital lobe is actually
13 the area that -- that processes visual information.
14                  As a result of that, what it means
15 is it means that there's a long nerve track, so the
16 nerve has to go a long way to get all the way to
17 the -- to the back of the brain.  And so if you're
18 going -- if you're going look for something on a
19 physical examination that's going to inform you
20 that -- that a portion of the brain may have been
21 injured, it would be best to look at the nerve

22    tracks that travel the farthest distance through the
23    brain, which is the reason why I looked at the eyes.
24    Okay?  And so the --
25    Q.        What did you find?
0031
 1    A.        So this -- the important thing to know
 2    about the eyes as it pertains to concussions or
 3    traumatic brain injuries is that we have two eyes
 4    and those two eyes have to work together, and that's
 5    something that in this patient was not happening.
 6              So when we looked at his visual
 7    convergence, we found that his visual convergence
 8    was abnormal.  So visual convergence means that as
 9    you look at an object far away, your eyes should be
10    more or less parallel, but as an object comes in
11    closer to you, your eyes should turn in; and on
12    repeated trials this individual was not able to turn
13    his eyes in, they were staying in a parallel
14    position as he -- as they came in like this.
15              And his visual convergence was
16    limited to 25 inches from the nose, which is very
17    far.  A normal convergence would be something like 1
18    inch from the nose.
19              Okay.  So what that means is it
20    means that anytime he was trying to look at
21    something up close he -- he would struggle, and it
22    would invariably intensify headache pains -- pains.
23    Q.        Is that something that's consistent with
24    somebody that's suffered a brain injury?
25    A.        Yes.
0032
 1    Q.        And yet using this diagram again, was
 2    the nerve track through the area that had the signs
 3    of injury on the MRI scan?
 4    A.        Right.  So yeah --
 5    Q.        And could you show the jury where that
 6    was, please.
 7    A.        Yeah, those -- those nerve tracks
 8    would -- would run back through this area.  So
 9    the -- the optic nerve comes in underneath here and
10    then gets processed, and then they track along the
11    side of the brain, like that, right through this
12    area.  It's called the optic radiations.  And yeah,
13    so there's an abnormality there.
14              So furthermore, looking at his
15    eyes, I looked at his visual saccade functions.
16    That means the ability of him to move his eyes
17    quickly back and forth from side to side and up and
18    down.  He had impairment with regards to that.
19              The other thing that was important

20  to note was that he had what we call visual
21  nystagmus with a type of testing called VOR or
22  visual-ocular reflex.
23                    And what that means is it means
24  that there's communication between the eyes and the
25  inner ear.  The eyes and the inner ear have to be in
0033
1  constant communication because the inner ear is
2  telling our brain what is the position of our head,
3  and that's important for our eyes to know.
4                    So when you turn your head from
5  side to side, that information is being processed at
6  the very same time that your visual information is
7  being processed, and those two systems work
8  together.  When there's a disturbance, what happens
9  is when you turn your head quickly the eye flickers
10 back and forth, and that's called nystagmus, and
11 this patient had presence of nystagmus.
12                    And when that happens, at least in
13 this particular examination, and quite frequently on
14 other examinations, the patient experienced nausea
15 and queasiness.  So that goes along with what I had
16 said earlier, that it tends to come with -- from
17 dizziness that patients don't expect.  So -- so we
18 saw that.
19 Q.        Let me just stop you right there just a
20 second and ask you a question.  In medicine you hear
21 the terms used objective and subjective symptoms.
22 A.        Right.
23 Q.        Yeah.  And were these -- just briefly
24 define each one for the jury so they'll understand,
25 we'll all understand.  An objective symptom, what is
0034
1  that?
2  A.        Objective sym -- you want me to tell you
3  what objective symptoms are or what objective
4  symptoms are in this case?
5  Q.        Generally objective versus subjective,
6  and then the objective symptoms you found with
7  Mr. Newcomb.
8  A.        Right.  Okay.  So -- so objective
9  basically means things that are -- that are hard
10 to -- hard to simulate or to pretend.  Okay?
11                    So in this individual, saccadic
12 functions are something that are objective because
13 you're seeing the eyes move in a -- in a pattern
14 that is -- that is not possible to affect,
15 especially when you're -- when you're seeing
16 abnormalities in regards to the movement.
17                    The same thing is true with the

18    visual convergence.  The visual convergence, the eye
19    will -- you'll have asymmetric movements of the eye.
20    In other words, one eye will actually move instead
21    of both eyes moving together.  That -- I would defy
22    anyone to try to move one eye at a time.  It just
23    doesn't happen.  We move eyes together in a -- in a
24    unified fashion.
25                    So those are -- those are things
0035
 1    that cannot be copied or simulated or pretended.
 2    Okay?
 3    Q.        The bottom line, in your opinion was
 4    Mr. Newcomb faking any of these symptoms?
 5    A.        No.  I don't think it's possible to fake
 6    them.  I guess that's what I'm trying to say in a --
 7    Q.        Yes.
 8    A.        -- roundabout way.
 9                    And then subjective.  But
10    subjective is important in this, too, because you
11    see, a lot of times what happens is that patients
12    will have movements or have activities that they
13    become aware of that they make them feel sick, that
14    makes them feel badly; and so what they'll do is
15    they'll either move slowly or they'll avoid
16    environments that put them in that sort of position.
17                    And so when you're testing these
18    things, you are trying to actually provoke some
19    symptoms, so you're actually trying to make them
20    feel sick.  So when they tell you oh, yeah, that
21    made me feel dizzy or oh, yeah, that made me feel
22    nauseous, that's actually a positive response to the
23    test.  Okay?
24    Q.        And that's consistent with what you
25    would expect; is that right?
0036
 1    A.        Yeah.
 2    Q.        Yeah.  Now, you've talked about a visual
 3    test.  Tell us about, you did some tests about his
 4    ability to smell?
 5    A.        Correct.
 6    Q.        Yeah.  And why is that important with
 7    somebody who's had a brain injury?
 8    A.        It's actually very important to look at
 9    the sense of smell because -- you know, you probably
10    have heard people say, you know, that -- I don't
11    know.  Some percentage.  Let's say, you know, 45
12    percent of our brain doesn't do anything.  Well,
13    that's not really true.  Okay?  But what they're
14    referring to is they're referring to the frontal
15    lobe.

```
16                    The frontal lobe is the part of
17   the brain that actually does all the things that are
18   hard to quantify, the kind of things that make --
19   make a person, you know, the person that they are.
20   They create your personality, they create your
21   motivation, they -- they make you do the things
22   that -- why you do them.  Okay?
23                    They make -- the frontal lobe
24   doesn't control your arm, it doesn't control your
25   leg, it doesn't control sneezing, but it does make
0037
 1   your personality what your personality is.
 2                    And so it's hard to assess the
 3   frontal lobe, but underneath the frontal lobe, right
 4   here, is where the -- the olfactory lobes are, and
 5   that's the projections of the nerves that run out to
 6   your nose.  And when you have an injury to the -- to
 7   the brain, if you have an injury to the frontal
 8   lobe, you'll often find abnormalities in the sense
 9   of smell.
10                    And so with this patient, I tested
11   him cinnamon, coffee, and smelling salts or ammonia;
12   and he was unable to note the coffee or the -- or
13   the cinnamon, and when I put the smelling salts
14   under his nose -- and I mean I put it under my nose
15   earlier before I examined him just to sort of remind
16   myself how bad that smelled.  And when I put it
17   underneath his nose, he said, "Yeah, I smell that,"
18   but he didn't recoil.  So I mean he didn't even have
19   a normal reaction to that.
20                    So that tells me that there's
21   damage to the olfactory lobes, and that suggests to
22   me that this is the etiology or the cause of his --
23   of his personality disorders and issues with regards
24   to some of his anger management problems.
25   Q.          Did you see anything in his medical
0038
 1   background that might -- Mike could attribute the
 2   problems with his smell other than his head injury
 3   in this case?
 4   A.          Well, he was a truck driver for 30
 5   years, and -- and he -- and he did some fabrication
 6   of sheet metal for a small time.  I don't know.
 7   Maybe -- maybe if you were a lifetime welder, maybe,
 8   but it doesn't sound like he was.
 9   Q.          All right.  So you carried out those
10   tests.  Hearing I think is another one you -- you
11   did?
12   A.          Yeah, he did have a reduction of hearing
13   in his left ear, and he did also have tinnitus,
```

14  which is a buzzing in the ears; kind of persistent,
15  it doesn't go away.
16  Q.          And that is subjective, isn't it?
17  There's no way you can test to see whether he really
18  has tinnitus in his ear or not?
19  A.          Correct.  But he did have auditory
20  testing that did indicate a reduction in his -- in
21  his hearing functions.
22  Q.          All right.  You talk about his gait.
23  What is gait?
24  A.          It means how well he can walk.
25  Q.          And did he have any issues with his --
0039
 1  his ability to walk?
 2  A.          Well, he did -- he did in the sense that
 3  his balance was impaired.
 4  Q.          The balance.  What about his brain
 5  injury would affect his ability to balance?  Yeah, I
 6  think you talked about the eyes and the ears have to
 7  work in conjunction.  Would that affect his ability
 8  to balance?
 9  A.          Well, it's not just about -- it's not
10  just about the eyes and the ears working in
11  conjunction, although that's part of it, but it's
12  also -- it's mostly about the synchronization of
13  those activities.
14             In other words, if -- if there's a
15  disturbance in how long it takes that information to
16  get to the brain and to be processed, then -- then
17  if the inner ear is saying I'm moving to the left
18  and the eyes -- but by the time that information
19  gets there the eyes are already noticing that you're
20  moving to the right, then the body gets confused,
21  and it doesn't know which way to move in order to
22  fix it.
23             So part of the problem is, is that
24  the synchronization of information being processed
25  by the brain gets delayed, so it's not getting there
0040
 1  at the same time; and when it's not getting there at
 2  the same time, it would be like -- it would be like
 3  as if you were telling somebody how to drive but
 4  there was a two-second delay in telling them the
 5  directions about what you want them to do.  While
 6  you're telling them to turn, and they would -- the
 7  turn would have already come.  You follow me?
 8  Q.          Yes, sir.
 9  A.          So that's what drives the -- the
10  impairment of the balance.
11  Q.          And just real quickly.  I know I guess

12  your major focus was on a possible brain injury, but
13  you did what's called a range of motion and
14  palpitation.  If you could just briefly go over what
15  you found on those.
16  A.          Well, the issue with regards to that is
17  our scalp is full of nerves, and there are nerves
18  that run from the back of the head, and -- and the
19  scalp is covered with muscles as well.  The
20  frontalis muscle is the muscle in the front of the
21  forehead, the temporalis is on the side of the head;
22  and you see commercials all the time on TV for --
23  for Botox treatments for -- for migraine headaches.
24              So the question is, is, you know,
25  is the patient's scar on his -- on his forehead and
0041
1  his temporal region, that horseshoe-shaped scar that
2  he has, did that cause injury to the muscles and
3  maybe cause some scar tissue to the muscles
4  themselves or maybe -- maybe catch or kink some of
5  the nerves of the -- of the cutaneous structures of
6  the -- of the scalp.
7              So that's why I was checking those
8  areas out to see whether or not they were tender and
9  trying to come to some understanding of whether or
10  not Botox would be beneficial for him in regards to
11  that.
12  Q.          And what was your impression about that?
13  A.          That he did have significant tenderness
14  not only in his neck but also into his -- into his
15  facial and scalp muscles, and that he had already
16  had a couple of Botox injections done that were --
17  was questionable whether they were helpful or not.
18  Q.          We've been over some of the neurological
19  testing that you've done, so we'll pass through
20  that.
21              You've got one -- before we get to
22  your impressions on page 7, you talk about Waddell's
23  testing.  Describe for the jury what Waddell testing
24  is.
25  A.          Well, Waddell's testing is kind of where
0042
1  we try to trick the patient.  We try to ask them to
2  do different things in different ways that we've
3  already asked them to do and to see whether or not
4  they -- they can't do them, because they should be
5  able to perform the same task in different ways.
6              So when I did that with him, there
7  didn't seem to be any -- any gaming of the -- of the
8  examination.
9  Q.          Is that something you have to look for

10    in the line of your profession and people in
11    rehabilitation and doing independent medical
12    examinations, whether a person who claims they're
13    injured, whether they're really injured or not?
14    A.         Yeah, that's part of it.
15    Q.         Yeah.  Did you see any evidence at all
16    that Mr. Newcomb was magnifying his symptoms or not
17    being truthful with the problems he was complaining
18    about?
19    A.         No.
20    Q.         All right.  You -- you have a list of
21    impressions here, and we've really covered a great
22    deal of them, but I think what we want to get down
23    to, in your opinion is Mr. Newcomb physically, given
24    his injury, able to go back to work?
25    A.         I don't think that he's going to be able
0043
 1    to be gainfully employed.
 2    Q.         Okay.  And why is that?  What are the
 3    most limiting factors that he has given his injury?
 4    A.         Well, his -- his balance is certainly a
 5    risk.  Falling is certainly something that he could
 6    do easily.  His visual function is not normal, and
 7    his -- his visual function in his left eye is
 8    impaired.  His visual convergence makes it difficult
 9    for him to see things up close.  His photophobia
10    makes it likely that he's going to have difficulty
11    driving a truck or -- or managing the sunlight or
12    headlights on a regular basis.
13                He -- he has a pissy personality
14    at this point in time which makes it difficult for
15    him to --
16    Q.         That's a technical term; is that right?
17    Yeah.
18    A.         Well, I don't really quite know how to
19    put it, but I mean --
20    Q.         Yeah.
21    A.         -- but, you know, he readily admits that
22    things that shouldn't bother him do --
23    Q.         Um-hum.
24    A.         -- and he lashes out about it.  So, you
25    know, I wouldn't want this kind of person working as
0044
 1    a customer service representative for me.  If I had
 2    a company, I wouldn't know exactly how they were
 3    going to respond, and quite frankly, I don't think
 4    that Mr. Newcomb knows how he would respond.  You
 5    know, he may go in to work every day and say now
 6    today I'm going to be good, but he seems like he
 7    sometimes has no control over it.

 8  Q.        And is that something you see on a
 9  consistent basis, for someone who has suffered a
10  brain injury like Mr. Newcomb?
11  A.        Yes.  Yeah, that's very common.
12  Dyscontrol, I mean that's the -- that's the term.
13  The problem is, is that trying to control dyscontrol
14  through the use of medications oftentimes results in
15  further cognitive suppression.  So --
16  Q.        When you say cognitive, explain to us
17  what you mean by that.
18  A.        Well, so -- so if you're trying to
19  control these episodes by giving him medications
20  that -- that dampen his cogni -- his brain function.
21  You know, if you lower the horsepower of his brain,
22  well, then you're going to bring out other problems,
23  like the fact that maybe his memory won't be so
24  good, or maybe he won't be able to have the
25  motivation to carry out a certain task or a certain
0045
 1  activity.
 2                    So -- so episodic dyscontrol means
 3  this -- this loss of control, this anger, this
 4  irritability, that kind of thing.  And there are
 5  medications that can be used to control it, but they
 6  oftentimes result in further loss of brain
 7  horsepower, which in this situation with his
 8  traumatic brain injuries you'd want to try to
 9  minimize.
10  Q.        Speaking of medications, what kind of
11  medications . . .
12  A.        What kind of medications would you use?
13  Q.        Was he using at the time when you saw
14  him.
15  A.        Oh.  I believe he was using primarily
16  pain medications.  Oxycodone, which is a
17  short-acting pain medication; OxyContin, which is a
18  long-acting pain medication; and tizanidine, which
19  is a muscle relaxer.  Those are the primary
20  medicines that he was taking for this condition.
21  And --
22  Q.        Was he taking some Lexapro at the time?
23  A.        Lexapro as well, which is an
24  antidepressant.
25  Q.        Is that something that physicians
0046
 1  usually give to somebody who's suffered a brain
 2  injury that affects their -- their mood?
 3  A.        Well, you might, but I don't -- I don't
 4  know if it would always work, but you could try it.
 5  Q.        All right.  Going forward with

```
 6    Mr. Newcomb, do you have an opinion within a
 7    reasonable degree of medical probability, medical
 8    certainty, is Mr. Newcomb going to get any better in
 9    the future, given his injury?
10    A.          Oh, I certainly think that he could get
11    better, but I don't think he could get back to
12    the -- back to normal, not with the -- not with the
13    damage and the injury that he has sustained so far.
14                     But I certainly think that -- that
15    there's a possibility that his headaches could be
16    better controlled.  I think that there's a
17    possibility that his visual function could improve
18    with the proper therapy.  I certainly think that his
19    balance could improve with the proper therapy as
20    well.
21                     But, you know, you need to apply
22    this in the -- in the appropriate place, and you
23    need to -- you need to gain his confidence so that
24    he understands that the discomfort that he might be
25    going through to attend the therapy may ultimately
0047
 1    pay off in the end.
 2    Q.          As somebody who does an independent
 3    medical examination, you don't also treat a patient
 4    like Mr. Newcomb, do you?
 5    A.          I'm not treating Mr. Newcomb, no --
 6    Q.          Yeah.
 7    A.          -- but --
 8    Q.          He's not your patient in other words?
 9    A.          He's not my patient.
10    Q.          Yeah.  If you were able to tell the jury
11    today what you thought would be good for Mr. Newcomb
12    as far as rehabilitation goes, what would you have
13    in mind for him?
14    A.          Well, I think he needs to keep on trying
15    with various medications to try to help improve
16    his -- his -- his headache management.  I think that
17    that's one of the most important things.  Dr. Kelley
18    at Geisinger Danville had been working with him
19    regarding that, and it was my understanding that
20    they were going to continue to do the Botox
21    injections.
22                     I really think that trying to
23    control the headaches are really the first step that
24    you need to do to try to improve the patient's
25    ability to tolerate any other activity; because
0048
 1    right now I think the headaches really tend to drive
 2    a lot of his irritability, his symptomatology, and
 3    his -- and his desire to shut it down, which is what
```

```
 4   he does most of the time.
 5   Q.           Um-hum.
 6   A.           So that's where I would focus initially.
 7   Q.           How about from a physical
 8   rehabilitation?  Anything that you would have in
 9   mind that maybe would be of help to Mr. Newcomb?
10   A.           He definitely needs to do a vestibular
11   therapy program, and he definitely needs to do a
12   visual therapy program.  Those are two things that
13   without a doubt would provide him with improvement
14   in regards to his clinical evaluation based upon
15   what I saw on his exam on this particular day.
16   Q.           Vestibular?  I ask you to explain that
17   to us, please.
18   A.           It means being able to understand and
19   tolerate movement, that's what that means.
20               So believe it or not, watching a
21   football game for an individual like this can -- can
22   make a person feel dizzy, just moving their eyes
23   back and forth watching the football move and the
24   football players move on the screen, let alone, you
25   know, actually trying to -- to do it himself.
0049
 1               So vestibular therapy is -- is
 2   making a patient more comfortable observing movement
 3   and participating in movement.  And again, that's --
 4   that's something that we all take for granted.  We
 5   take for granted that -- that -- that our ability to
 6   understand and tolerate movement is -- well, it's
 7   something that's innate.
 8               But you have to remember that when
 9   we were babies we moved very slowly, and we kind of
10   over time, you know, got used to going a little
11   faster, a little faster, a little faster until we
12   get to, you know, maturity, and -- and we forget
13   about how we get there.
14   Q.           I'm going to wrap it up here with you,
15   Doctor.  I'm looking on page 8 of your report, and
16   you make a comment about the third paragraph down
17   about his work capacity, and you said it's been
18   reduced to zero.  If you could just tell the jury,
19   why did you make that statement?
20   A.           Well, when I -- whenever I see a
21   patient, if I see a patient who -- who let's say,
22   for example, has a difficult time lifting, I think,
23   well, can the patient sit down?  Because if the
24   patient could sit down, maybe they could work in a
25   seated capacity.
0050
 1               So with this individual,
```

```
 2    Mr. Newcomb, I thought:  Okay.  Well, can the guy do
 3    physical activity?  And then, you know, no, I don't
 4    think he can do physical activity because of his
 5    visual function, because of his balance function.
 6                      Can he do interpersonal
 7    activities?  No, because his personality is
 8    impaired.
 9                      Can he do sedentary, you know,
10    paperwork, sorting papers, so on and so forth?  No,
11    because of his visual impairment.
12                      So I kind of was looking at trying
13    to -- trying to run the gambit through my own head
14    about how this guy could potentially get back to
15    work, and at the end of the day I wasn't able to
16    come up with something that seemed to be successful.
17    Q.        In the line of your profession is that
18    ultimately what you want to do for your patients is
19    see that they're rehabilitated so they can get back
20    to a normal lifestyle?
21    A.        Well, absolutely.
22    Q.        Yeah.
23    A.        But as of the time that I evaluated the
24    patient that was -- that was the status he was at.
25    If I had -- if I had the ability to treat him, I
0051
 1    would be doing different things and hopefully trying
 2    to move him towards one of those goals.
 3    Q.        And you saw him in April of 2015?
 4    A.        Correct.
 5                      MR. HELMS:  Okay.  Doctor, thank
 6    you very much.  Mr. Pickett I'm sure will have some
 7    questions of you.
 8                      THE WITNESS:  Okay.  Thank you.
 9                      THE VIDEOGRAPHER:  Your mike.
10                      MR. PICKETT:  Thank you.
11                      * * *
12                      CROSS EXAMINATION
13    BY MR. PICKETT:
14    Q.        Dr. Horchos, you did not exactly treat
15    this injury, but you did see the scar from where it
16    occurred, correct?
17    A.        Yes.
18    Q.        And that scar was on the left side of
19    his head?
20    A.        Correct.
21    Q.        And in fact with the -- the exhibit a
22    few minutes ago that you were referring to, the
23    diagram of the brain?
24    A.        Yes.
25    Q.        The way that's oriented, that would be
```

0052
1    the left side; is that right?  Or am I wrong?  Is
2    that the right side?
3    A.          Well, I guess -- I guess so.  I mean --
4    Q.          Could you hold it up, maybe make . . .
5    A.          (Descriptive gesture)
6    Q.          Okay.  So that would be -- that's a side
7    view of the brain, correct?
8    A.          Correct.
9    Q.          And that would be drawn from the --
10   showing the left side?
11   A.          Correct.
12   Q.          The right side would be a mirror image,
13   but that one is actually the left side?
14   A.          Yes.
15   Q.          Okay.  And you were able to see where
16   his injury had occurred from the scar?
17   A.          Right.
18   Q.          Okay.  Which was on the left side?
19   A.          Correct.
20   Q.          Now, you also reviewed the medical
21   records, including the procedure that was done by
22   Dr. Azeredo, and -- and some of the imaging records
23   to also confirm that this injury was indeed on the
24   left side?
25   A.          The injury, you mean the brain injury?
0053
1    Q.          Yes, sir.
2    A.          Yes.
3    Q.          I mean was there another injury that you
4    looked at of him?
5    A.          Well, I thought -- the scalp injury I
6    thought you -- you know, I'm just differentiating
7    between the scalp injury and the brain injury.
8    Q.          Okay.  Well, is it your opinion that the
9    scalp injury is what caused this brain injury?
10   A.          Well, the scalp injury is an external --
11   is an external injury, and the brain injury is an
12   internal injury.
13   Q.          Okay.
14   A.          From the same mechanism.
15   Q.          But you think they came from the same --
16   at the same time?
17   A.          Yes.
18   Q.          And they were both on the left-hand
19   side?
20   A.          Yes.
21   Q.          As far as the -- there are two types of
22   information you take, and some of that is in fact
23   subjective that came from Mr. Newcomb, correct?

```
24   A.          Correct.
25   Q.          And some of the -- when you spoke with
0054
 1   him, you spent about 40 minutes speaking with him?
 2   A.          Right.  And then another 20 minutes to a
 3   half an hour examining him.
 4   Q.          Okay.  During that 40 minutes that you
 5   examined him -- or spoke with him, interviewed him,
 6   you took some handwritten notes?
 7   A.          Yes, I did.
 8   Q.          And you have those with you?
 9   A.          Yes.
10   Q.          Okay.  One of the things that he told --
11   A.          Would you like them?
12   Q.          Pardon?
13   A.          Would you like them?
14   Q.          I have a copy.
15   A.          You do?
16   Q.          I just want to make sure that you had
17   them so that --
18   A.          Oh, okay.
19   Q.          -- if I refer to something in them, you
20   would be able to --
21   A.          You got my scratch pad, huh?
22   Q.          I do.  I have all kinds of things.
23   A.          All right.
24   Q.          We get all the information we can to try
25   to evaluate something.
0055
 1               One of the things that he told you
 2   as you were evaluating him, he told you that in this
 3   accident he was thrown 10 to 15 feet?
 4   A.          Yes.
 5   Q.          Okay.  And you don't know if that's true
 6   or not, do you?
 7   A.          I don't.
 8   Q.          But that's what he told you?
 9   A.          Yes.
10   Q.          And you're sure -- you wrote that down,
11   so you're sure that's what he said, it threw him 10
12   to 15 feet?
13   A.          Yes.
14   Q.          If it -- if it -- in fact he only fell a
15   shorter distance or moved a shorter distance, maybe
16   a few feet, then if he had actually moved a few feet
17   and he told you 10 to 15 feet, then he exaggerated
18   the accident, did he not?
19   A.          Sure, I guess -- I guess that's
20   possible, yeah.
21   Q.          Well, I mean if he only moved a few feet
```

22    and he told you it was 10 or 15, then he
23    exaggerated, didn't he?
24    A.        I only know what -- I asked him what had
25    happened, and that was pretty much what -- what he
0056
1    told me.  So yeah, I guess the answer is yes.
2    Q.        Okay.  And you have to -- you have to
3    rely on what he tells you as far as the subjective
4    taking of a history from him, correct?
5    A.        Right.  But then, you know, then you
6    read through, you know, the voluminous records and
7    you try to corroborate it, but the problem is, is
8    that sometimes the information gets corroborated
9    by -- in other words, either true or false
10    information can be corroborated, you know.
11                    So, you know, the ambulance crew
12    might come up to him or something like that and say
13    hey, what happened?  If the patient tells the
14    ambulance crew that I got thrown 10 to 15 feet, then
15    that gets put into the medical record and it gets
16    perpetuated.
17    Q.        Okay.
18    A.        You know what I mean?  So sometimes even
19    when you look through the medical record if you find
20    information like that, your point is well taken.
21    Maybe -- maybe it's -- maybe it's just a repetition
22    of that original exaggeration.
23    Q.        Okay.  Did he also tell you that he had
24    a skull fracture?
25    A.        The patient?
0057
1    Q.        Yes, sir.
2    A.        Well, no.  My understanding was that
3    he -- in Georgia he was not diagnosed with a skull
4    fracture, but obviously he had a skull fracture
5    if -- if brain fluid got into the area of the
6    internal auditory canal.
7    Q.        Okay.  He had a -- well, he had a -- I
8    believe you said he had a rupturing of the dura.
9    A.        He did, but he also had -- had injury to
10    the bone itself.  That's -- that was my
11    understanding from Azeredo.
12    Q.        Okay.  You believe there was actually a
13    fracture to the bone itself, not just to the --
14    A.        I believe so, yeah.
15    Q.        -- to the dura?
16    A.        But I mean the original CAT scan that
17    was done in -- in Georgia did not show a fracture.
18    Q.        Okay.  If you'd look at your handwritten
19    notes, the last page.  Those are your -- those

```
20   handwritten notes are from your 40-minute interview
21   with him, correct?
22   A.        Correct.
23   Q.        Not from your three-hour review of the
24   medical records later on?
25   A.        That's right.
0058
 1   Q.        Okay.  So from your 40 minutes with him,
 2   if you'd look at the last page of your written
 3   notes, you've got a notation, "had a skull
 4   fracture."
 5   A.        "Saw ENT, neurosurgery; had a skull
 6   fracture, CSF leak.  Put in a plate, used ear tissue
 7   to close the area."
 8                 So this is -- this is -- this is
 9   verbal communication with the patient and his
10   family.
11   Q.        Okay.  So in -- in your verbal
12   communication with him, he indicated to you that he
13   had a skull fracture?
14   A.        Right.
15   Q.        He also indicated to you that he had had
16   a plate put in his head?
17   A.        Correct.
18   Q.        Okay.  And you've reviewed Dr. Azeredo's
19   operative notes?
20   A.        Right.
21   Q.        And he did not put a plate in his head,
22   did he?
23   A.        Well, I will say this though.  I'm not a
24   surgeon, and I would say that Dr. Azeredo's
25   operative notes are very complicated.
0059
 1   Q.        Okay.
 2   A.        And I read through them many times and
 3   tried to understand them as best as I could, and
 4   this is the -- I'm only -- I'm only a person.
 5   Q.        Okay.
 6   A.        This is the best I was able to do.
 7   Q.        Okay.
 8   A.        Okay?  But I would say that the notes
 9   were -- that the operative notes were complicated.
10   Q.        Okay.  But just to establish, there are
11   two things.  One, Mr. Newcomb told you verbally that
12   he had a plate in his head?
13   A.        I guess so, yeah.
14   Q.        Okay.  As far as whether there actually
15   was a plate put in his head by Dr. Azeredo, you'd
16   have to defer to him to that -- on that one?
17   A.        Yes.
```

18  Q.          Okay.  The -- aside from the subjective
19  tests, you did some objective tests, too, correct?
20  A.          Yeah.
21  Q.          And one of -- one of those was the
22  visual convergence test?
23  A.          Yes.
24  Q.          Now, do you know if he had ever been
25  tested, his visual convergence had ever been tested
0060
 1  before?
 2  A.          I don't think it ever had been.
 3  Q.          Okay.  So if he'd had this as a -- as a
 4  birth defect from earlier in life and it just was
 5  the first time that you had tested it, there's no --
 6  there's no way for you to know that, is there?
 7  A.          I -- I think that it's the kind of
 8  deficit that you can't function with without some
 9  sort of modification.  I mean if he -- if he had
10  this deficit from -- from birth, he would have had,
11  you know, glasses that look like Joe Paterno's, you
12  know what I mean?  Thick, thick glasses to be able
13  to control that.
14  Q.          Okay.  So --
15  A.          Because I don't see how he would have
16  gotten through grade school.
17  Q.          Can the visual convergence be corrected
18  with corrective lenses?
19  A.          It can be, yes.
20  Q.          Okay.  So could his, the one that he
21  displayed for you, could it be corrected with
22  visual -- I mean with corrective lenses?
23  A.          Well, like I'm saying, you know, you --
24  if your convergence is 25 inches from your nose,
25  everything you're reading would have to be like
0061
 1  this, (descriptive gesture) you'd have to be holding
 2  it at arm's length.
 3  Q.          Okay.
 4  A.          So what I'm saying is that you're asking
 5  me, you know, do I think that that finding is a real
 6  finding, do I think that that finding is an
 7  objective new finding, and my answer is yes, I think
 8  that it is; because the patient to my recollection
 9  wasn't wearing, you know, thick, you know,
10  soda-bottom glasses.
11  Q.          He would need something like reading
12  glasses like I'm using right now?
13  A.          Thick ones.
14  Q.          Okay.  A very strong reading glass?
15  A.          Yes, sir.

16  Q.          Could his visual convergence that he
17  displayed for you, could it be corrected with
18  corrective lenses, with glasses?
19  A.          It could be, but you'd have to -- you'd
20  have to turn them -- you'd have to put them on and
21  take them off and put them on and take them off.
22  You wouldn't be able to have bifocals that would be
23  able to make that kind of correction.
24  Q.          Okay.  You would have to put them on
25  when you're reading something within 25 inches from
0062
 1  your face?
 2  A.          Yeah.  I mean I have had patients that
 3  have had some visual correction lenses for -- for
 4  visual convergence abnormalities, but they don't
 5  really work that well because they don't work well
 6  when you look to the side, they only work well when
 7  you look right straight ahead.  Because when you
 8  look to the side, your eyes now are not converging
 9  at the same point, so the left eye has a longer
10  track than the -- or the right eye has a longer
11  track than the left eye.
12              So in other words, these glasses
13  are -- are of -- are of impaired util -- you know,
14  mild utility because of the fact that you can only
15  look straight ahead with them.
16  Q.          Okay.  Of course when you're reading
17  something within 25 inches of your face, you're
18  going to be looking straight ahead when you're
19  reading, correct?
20  A.          Yeah.
21  Q.          Okay.  The nystagmus test that you gave
22  him.  Now, other things can affect nystagmus as
23  well, can they not?
24  A.          Like drugs?
25  Q.          Yeah.
0063
 1  A.          Yes.
 2  Q.          Drugs can affect it, right?
 3  A.          Yes.
 4  Q.          Opioids could -- or would be a
 5  particular drug which could affect it?
 6  A.          Well, opioids, perhaps if you -- if you
 7  were naive to opioids.  That is, if you had never
 8  taken them before and you took a dose, you might see
 9  something like that, but I don't think that you
10  would see chronic nystagmus with regards to the use
11  of chronic opioids.  I've never seen that before,
12  and I don't believe that that's -- would be a
13  typical finding.

```
14   Q.          But opioids can cause the nystagmus that
15   you saw?
16   A.          As I said, to opioid-naive patients,
17   meaning people that have not taken them chronically.
18   Q.          Okay.  And he you would not describe as
19   opioid-naive?
20   A.          No.
21   Q.          He was very experienced when it comes to
22   opioids?
23   A.          Well, he's -- his body has become
24   tolerant to them.
25   Q.          Okay.  In fact -- I mean as far as
0064
 1   opioids go and his experience with them, you've
 2   reviewed some of his medical history?
 3   A.          Yes, I did.
 4   Q.          And are you aware that in his medical
 5   history he's been taking various opioids since back
 6   in 2004?
 7   A.          I don't know how long he's been taking
 8   them for.
 9   Q.          Okay.
10   A.          So if that's what you say, then I'll
11   accept that.
12   Q.          That wasn't something that he told you
13   about or that you determined during your examination
14   of him?
15   A.          I guess, you know -- again, you know,
16   it's -- it's a limited examination, but I mean I
17   didn't ask him, you know, for how long have you been
18   taking these medications.  But I do know that --
19   that the headache doctor, Dr. Kelley, did try to
20   withdraw him off of those medications, and it didn't
21   go very well.
22                So at least at this point in time
23   he's at -- he's taking the -- the narcotic pain
24   medications at least to some degree to control his
25   headaches as well.
0065
 1   Q.          Okay.  Dr. Kelley's treatment of him,
 2   she was trying to determine whether his -- he was
 3   suffering from a medication overuse headache
 4   syndrome?
 5   A.          Right.
 6   Q.          She believed that his headaches may be
 7   caused by his overuse of narcotics?
 8   A.          Right.
 9   Q.          And she tried to take him off of them
10   and it did not go well?
11   A.          Well, I made mention in my -- in my --
```

12    in my report here that -- that she even tried to use
13    what's called a bridging technique, which is a
14    pretty complicated technique.  So basically trying
15    to control inflammation with the use of prednisone
16    while trying to taper the patient off of those
17    medications.
18                    So she -- she followed the book,
19    you know, to try to accomplish that, but it didn't
20    seem to work.
21    Q.          Okay.  The narcotics can -- could be the
22    cause of his headaches?
23    A.          Well, are you asking me or are you
24    telling me?
25    Q.          Well, I'm -- Dr. Kelley had that
0066
 1    opinion, did she not?
 2    A.          Well, I made -- I made comment again
 3    that it -- that may or may not have been true;
 4    that's what I said in my note.  And the only way
 5    that you would know is if you try to withdraw them,
 6    and you see if the patient . . .
 7                    Most of the times that I've ever
 8    taken care of patients that have had medication
 9    overuse syndrome, you have to have a long discussion
10    with them and you really have to educate them about
11    what it is that might be happening, and then you
12    have to ask them, please, could you please try to
13    reduce these medications for two days, and we'll see
14    what happens.  And if you gained their confidence,
15    most times the patients will do that.
16                    And the times that I've been right
17    and the patient has had medication overuse headache,
18    they come in and say, Doctor, you were right.  When
19    I stopped doing that, I felt so much better.  It
20    almost -- that that's the way it goes.
21    Q.          Um-hum.
22    A.          Okay?  So if that's what Dr. Kelley did,
23    which I think she probably did, and -- and the
24    patient didn't come back and say that, then -- then
25    it wasn't medication overuse headache.
0067
 1                    So that's -- that's my answer --
 2    that's my long-winded answer to your short question.
 3    Q.          Okay.  The -- and the truth is you don't
 4    know what Dr. Kelley did or didn't do in that
 5    regard, do you?
 6    A.          Well, I know what I wrote.  I -- I know
 7    that she considered . . . the most important thing
 8    about medication overuse headache is that you
 9    consider it, that you consider it.  Okay?  And if

10    you consider it, then -- then you usually evaluate
11    that and determine whether or not the patient's
12    behavior is consistent with that.
13    Q.        Okay.  Well, can we agree on this, that
14    the --
15    A.        That the doctor did consis -- consider
16    it.
17    Q.        The doctor did consider it and that
18    the -- that medication overuse could be the reason
19    for his headaches?
20                  MR. HELMS:  I object to the form.
21    A.        Well, she -- she explored that, and it
22    didn't seem -- it didn't seem to make any difference
23    whether -- whether he stopped the medication or not
24    in regards to the headaches.  In other words, the
25    headaches didn't get any better, which would suggest
0068
 1    that it wasn't.
 2    Q.        Okay.  But again, overuse of medication,
 3    an overuse of narcotics could cause headaches?
 4    A.        True.  But an overuse of other
 5    medications, such as Motrin or Tylenol, could also
 6    cause headaches.
 7    Q.        Okay.  The overuse of narcotics could
 8    cause dizziness?
 9    A.        Again, there's a lot of evidence that
10    supports that patients that are tolerant of
11    narcotics don't suffer from dizziness, don't suffer
12    from vestibular abnormalities, but acute -- acute
13    high doses of narcotics in individuals who are
14    unused to them?  Certainly it could cause dizziness.
15    Q.        It could cause blurriness of their
16    vision?
17    A.        Yes.
18    Q.        In taking a history from Mr. Newcomb,
19    did he -- did he tell you or not tell you that he
20    had been involved in a motor vehicle accident back
21    in 2004 in which he received an injury to his -- the
22    left side of his head and to his left eye?
23    A.        No, he did not tell me that.
24    Q.        Would that -- because we're looking at
25    injuries to the left side of his head, would that be
0069
 1    important for you to know and to consider in giving
 2    your opinions?
 3    A.        Well, everything is -- more information
 4    is always better than less.
 5    Q.        One of your opinions is that he cannot
 6    return to being a commercial truck driver, correct?
 7    A.        That's my opinion.

```
 8    Q.            He can't drive?
 9    A.            I don't think he can drive safely, no.
10    Q.            Not a commercial truck or not a car?
11    A.            I don't think so.
12    Q.            Okay.  If he -- approximately six months
13    after he saw you if he drove from here in
14    Pennsylvania to South Georgia, which is a very long
15    drive, would it surprise you that he was able to
16    drive that far?
17    A.            If he drove from Pennsylvania to South
18    Georgia?
19    Q.            Yes, sir.
20    A.            Yeah, I'd be a little surprised.
21    Q.            Given his -- his dizziness and his
22    nausea and his vision and his hearing, that would
23    make it difficult for him to drive from Pennsylvania
24    to South Georgia?
25    A.            I wouldn't be surprised if it made it
0070
 1    difficult, yeah.
 2    Q.            Okay.  And if he were to be driving --
 3    or traveling from Pennsylvania to South Georgia --
 4    you met his wife, and the rest of his family, too,
 5    correct?
 6    A.            Right.
 7    Q.            His wife seemed able-bodied to you?
 8    A.            I think so, yeah.
 9    Q.            Any reason that you know why she would
10    not be able to make that drive; if the two of them
11    were in the car together that she would not be the
12    one behind the wheel?
13    A.            I have no idea why.
14    Q.            Okay.  You were hired in this case to
15    give an independent medical opinion.
16    A.            Right.
17    Q.            Have you -- did you -- are you aware
18    that a Dr. Rajjoub also prepared an independent
19    medical examination?
20    A.            No.
21    Q.            So you have not been able to review his
22    report?
23    A.            No.
24    Q.            Would that be helpful or beneficial to
25    you in reaching your opinions?
0071
 1    A.            Well, like I said, you know, more
 2    information is better; but in the world of legal
 3    stuff I've kind of stopped asking why I'm given some
 4    things and not given other things, so I just review
 5    what's given to me.
```

```
 6   Q.          And who was it that -- that hired you to
 7   perform this IME?
 8   A.          Attorney Donald Ligorio.
 9   Q.          And who did he represent?
10   A.          The patient.
11   Q.          Mr. Newcomb?
12   A.          Right.
13   Q.          Okay.  Were you aware that a Dr. Bennett
14   had also done an independent medical examina --
15   examination?
16   A.          Only because counsel told me that --
17   that Dr. Bennett did an IME, I don't know, however
18   long we've been here, an hour and a half ago.
19   Q.          Okay.  So I take it you haven't had an
20   opportunity to review his report either?
21   A.          No.
22   Q.          Okay.  And again, the more information
23   being the better, it would be helpful if you had
24   been given the opportunity to review Dr. Bennett's
25   report as well?
0072
 1   A.          What?  You mean -- you mean in
 2   preparation of this -- in preparation for this
 3   deposition?
 4   Q.          That, and also in making your opinions
 5   about Mr. Newcomb's conditions.
 6   A.          Well, I don't think that that -- was
 7   that deposition available at the time that I saw
 8   him?  I don't know.
 9   Q.          No, Dr. Bennett's was done after.  But
10   as far as your testimony today and your continued
11   opinions about Mr. Newcomb --
12   A.          Yeah, I mean I would -- I always prefer
13   to answer questions about things that I know about.
14   Fair enough?
15   Q.          Fair enough.
16   A.          Okay.
17   Q.          And at no time have you been
18   Mr. Newcomb's treating physician?
19   A.          No.
20   Q.          You were just asked to give opinions
21   about legal matters?
22   A.          Correct.
23   Q.          And as far as today, who -- who hired
24   you to be here for today?
25   A.          Counsel.
0073
 1   Q.          Okay.  And counsel, you're talking about
 2   Mr. -- Mr. Newcomb's attorney in this case?
 3   A.          Correct.
```

```
 4  Q.          And he is paying you for being here
 5  today?
 6  A.          That's correct.
 7  Q.          And paying you for -- did he pay you for
 8  the initial IME?
 9  A.          No.
10  Q.          How much were you paid by Mr. Newcomb's
11  first attorney for the initial IME?
12  A.          I think $1500.
13  Q.          Okay.  And how much are you being paid
14  to appear today to give this testimony?
15  A.          Well, a video deposition is more
16  expensive.  I hate to sound like an idiot, but, you
17  know, I don't exactly know.  I think it's . . .
18  $3500.
19                  MR. HELMS:  That's right.
20  A.          $3500.
21  Q.          Okay.  And Mr. Newcomb's attorney is
22  paying you to be here to give that opinion --
23  A.          Well --
24  Q.          -- $3500, correct?
25  A.          No.  Mr. Newcomb's attorney has paid me
0074
 1  to come in here and answer questions that are being
 2  asked about the case.
 3  Q.          Okay.  And he's paid you $3500 for that?
 4  A.          He has paid me $3500 to sit here for an
 5  hour and a half and get grilled, correct.
 6  Q.          Okay.  That is all the questions I --
 7  oh, one last question.
 8                  Again, the injury to Mr. Newcomb
 9  that you observed the scars on and for which you
10  reviewed the records was on the left side of his
11  head?
12  A.          Correct.
13                  MR. PICKETT:  That's all I have.
14  Thank you.
15                       * * *
16                  REDIRECT EXAMINATION
17  BY MR. HELMS:
18  Q.          A couple follow-up questions, Doctor.
19                  Obviously Mr. Newcomb is not a
20  medical doctor himself; is that right?
21  A.          Correct.
22  Q.          So when he was explaining to you what
23  Dr. Azeredo did, he was just telling you based on
24  what he understands as a layperson happened; is that
25  right?
0075
 1  A.          Well, I mean that's so true.
```

```
 2   Q.          Yeah.
 3   A.          I mean I had a patient once that came in
 4   and told me that he had his fish gill removed from
 5   his neck, a fish gill.  And what was amazing about
 6   that was that he just said it like that and went on
 7   to the next subject; and I kind of was thinking,
 8   what the heck is a fish gill?
 9                    But he -- in other words, the
10   point is he didn't care what it was; he just was
11   happy that it was taken out.
12   Q.          Yeah.
13   A.          So yeah.
14   Q.          And you've read the operative report
15   that Dr. Azeredo did to fix the leak, didn't you?
16   A.          Yes.
17   Q.          Yeah.  On a scale of 1 to 10, how
18   serious was that surgery?
19   A.          Well, like I described it, it's very
20   complex, very complicated.  In fact it took two
21   surgeons, didn't it?
22   Q.          Yes.
23   A.          Yes, it took two surgeons.
24                    MR. PICKETT:  I'm going to object
25   to counsel answering the question.
0076
 1   A.          Well, I know it took two surgeons.
 2   Q.          Yeah.
 3   A.          There was an ENT surgeon and there was a
 4   brain surgeon involved in it.  So that's a lot of
 5   surgery for a very small area.
 6   Q.          Any time you operate on the brain,
 7   that's a pretty delicate matter, isn't it?
 8   A.          I would say so.
 9   Q.          Yeah.  Is a tegmen, have you heard that?
10   That bone in the inner ear or inside the skull?
11   A.          I'm not really familiar with that, with
12   that term as a bone, but -- because some of the
13   bones have different names.
14   Q.          Yeah.
15   A.          You could call something the occipital
16   bone, you could call it the basilar bone.  So I'm
17   not really sure what bone they're referring to.
18   Q.          Yeah.  But you read in the operative
19   report whether or not that bone was actually broken,
20   fractured?
21   A.          Yeah, and I don't have the operative
22   report --
23   Q.          Yeah.
24   A.          -- in front of me.  If somebody wanted
25   to provide me, I could -- I could, you know, dissect
```

0077
1   that a little bit more.  But from what I read, the
2   important point was is that there was fluid that was
3   getting into the inner ear canal, which comes
4   through a crack in the bone, and there was a tear of
5   the dura that was frayed.  Frayed, f-r-a-y-e-d.
6   Q.          Somebody who had a visual convergence I
7   think you said of what?  Twenty-five inches; is that
8   right?
9   A.          Yes.
10  Q.          Could somebody like that be driving an
11  18-wheeler tractor-trailer up and down the road with
12  a -- with just a pair of corrective glasses --
13  A.          No.
14  Q.          -- backing it up?
15  A.          No.
16  Q.          Okay.  They physically wouldn't be able
17  to do that in your opinion?
18  A.          It would be impossible.
19  Q.          Yeah.  Is that -- if Mr. Newcomb had
20  been driving an 18-wheeler for 30 years before this
21  incident right here, would that seem to indicate to
22  you that he didn't have this visual convergence
23  before this incident?
24  A.          It would be highly unlikely that --
25  Q.          Yeah.
0078
1   A.          -- he would have this abnormality.
2   Q.          Right.
3                Now, there was also a lot of
4   questions about, well, Mr. Newcomb, did you fly
5   through the air, go through the air 3 feet, 4 feet,
6   11 feet, 15 feet?
7                What did you understand that
8   Mr. Newcomb's head struck when he did get hit and
9   his head hit something as a result of this forklift
10  hitting him?  What did you understand his head
11  struck?
12  A.          Mr. Newcomb's head struck the -- the
13  reinforced rear entry to the trailer.  And I --
14  Q.          Is that significant to you?
15  A.          Yeah, that is significant.
16  Q.          Why is that?
17  A.          Well, it's significant because in my
18  experience I have seen bad concussions and bad
19  traumatic brain injuries when -- when patients hit
20  the doorframes of doors, and -- and I have come to
21  believe that the reason why that is is because the
22  doorframes are reinforced, and doorframes when
23  they're reinforced recoil less to their hit.

```
24                    So in other words, what takes the
25      hit is the head and the brain, not the -- not the --
0079
 1      not the door or not the object that they're hitting.
 2                    And so in this -- in this truck
 3      the door is attached to this -- to the side of
 4      the -- of the trailer, and that side of the trailer
 5      at that point, in that location is reinforced so
 6      that the door doesn't -- doesn't move up and down or
 7      wiggle.  And so where he hit I believe was
 8      reinforced and very sturdy, and I think that that
 9      impacted upon the severity of his injury.
10      Q.         Yeah.  Have you seen that in the course
11      of your practice treating people with brain
12      injuries, that somebody that hits their head on a
13      doorframe suffers a more serious head injury?
14      A.         Yes, I have.
15      Q.         So in the -- at the end of the day
16      whether he flew through 15 feet or 3 feet or 4 feet
17      or 6 feet doesn't matter to you just as far as your
18      diagnosis --
19                    MR. PICKETT:  Objection, leading.
20      Q.         -- and opinions.
21      A.         Can I answer?
22      Q.         Yes.
23      A.         Well, your point is -- is very well
24      taken.  The importance of -- well, what's important
25      in a concussion is not acceleration; it's
0080
 1      deceleration, it's how quickly you decelerate.  So
 2      when he strikes this object, (descriptive gesture)
 3      he decelerates very, very quickly, and that's what
 4      imparts the force on the brain.
 5      Q.         You read Dr. Kelley's reports from
 6      Geisinger.  She was a neurologist I think?
 7      A.         Yes.
 8      Q.         Yeah.  And based on what you know about
 9      protocols for trying to help somebody who's
10      suffering from headaches due to narcotics, in your
11      opinion, based on what you discussed with
12      Mr. Newcomb also, were the narcotics causing his
13      continuous headaches in this case?
14      A.         It was my impression that they weren't
15      causing his headaches.  The intensity of the
16      headaches seemed to be of such a degree that -- that
17      he didn't think that he could tolerate being off of
18      the pain medications.
19      Q.         And is that the accepted protocol to
20      follow in a situation like that, to wean him off
21      narcotics to see if the -- they're causing
```

22  headaches?
23  A.          Yeah.
24                    MR. PICKETT:  Object to the
25  leading.
0081
 1  Q.          Yeah, you can go ahead and answer.
 2  A.          I try not to put patients on narcotics,
 3  but the truth of the matter is, is that I do have
 4  some headache patients that are on narcotics, and
 5  sometimes that's all -- the only thing that will
 6  work.
 7  Q.          A couple more questions.  We talked
 8  about this, an injury he had to his head back in
 9  2004.  It was actually to his forehead and had some
10  stitches in there.
11                    Assuming that this resolved, he
12  had some dizziness or headaches from that particular
13  injury and it resolved within a period of less than
14  six months, is that significant to you in your
15  formulation of your opinions in this particular
16  case, an injury that occurred back in 2004?
17  A.          Well, it's significant in the sense that
18  it occurred nine years ago.  So experience of
19  multiple concussions is not good.  If the guy did
20  suffer from a concussion at that point in time, that
21  could be harmful.
22                    But what we do know about
23  concussions is that it's not necessarily the number
24  of concussions that you suffer, it's the fre -- it's
25  the rapidity with which you suffer them.  In other
0082
 1  words, if you suffered three concussions over ten
 2  years, that's significantly better than if you
 3  suffered from three concussions over a one -- one
 4  football season.  Okay?  So -- so when you have
 5  those concussions that occur quickly without
 6  allowing the brain to fully recover, that's where
 7  you get cumulative trauma.
 8                    So in answer to your question, I
 9  think that if he had -- even if he had suffered a
10  concussion in 2006 was it?
11  Q.          Four.
12  A.          Four.  I'm sorry, 2004.  Even if he had
13  suffered that, it appeared as though he had
14  recovered and had no additional sequelae or side
15  effects from that.
16  Q.          Would you assume if he was an
17  over-the-road 18-wheeler truck driver for that
18  period between 2004 until the time he suffered this
19  injury, in your opinion would he have recovered from

```
20    that, whatever happened to him when he got hit in
21    the head back in 2004?
22    A.        Yes.
23                MR. PICKETT:  Objection to
24    leading.
25    Q.        Okay.  A couple more questions and we'll
0083
 1    be gone.  In your opinion are the narcotics causing
 2    him his dizziness?
 3    A.        No.
 4    Q.        Are the narcotics causing him his
 5    blurred vision?
 6    A.        No.  Well, I mean in answer to that.
 7    Q.        Yeah.
 8    A.        His blurred vision, he has blurred
 9    vision in his left eye; so it would be real hard to
10    have the narcotics cause unilateral blurry vision.
11    Q.        You were asked about the opinions of two
12    doctors who were, by the way, hired by opposing
13    counsel in the earlier case to form opinions; and
14    you haven't had a chance to review those reports,
15    but does --
16                MR. PICKETT:  I'm going to object
17    to the facts not in evidence.
18                MR. HELMS:  Okay.
19                MR. PICKETT:  I'll let you finish
20    the question before I object any more.
21                MR. HELMS:  Yeah, I think . . .
22    BY MR. HELMS:
23    Q.        Nevertheless, whatever those two doctors
24    had to say, does that in any way change your
25    ultimate opinions based on your review of the
0084
 1    records, your examination of Mr. Newcomb, and your
 2    training and education as a rehabilitation
 3    specialist?
 4    A.        No.
 5                MR. PICKETT:  I'm going to object
 6    to leading as well.
 7    Q.        Do those -- do those opinions -- and let
 8    me ask it again to try to assuage my opposing
 9    counsel's heartburn on this question.
10                The opposing counsel asked you
11    about a couple of opinions by other doctors who did
12    their evaluation of Mr. Newcomb; is that right?  You
13    remember that?
14    A.        Right.
15    Q.        Yeah.  You haven't had a chance to
16    review those records?
17    A.        Well, you keep saying like I haven't had
```

```
18   a chance.
19   Q.          Yeah.
20   A.          Nobody gave them to me.
21   Q.          I -- granted, granted.  They were not
22   provided to you; is that right?
23   A.          Correct.
24   Q.          Got it.  But -- and again in the long
25   run as -- as you speak to this jury, what those
0085
 1   records say, does that in any way change your
 2   opinions that you've written in your report and the
 3   opinions you've given here today?
 4   A.          I'm going to give you the same answer I
 5   gave --
 6   Q.          Yeah.
 7   A.          -- the other attorney, which is that I
 8   don't like answering questions about things that I
 9   don't know about.
10   Q.          Um-hum.
11   A.          But my humble experience with regards to
12   traumatic brain injuries, and I've seen a lot of
13   traumatic brain injuries that have been pooh-poohed,
14   if that's a medical term, by other doctors, and when
15   I've read their other reports, I haven't seen them
16   perform the same examinations that I've performed.
17   Q.          Yeah.
18   A.          And so they come to conclusions
19   oftentimes with -- with data that I believe is
20   incomplete, because I don't believe that the
21   physical examination tests the same things that I'm
22   looking at.
23   Q.          So it could be possible these doctors
24   didn't do any of the tests that you've been trained
25   to do as a specialist in this field?
0086
 1   A.          Well, it's possible --
 2               MR. PICKETT:  Object to leading.
 3   A.          -- and that's what I've seen --
 4   Q.          Yeah.
 5   A.          -- in other cases.
 6               MR. HELMS:  Okay.  Doctor, I've
 7   grilled you enough today I think.  Mr. Pickett might
 8   have some follow-up questions for you.
 9                         * * *
10               RECROSS EXAMINATION
11   BY MR. PICKETT:
12   Q.          I have just a couple.
13   A.          Okay.
14   Q.          You've referenced a couple of times
15   sports concussions, which we all heard -- all heard
```

```
16   a lot about lately.  There was a movie about it that
17   came out a couple years ago.  It's a -- it's a big
18   topic.
19                   With those sports concussions, the
20   problem is again not enough time to heal in between
21   them; is that -- that's generally the problem?
22   A.          That's one of the problems, abso --
23   Q.          Okay.
24   A.          Yeah, absolutely.
25   Q.          All right.  That presupposes that there
0087
 1   is a healing that occurs after a concussion.
 2   A.          Correct.
 3   Q.          Is -- when we talk about traumatic brain
 4   injuries, the word "traumatic" in that sense is that
 5   there was some trauma, some physical impact with the
 6   head that caused the injury, correct?
 7   A.          Yes.
 8   Q.          It doesn't have to do with how severe
 9   the brain injury was or how permanent it may be?
10   A.          You mean the term "TBI"?
11   Q.          Yes, sir.
12   A.          So concussion equals MTBI or mild
13   traumatic brain injury.  So correct.  The -- I think
14   we could argue that this patient didn't suffer an
15   MTBI, he suffered a moderate traumatic brain injury.
16   Q.          Okay.  More -- more -- a more severe
17   concussion?
18   A.          More severe than just a -- than just a
19   concussion --
20   Q.          Okay.
21   A.          -- yeah.
22   Q.          And the mechanism by which he
23   encountered that would be important for you to
24   understand in determining if it was mild or
25   moderate, the amount of impact that he had?
0088
 1   A.          I've -- I've always believed that that's
 2   true, yes.
 3   Q.          And we talked about how doorframes don't
 4   bend and metal bends even less, and if he flew
 5   through the air 10 to 15 feet, he would have a more
 6   significant impact than if he simply slipped and
 7   fell and hit his head, correct?
 8   A.          You would think it would take more force
 9   to throw someone through the air, sure.
10   Q.          Okay.  So you would think that the
11   amount of force that his head suffered would be
12   greater in that circumstance, correct?
13   A.          Possibly, but -- possibly but not -- but
```

14   I can tell you that I can't say for sure.  Because
15   we -- we have done lots of research looking at --
16   at -- you know, you've heard I'm sure about football
17   and, you know, they want to put little lights on
18   helmets that -- that will blink if a person has
19   sustained a -- a certain G force.
20   Q.         Um-hum.
21   A.         Okay?  Well, the -- the threshold at
22   this point in time that we think is necessary to
23   sustain a concussion injury is 60 Gs.  But if you
24   look at the data, you know, on people who have
25   helmets that get hit and they suffer a concussion,
0089
 1   unfortunately it makes a difference whether or not
 2   the blow is linear, in other words straight on or
 3   straight to the side, or whether there's a rotatory
 4   component, and -- and those things confound it.
 5                 So it makes it hard to say, you
 6   know, specifically that, you know, X force equals
 7   concussion, because it has a lot to do with the
 8   trajectory, it has a lot to do with the rotation, it
 9   has to do with how the brain is rotating inside of
10   the skull.  So those -- those factors are as of yet
11   unknown.
12   Q.         Would you expect that someone who
13   slipped -- I'll strike that question.
14                 Overall with concussions and
15   traumatic brain injuries, those are injuries to the
16   brain that were caused by some trauma, some impact
17   that the head suffered?  That's what we're talking
18   about as far as traumatic, correct?
19   A.         Yes, but that's -- if you look at the
20   CDC's definition of -- of concussion or mild
21   traumatic brain injury, they state in the CDC -- at
22   the CDC website they state that -- that a concussion
23   can occur with a blow to the body.
24   Q.         Okay.
25   A.         All right?  So you don't necessarily
0090
 1   have to hit the head.
 2   Q.         Okay.  But there's some impact that the
 3   body or the head has suffered, and that's -- when we
 4   talk about traumatic, that's the traumas that we're
 5   talking about?
 6   A.         Yes.
 7   Q.         Okay.  And those injuries are expected
 8   the brain will heal over time?
 9   A.         Yes.
10   Q.         Okay.  And so in an injury like
11   Mr. Newcomb has, it's one that we would expect would

12  heal over time?
13  A.          That's true, but -- but the issue with
14  regards to functional recovery may have less to do
15  with healing and it may have more to do with
16  rehabilitation.
17                In other words, perhaps the nerves
18  are healed, but the nerves are untrained.  And
19  that's what I was saying to you that -- you know,
20  that we take it for granted our abilities to do the
21  different things that we do because we perfected
22  them when we were babies.
23                And so in this individual, he may
24  be able to -- to show significant improvement if he
25  was able to participate in the appropriate training
0091
 1  programs to help reactivate those neural -- those
 2  neural circuits.
 3  Q.          And that would be physical therapy
 4  essentially?
 5  A.          Physical therapy, balance therapy,
 6  vestibular therapy, and visual therapy as I've
 7  mentioned, yes.
 8  Q.          And do you know if he's participated in
 9  any of those sort of things?
10  A.          I don't think he has.
11  Q.          Okay.  Final thing.  You said that if he
12  had had visual convergence, it would make it
13  unlikely he would be able to operate an eight -- to
14  drive an 18-wheeler?
15  A.          Uh, yes.
16  Q.          Okay.  Is there anything different about
17  him being able to drive a car with visual
18  convergence as opposed to an 18-wheeler?
19  A.          No.
20  Q.          He wouldn't be able to operate either
21  one of them?
22  A.          I agree.
23                MR. PICKETT:  Okay.  That's all I
24  have.
25                      * * *
0092
 1                REDIRECT EXAMINATION
 2  BY MR. HELMS:
 3  Q.          You've had patients who drive against
 4  doctor's orders; is that right?
 5  A.          Patients do whatever they want.
 6  Q.          Yeah.  Given Mr. Newcomb and based on
 7  your discussions with him and evaluation as a
 8  person, did he seem pretty headstrong type kind of
 9  guy?

```
10  A.          Yeah, he did.
11  Q.          In your opinion -- and you talked about
12  the Waddell's test.  Did you come to the conclusion
13  or the opinion that Mr. Newcomb is a man who would
14  rather be at work than be disabled?
15                  MR. PICKETT:  Objection to
16  leading.
17  Q.          What is your opinion about
18  Mr. Newcomb's, based on your examination and review
19  of him and that?
20  A.          I think that -- I think that
21  Mr. Newcomb's family wished that he would go to
22  work.
23  Q.          Yeah.
24  A.          That's what I think.  I think that he's
25  a bear, that's -- that's what I think, and I think
0093
 1  that they wish he had somewhere that he could ex --
 2  you know, kind of release his -- his frustration.
 3  Q.          Himself did he relate to you that he
 4  would prefer to return to work as opposed to being
 5  disabled?
 6  A.          Absolutely.
 7                  MR. HELMS:  Yeah.  All right.
 8  Thank you, Doctor.  Okay.
 9                  THE VIDEOGRAPHER:  The time is
10  5:49.  That concludes this video deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0094
 1
 2
 3
 4                          _____, 2017
 5
 6
 7              I hereby certify that the evidence
```

8  and proceedings are contained fully and accurately
9  in the notes taken by me of the testimony of the
10 within witness who was duly sworn by me, and that
11 this is a correct transcript of the same.

12
13
14
15                    _____
                      Steven R. Mack
16                    Registered Merit Reporter
                      Certified Realtime Reporter
17                    Notary Public
18
19
20
21
22
23
24
25