**Deposition of Willie Morman, taken on 7/6/2016**
**courtreporter@mixonreportingservice.com**

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF GEORGIA
2                     ALBANY DIVISION
3    MICHAEL NEWCOMB and KATHY    )
     NEWCOMB,                     )
4                                 )
                     Plaintiffs, )
5                                 ) Civil Action File
          vs.                     )
6                                 ) No. 1:15-CV-00080-LJA
     SPRING CREEK COOLER, INC.;   )
7    SPRING CREEK PRODUCE, LLC;   )
     SF FARMS, INC.; SF EXPORTS,  )
8    INC.; T & L FARMS, INC.;     )
     TERRIL SCOTT PROPERTIES,     )
9    LLC; TERRIL SCOTT FARMS,     )
     LLC; WALDINE B. SCOTT FARMS,)
10   LLC; EDDIE T. SCOTT FARMS,   )
     LLC; T S EQUIPMENT LEASING,  )
11   LLC; L & W FARMS, LP; TERRIL)
     SCOTT; and JOHN DOE, Name    )
12   Unknown, Address Unknown,    )
                                  )
13                   Defendants. )
14   -----------------------------------------------------
15
16              Videotaped Deposition of WILLIAM JAMES
17   MOORMAN, called by the Plaintiffs, taken pursuant to
18   the Federal Rules of Civil Procedure, was reported
19   by Debbie Paulk Mixon, Certified Court Reporter,
20   Registered Professional Reporter, Certified Realtime
21   Reporter, and Notary Public, at the offices of
22   Gardner, Willis, Sweat & Handelman, LLP, Albany,
23   Georgia, commencing at approximately 12:45 p.m. on
24   the 6th day of July 2016 and concluded on the same
25   date.
```

1

**Deposition of Willie Morman, taken on 7/6/2016**
courtreporter@mixonreportingservice.com

```
 1                  A P P E A R A N C E S
 2
     For the Plaintiffs,
 3   MICHAEL NEWCOMB and KATHY NEWCOMB:
 4                      J. JEFFERY HELMS, Esquire
                        JAMES E. DOUGLAS, JR., Esquire
 5                      The Helms Law Firm, P.C.
                        10 North College Street
 6                      P.O. Box 537
                        Homerville, Georgia  31634
 7
     For the Defendants,
 8   SPRING CREEK COOLER, INC.; SPRING CREEK PRODUCE,
     LLC; SF FARMS, INC.; SF EXPORTS, INC.;T & L FARMS,
 9   INC.; TERRIL SCOTT PROPERTIES, LLC; TERRIL SCOTT
     FARMS, LLC; WALDINE B. SCOTT FARMS, LLC; EDDIE T.
10   SCOTT FARMS, LLC; T S EQUIPMENT LEASING, LLC; L & W
     FARMS, LP; TERRIL SCOTT; and JOHN DOE, Name Unknown,
11   Address Unknown:
12                      MARK PICKETT, Esquire
                        Gardner, Willis, Sweat & Handelman
13                      P.O. Drawer 71788
                        2408 Westover Boulevard
14                      Albany, Georgia  31708-1788
15
16   Also Present:  Mr. Jimmy Mixon, Videographer
17   -----------------------------------------------------
18   PRELIMINARIES:
19                 (Disclosure submitted to all counsel.)
20                      MR. DOUGLAS:  This will be for --
21                      MR. HELMS:  Same.
22                      MR. DOUGLAS:  Same?
23                      MR. PICKETT:  Yeah, same stipulations
24   as the last one.
25                      MR. DOUGLAS:  Okay.
```

1                    MR. HELMS:  And same issue about -- I

2      mean, he lives down in Belle Glade, so --

3                    MR. DOUGLAS:  But you're --

4                    MR. PICKETT:  We'll intend to either

5      have him here for trial or we'll go down and take

6      him for use.

7                    MR. DOUGLAS:  All right.  And

8      reserving objections except to the form and --

9                    MR. PICKETT:  And responsiveness,

10     yes.

11                   MR. DOUGLAS:  -- responsiveness?

12     Okay.

13                   MR. HELMS:  Just to be clear, I'm not

14     trying to be -- we're still going to maintain that

15     we can use this for trial if he's unavailable.

16     We're not agreeing that it's --

17                   MR. PICKETT:  Well, I'm not agreeing

18     that he's unavailable.

19                   MR. HELMS:  Yeah, I know.

20                   MR. PICKETT:  I would maintain that

21     if we can go to Florida and take his deposition,

22     he's not unavailable.  We weren't noticed this is to

23     be a for-use deposition, so we weren't prepared to

24     come and, you know, examine him.  But I --

25                   MR. HELMS:  The notice says for all

1    purposes allowed, so --

2                    MR. PICKETT:  I understand.  But at

3    this juncture, he is not unavailable, nor do we

4    anticipate that he will be.  I mean, if he were to

5    decease or something like that where it would become

6    impossible for us to take a for-use deposition, then

7    I think I'd have little to say to you using it.  But

8    other than that, I don't think -- I don't anticipate

9    that he will be unavailable.  And I would -- we were

10   going to go to -- we're going to go to Pennsylvania

11   and take doctors' depositions for use?  And part of

12   this is going to depend on the trial schedule.  But

13   if, based on trial schedule, we need to go to

14   Florida, I would want to go to Florida to take his

15   deposition for use at trial.

16                    MR. HELMS:  We're going to agree to

17   disagree.

18                    MR. PICKETT:  We will deal with it

19   later, then.

20                    MR. HELMS:  Yeah.  The notice stands,

21   his objection stands.  Whatever we've got to say,

22   we're going to proceed.  We're just not waiving

23   anything, is the point I'm trying to make.  I trust

24   you, but I'm just not acquiescing to what you're

25   saying.

1                    MR. PICKETT:  The only thing I'll say

2      about that is --

3                    MR. HELMS:  Yeah.

4                    MR. PICKETT:  -- if we are -- I'll

5      either need to, within the discovery period, which

6      at this point expires in September, subject to some

7      extension, which we may need, anyway, I'll either

8      need to schedule his deposition for use in Florida

9      or we'll need to agree that if he cannot be present

10     for trial, we would go take it before the trial.

11     And you don't need to answer that right now.  We can

12     think about it.

13                   MR. HELMS:  Yeah.  I'm not going to

14     agree with it because that's not how I read the

15     federal rules.  But I could be wrong, because I've

16     been wrong in the past.  Well --

17                   MR. PICKETT:  I think I'm entitled to

18     take it for use.  I don't think you could preclude

19     that.

20                   MR. HELMS:  If you want to take it

21     for use, and we're having an intellectual discussion

22     here, I still don't think that precludes me from

23     using any portion of this deposition here today,

24     because he lives outside the 100-mile radius of this

25     court.

1           MR. PICKETT:  Well, you can use it
2    for cross-examination if he appears live at trial.
3    You could do the same with it at a for-use
4    deposition.  I mean, it doesn't stop you from using
5    it for that purpose.
6           MR. HELMS:  That's true.
7           MR. PICKETT:  But as far as this
8    standing as his trial testimony, I want to have the
9    right to be able to examine him as well.  And I
10   see -- I see three ways that can happen.  One is I
11   do it today totally unprepared, which doesn't seem
12   fair; two, we schedule his deposition to be taken
13   where we both are aware that's what it's going to be
14   for, in Florida; or three, he appears live for
15   trial.  And I anticipate he would be able to come
16   live for trial.  I anticipate bringing him live for
17   trial.  But the only thing is I'd want to
18   have some -- before I just let the discovery period
19   lapse and don't take it for use, I'd want to have
20   some agreement that if that were not possible, we
21   would go take it outside the discovery period.
22          MR. HELMS:  Okay.  We've made our
23   positions clear.  I don't expect you to agree with
24   me, and you don't expect me to agree with you right
25   now.  We're just going to proceed.  And you've

1    entered it up, and that's fine.

2                    MR. PICKETT:  Okay.

3                    MR. HELMS:  Yeah.

4                    MR. PICKETT:  Well, I just -- I mean,

5    the only thing I'm saying, while we're here on the

6    record is I need to know and if I -- you know,

7    within, let's say, the next ten days if we can do

8    that.  If not, I need to go ahead and schedule it.

9                    MR. HELMS:  Well, it kind of puts me

10   in a difficult position, because how do I know he

11   won't be here for trial?

12                   MR. PICKETT:  Well, here's -- I don't

13   want to go to the inefficiency of taking it in

14   Florida if --

15                   MR. HELMS:  Uh-huh (positive

16   response).

17                   MR. PICKETT:  -- we don't need to.

18                   MR. HELMS:  Uh-huh (positive

19   response).

20                   MR. PICKETT:  And I don't think we'll

21   need to.  I think he'll be here for trial.  What I'm

22   asking is that we have an agreement that in the

23   event we get down to the eve of trial -- or not the

24   eve of trial but within, say, the pretrial or

25   something like that and it's obvious I can't get him

1   here for whatever the trial date is, when the trial

2   is set, that we'll agree that we'll go to Florida

3   and take it for use.

4                    MR. HELMS:  Okay.  Let me consider

5   that.

6                    MR. PICKETT:  Okay.  And I

7   understand.  You don't have to agree to it.  And if

8   you don't agree to it, then I'm going to have to

9   protect my interest --

10                    MR. HELMS:  Sure.

11                    MR. PICKETT:  -- with my client,

12   schedule it for Florida during the discovery period.

13   Does that make any sense?

14                    MR. HELMS:  As much as it needs to

15   right now.

16                    MR. PICKETT:  Okay.  I'm just saying

17   in the rare event we can't get him here for trial,

18   if you'll agree that we can go take it in Florida

19   then, I'll let it go.  But if we can't agree to

20   that, you can go ahead and take it.  So take ten

21   days, let me know.

22                    MR. HELMS:  We'll talk about it.

23                    MR. PICKETT:  Okay.

24                    MR. HELMS:  Okay?  Thanks.

25   (Videotaping Started)

8

1                        WILLIE JAMES MOORMAN

2     having been first duly sworn, was examined and

3     testified as follows:

4                        EXAMINATION

5                        BY:  MR. DOUGLAS

6          Q.     All right.  Mr. Moorman, my name is Jed

7     Douglas.  We met very briefly right before we went

8     on camera here.  I'll be taking your deposition

9     today.  And I wanted to go over just a few ground

10    rules about the deposition.  And I may be going over

11    things you talked about with Mr. Pickett, but I just

12    want to get them on the record.  Okay?

13         A.     (Witness nods head affirmatively.)

14         Q.     All right.  First -- and we're on

15    camera, so that's good.  But for the purposes here,

16    we'll need you to answer aloud whenever I give you a

17    question.  Okay?

18         A.     Yes, sir.

19         Q.     All right.  And that's so the court

20    reporter here can make sure she gets an oral answer,

21    she hears it and can type it down.  Okay?

22         A.     Yes, sir.

23         Q.     All right.  And the other thing is --

24    and you're doing good -- you say yes and make sure

25    that you give answers like yes, no.  Try not to say

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    uh-huh and huh-uh.  Okay?

2          A.      Yes, sir.

3          Q.      All right.  Again, for her purposes and

4    just -- let's try to not talk over each other.

5    Okay?

6          A.      Yes, sir.

7          Q.      So I'll -- let me finish a question, and

8    I'll let you finish your answer.  Okay?

9          A.      Yes, sir.

10         Q.      Sound good?

11         A.      Yeah.

12         Q.      All right.  And the other thing is:  If

13   you need to take a break, I don't think we're going

14   to be here too long, but if you need to take a

15   break, just let me know and finish whatever answer

16   you're giving or answer the question I've asked.

17   And if you need to go to the restroom or something,

18   that's okay, too.  Okay?

19         A.      Yes, sir.

20         Q.      Just let me know.  All right.  For the

21   record, can you state your full name.

22         A.      My full name is Willie James Moorman.

23         Q.      Okay.  And Moorman, can you spell that

24   for me?

25         A.      M-O-R-M-A-N.

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1      Q.      Okay.  There's just one O?

2      A.      No.  It probably is two O's.  But I

3   don't -- we always spell it with one O.

4      Q.      Okay.  All right.  Well, do you know

5   what it is on your driver's license?  Is it one?

6      A.      It's two O's.

7      Q.      It's two O's.  Okay.  All right.  All

8   right.  How old are you?

9      A.      Sixty-six.

10     Q.      All right.  And what's your home

11  address?

12     A.      1001 Northeast 1st Street, Belle Glade,

13  Florida.  ZIP code is 33430.

14     Q.      All right.  And who lives there with

15  you?

16     A.      Well -- well, my ex lives there.

17     Q.      Okay.

18     A.      But, see, what it is, that is my mailing

19  address.

20     Q.      Okay.

21     A.      I really don't live there.  But that's

22  where all my mail comes to --

23     Q.      Okay.

24     A.      -- comes to her house.

25     Q.      Okay.

1        A.      That's her house.

2        Q.      So that's your ex-wife --

3        A.      Yeah.

4        Q.      -- or girlfriend?

5        A.      No.  Ex-wife.

6        Q.      Okay.  All right.  Well, where do you

7   live, then?

8        A.      316 Southwest 3rd Street.

9        Q.      Okay.  You live on -- sorry.  Say that

10   again?

11        A.      3--

12        Q.      Okay.

13        A.      --16 Southwest --

14        Q.      Oh, okay.

15        A.      -- 3rd Street.  See, that's where I

16   live.  But I get all my mail to her house.

17        Q.      I got you.  I understand.  It can be

18   kind of a pain to get all your mail transferred

19   somewhere else, can't it?

20        A.      No.  See, I don't have to worry about

21   nobody messing with it when it comes there.

22        Q.      Oh, is that right?

23        A.      Yeah.

24        Q.      Okay.  Okay.  All right.  All right.

25   Well, at this 3rd Street, who lives there with you?

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
1          A.      Nobody.

2          Q.      Just you?

3          A.      Yes.

4          Q.      All right.  Got any children?

5          A.      Well, I got two boys, and I got two

6    adopted --

7          Q.      Okay.

8          A.      -- girls.

9          Q.      Are they all grown, over 18?

10         A.      All but one.

11         Q.      Okay.  Okay.

12         A.      Destiny, she 10.

13         Q.      Okay.  All right.  And how long have you

14   lived at that 3rd Street address?

15         A.      About 20 years.

16         Q.      Oh, okay.  Okay.  So your ex, y'all have

17   been separated for a long time, then?

18         A.      About 40 years.

19         Q.      Well, you've been separated -- you were

20   married to her --

21         A.      Yeah.

22         Q.      -- for a long time?

23         A.      Yeah.

24         Q.      Okay.

25         A.      And we got a -- then, you know, we broke
```

13

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
 1    up.
 2         Q.    Okay.
 3         A.    Then we got a divorce.  But I still goes
 4    around there.
 5         Q.    Okay.
 6         A.    I eat around there, and I wash my
 7    clothes.  She do everything for me.  I just don't
 8    sleep around there.
 9         Q.    Okay.  All right.  Well --
10              MR. HELMS:  That's a pretty good
11    arrangement.
12         Q.    That's not bad.  You can go home and
13    sleep alone, huh?
14         A.    Uh-huh (positive response).
15              MR. HELMS:  She does your clothes and
16    cooks for you --
17              THE WITNESS:  Yeah.
18              MR. HELMS:  -- and you don't even
19    have to live there.
20              THE WITNESS:  I just don't live
21    there.
22              MR. HELMS:  That's all right.  That's
23    pretty good.
24         Q.    Now, do you have any family in southwest
25    Georgia?
```

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1        A.      Well, I got some cousins --

2        Q.      Okay.

3        A.      -- over there in Wrightsville, Georgia.

4        Q.      Okay.  Where is that?

5        A.      That's over there by Dublin.

6        Q.      Oh, okay.  All right.  I know where

7   you're talking about.  But like near Albany --

8        A.      No.

9        Q.      -- near here, you got any family?

10       A.      Not as I know of.

11       Q.      Near Bainbridge?

12       A.      No, huh-uh (negative response).

13       Q.      Brinson, up where the Spring Creek

14   office is, you don't know of any family up that way?

15       A.      No.

16       Q.      All right.  When you're -- how long have

17   you been working with Spring Creek?

18       A.      Well, I bought that truck in 1005 (sic).

19   And so let's see.  I started working there in

20   1005 (sic) --

21       Q.      Okay.

22       A.      -- till now.

23       Q.      Okay.

24       A.      So that's -- what is it, 16 years, 11

25   years?

1      Q.    About 11 years?

2      A.    Yeah, 11 years.

3      Q.    About 11 years?  Now, do you work -- how

4  often do you work with Spring Creek?

5      A.    Well, I come up here in the spring -- in

6  the -- in the -- in the spring --

7      Q.    Okay.

8      A.    -- in June.

9      Q.    Okay.

10     A.    And I work until July.  Then I come back

11  up here in October, and I work till November.

12     Q.    Okay.

13     A.    Then I go back to Belle Glade.

14     Q.    All right.  So you work the summer corn

15  crop; is that right?

16     A.    And the fall crop.

17     Q.    And then the fall crops?

18     A.    Yes.

19     Q.    Okay.  When you're up here, or I say

20  here.  But really I'm talking about over at the

21  farm.

22     A.    Uh-huh (positive response).

23     Q.    When you're up that way, where do you

24  stay?

25     A.    Well, I stay in the apartments, motel on

16

1    Highway 27.

2        Q.    Okay.  And who pays for that?

3        A.    They pay for it.

4        Q.    They pay for it?  All right.  And just

5    so I know, I mean, you've been coming up here about

6    11 years.  And I know you don't live there.  But do

7    you -- do you ever go to church out that way?

8        A.    No.

9        Q.    Okay.  A part of any clubs over there or

10   anything like that?

11       A.    No.

12       Q.    Okay.  You just go and work?

13       A.    No, sir.  Well, see, I used to do all of

14   that.  But once I had -- you know, I got high blood

15   and sugar.  And the alcohol and I -- you know, the

16   medicine I take, I can't drink no alcohol.

17       Q.    Okay.

18       A.    So I just stopped going to clubs.

19       Q.    Okay.  All right.  I understand.  So you

20   pretty much just go and work and then go back to

21   your hotel; is that right?

22       A.    No.  I got a little old girlfriend I go

23   see.

24       Q.    You got a girlfriend you go see?  All

25   right.  What's her name, if you don't mind me

```
 1    asking?
 2         A.    Doris Pickens.
 3         Q.    Doris Pickens?
 4         A.    Yeah.
 5         Q.    Okay.  And she's over that way near
 6    Brinson or Bainbridge or --
 7         A.    No.  She stay in Bainbridge.
 8         Q.    Bainbridge.  Okay.  You don't have any
 9    children up this way, though?
10         A.    No.  Only thing I got is from the -- my
11    ex-wife.
12         Q.    Okay.  And -- all right.  So you have
13    Ms. Pickens over there.  Does she have any children
14    or anything?
15         A.    She have a boy -- no.  She have two boys
16    and two girls.
17         Q.    Okay.  They adults?
18         A.    Yes.
19         Q.    Okay.  Do they live in the area, too?
20         A.    They live --
21         Q.    Yeah.
22         A.    They live in Bainbridge.  But the oldest
23    boy, he's in the Army.
24         Q.    Okay.  Right.
25         A.    So the other three, they live in
```

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
 1    Bainbridge.
 2         Q.    Did -- are their last names Pickens,
 3    too?  Do you know?
 4         A.    No, I couldn't tell you that.
 5         Q.    Okay.  All right.  All right.  Are you
 6    from Belle Glade, you born and raised?
 7         A.    I was born there.
 8         Q.    Okay.
 9         A.    I believe that's where they going to
10    bury me at.
11         Q.    Yeah?  Is that right?
12         A.    Yeah.
13         Q.    Okay.  Well, you'll have some say in
14    that, I guess.
15         A.    Yeah.  Because I ain't ready to go yet.
16         Q.    Well, that's good.  That's good.  We're
17    not ready for you to go.
18         A.    Huh-uh (negative response).
19         Q.    All right.  You -- but you grew up there
20    in Belle Glade?
21         A.    Yes, sir.
22         Q.    Okay.  All right.  Did you go to high
23    school there?
24         A.    Yes.  I finished high school there.
25         Q.    Okay.  Where did you graduate from?
```

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

```
1          A.     Lake Shore.

2          Q.     Lake Shore?  And that's in Belle Glade?

3          A.     Yes.

4          Q.     Okay.  After Lake -- what year did you

5   graduate?

6          A.     '68.

7          Q.     '68?  Okay.  After you graduated from

8   high school, did you do any other schooling?

9          A.     No.

10         Q.     Go to tech school or anything?

11         A.     No.

12         Q.     Okay.

13         A.     I ain't -- I didn't know -- I had a

14  choice.  But I chose, you know, not to go.  You

15  know, I got me a job and started working.

16         Q.     Started working?  Okay.

17         A.     Uh-huh (positive response).

18         Q.     That's good.  Now, you -- did you get

19  any sort of certifications after high school?  So I

20  understand you didn't go to college, but did you

21  ever go to any sort of special school to get a CDL

22  or --

23         A.     No, no.  I ain't never --

24         Q.     Okay.

25         A.     No.
```

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1        Q.      What about forklift?

2        A.      I got fork-- the place I work for down

3    there in Belle Glade, I got a forklift license.

4        Q.      Okay.  Where do you work down in Belle

5    Glade?

6        A.      Pioneer Growers.

7        Q.      Pioneer Growers?

8        A.      Uh-huh (positive response).

9        Q.      Okay.  You still work there?

10       A.      Well, I work -- I go to work there in

11   March and I work until June.  Then I -- that's when

12   I come up here.

13       Q.      You come up here.  How long you been

14   working with them?

15       A.      Oh, about 20-something years.

16       Q.      Okay.  Long time.

17       A.      Yeah.

18       Q.      Long time.  Is that where you got your

19   fork-- first forklift experience?

20       A.      No.  I got my first forklift experience

21   to Gressinger Packing House.  But they done went out

22   of business.

23       Q.      Okay.  What was it called?

24       A.      Gressinger.

25       Q.      Gressiner (sic)?

**Mixon Reporting Service, Inc.**
**Albany - Perry - Tifton - Valdosta - Waycross**                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
1          A.      Uh-huh (positive response).

2          Q.      Is that down in Belle Glade, too?

3          A.      Yes.

4          Q.      Okay.  Okay.  And so you work for

5     Pioneer during the spring --

6          A.      Yes.

7          Q.      -- right?  And then you work here?

8          A.      Uh-huh (positive response).

9          Q.      When I say "here," but for Spring Creek.

10         A.      Yes.

11         Q.      For -- two times a year.  Do you work

12    any -- any other place -- any other places during

13    the year?

14         A.      No.

15         Q.      Okay.

16         A.      No, sir.

17         Q.      Okay.  And so from -- really from about

18    the end of the fall till about March, you take off;

19    is that right?

20         A.      Yes, sir.

21         Q.      Okay.  Okay.  Other than Spring Creek --

22    and let me ask you this.  Do you get a W-2 --

23         A.      Yes.

24         Q.      -- or a 1099 from Spring Creek?

25         A.      I get a W-2.
```

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1      Q.      Okay.  Do you know:  Who's your official

2   employer?  Do you know their legal name?  Is it

3   Spring Creek Farms or Spring Creek Cooler?

4      A.      That's -- well, the legal -- the name

5   appear on the W-2 form is Spring Creek Cooler.

6      Q.      On the W-2 it says Spring Creek Cooler?

7      A.      Yeah.

8      Q.      Okay.  Is that what you get -- your

9   check stubs or your checks, they say Spring Creek

10  Cooler?

11     A.      Yes.

12     Q.      Okay.  Okay.  Other than Spring Creek

13  Cooler and Pioneer Farms, do you do any -- have you

14  done any other jobs in the last five years?

15     A.      No.

16     Q.      Okay.  You don't have your own business

17  in some way, do you?

18     A.      No.

19     Q.      You don't get a 1099 from anybody?

20     A.      No.

21     Q.      Okay.  How long you been driving a

22  forklift?  You remember your first time you drove a

23  forklift?

24     A.      Well, I was in my twenties when I first

25  started driving.

```
 1        Q.      Okay.  And that was with the
 2   Gressiner (sic) ?
 3        A.      Yes.
 4        Q.      Is that the name of it?
 5        A.      Yes.
 6        Q.      Okay.  Did they put you through any sort
 7   of certification program?
 8        A.      No, they didn't.  But they -- well, they
 9   just showed me, you know -- they showed me how to
10   drive.  And then, you know, when I wasn't doing
11   nothing, I get on it.  And that's how I learned.
12        Q.      Right.  And practice?
13        A.      Yes.
14        Q.      Okay.
15        A.      Yes.
16        Q.      Has anybody ever given you, ever, given
17   you some sort of test about forklift driving?
18        A.      Over at Pioneer we used -- we used to
19   have -- used to do that.
20        Q.      Okay.  You don't do them anymore --
21        A.      No.
22        Q.      -- over there?
23        A.      No, they don't do it --
24        Q.      Okay.
25        A.      -- no more.
```

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken  on 7/6/2016
courtreporter@mixonreportingservice.com

| | | |
|---|---|---|
| 1 | Q. | Did you ever have, you know, something |

1      Q.    Did you ever have, you know, something
2  like a certificate or a piece of paper saying, you
3  know, "Willie Moorman is certified to drive a
4  forklift"?
5      A.    Only thing I had was forklift license.
6      Q.    Okay.  You do have a forklift license?
7      A.    Yeah, yeah.
8      Q.    And you got that -- okay.
9      A.    Yes.
10     Q.    Okay.  Do you still have that?
11     A.    But it's in Belle Glade.
12     Q.    It's in Belle Glade.  Okay.
13     A.    You know, I got -- I got -- it's
14 somewhere around in the house.
15     Q.    Right.  Do you -- do you know when you
16 got that?
17     A.    Well, I -- I'm really not exactly.  I
18 think about 10 or 15 years ago.
19     Q.    Okay.
20     A.    That's -- I think that's when I got it.
21     Q.    And you would have gotten that from
22 Pioneer?
23     A.    Yeah, I got that from Pioneer.
24     Q.    Okay.  When you started working with
25 Spring Creek -- well, let me -- let me back up.  How

25

1    did you get a job with Spring Creek Cooler?

2         A.    Well, see, what happened, I was working

3    with Pioneer Growers.  And I -- I had gotten a job

4    over there with -- cleaning rubble.  But when I went

5    over there, things didn't work out.  So the guy what

6    was running the job for Spring Creek Cooler is a

7    good friend of mine.  And I went over there and

8    talked with him, said I needed a job because I

9    wasn't -- you know, because I had to go back to

10   Belle Glade.  So the guy, he walked with Jack.  And

11   Jack told him, said, "Yeah, put him over."  And I

12   just started loading trucks.  And I've been there

13   ever since.

14        Q.    Now, who's the friend?

15        A.    Joseph.

16        Q.    Okay.

17        A.    Joseph Watts.  He used to be the foreman

18   over there.

19        Q.    He used to be the foreman at --

20        A.    At Spring Creek.

21        Q.    At Spring Creek.  Okay.

22        A.    Uh-huh (positive response), yeah.  But

23   he's not there now.

24        Q.    Okay.  And he knew Jack?

25        A.    No.

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
1          Q.      Or --

2          A.      Jack is our supervisor.

3          Q.      Oh, okay.  Okay.  So Jack was his

4    supervisor?

5          A.      Yes, yes.

6          Q.      Oh, okay.  So did you take -- Joseph,

7    did you say?

8          A.      Yes.  That's Joseph.

9          Q.      Did you take his place at Spring Creek?

10         A.      No.  He's a -- he's a supervisor.  He

11   gave me a job.

12         Q.      Oh, he gave you the job?

13         A.      Yeah.

14         Q.      Okay.

15         A.      He talked with Jack for me to get the

16   job.

17         Q.      I got you.  I got you.  Okay.  And so

18   back sometime around 2005 or so --

19         A.      Yeah.

20         Q.      -- you started going to Spring Creek --

21         A.      That's when I first --

22         Q.      -- coming up here?

23         A.      That's when I first started working --

24         Q.      Okay.

25         A.      -- over there at Spring.  But I had -- I
```

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                229-382-8512

1    had been coming up here.  I was working with Green

2    Circle Farm.

3         Q.    Okay.

4         A.    I was working with them.  But then I --

5    then I missed a year from coming up here.  And then

6    the next year, I started back coming up here.

7    That's when I started working with Spring Creek.

8         Q.    Okay.  Where is Green Circle Farms?

9         A.    Well, it's on 84, right down -- right

10   down the road from where we at.

11        Q.    Oh, right down the road from Spring

12   Creek?

13        A.    Yeah.  You just --

14        Q.    Okay.

15        A.    Yeah.

16        Q.    Okay.  All right.  So you had been

17   coming up there for a few years.

18        A.    Right.

19        Q.    Driving a forklift?

20        A.    That's all I ever did.

21        Q.    That's all you do.  Okay.  All right.

22   And then -- so you got a job at Spring Creek.

23   What -- did you ever -- did Jack Brinson hire you?

24   Was he the one who made the decision to hire you?

25        A.    Yes.

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    Q.    Okay.  When -- and that was in 2005?

2    A.    Yes.

3    Q.    Did you come up here to talk with him or

4    interview?

5    A.    No.  Like I say, I was up here to -- I

6    came up here to work to another place, but it didn't

7    work out.

8    Q.    Oh, I understand.  So you just went over

9    there that next day or something?

10    A.    No.  I went over there the same day.

11    Q.    Same day.  Okay.  Why didn't it work

12    out?

13    A.    Because I had told them -- when I left,

14    they wanted me to stay.  I told them I didn't want

15    to stay.

16    Q.    What you mean?  Tell me about it.

17    A.    Well, they taking the corn off the

18    pallet, stacking it in the truck.  And I didn't want

19    to do that.  And they told me that -- they told me I

20    was going to be working in the trade pack, I

21    wouldn't have to do it.  As I got up here, it was a

22    different story.  And I didn't want to stack.

23    Q.    Okay.

24    A.    So then --

25    Q.    Did you have to physically do that with

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross          229-382-8512

```
 1    your hands?  Is that --
 2         A.      Yeah.
 3         Q.      Oh, okay.
 4         A.      Take it off -- take it off the pallet
 5    and stack it in the truck.
 6         Q.      And you were a forklift guy?
 7         A.      Yeah.  That's --
 8         Q.      They wanted a forklift guy.
 9         A.      -- all I ever did.  I'm a forklift
10    driver.
11         Q.      I got you.  So you go over there that
12    same day?
13         A.      Yeah.
14         Q.      And did Jack Brinson hire you then?
15         A.      Yes.
16         Q.      On the spot?
17         A.      Yes.
18         Q.      Okay.  And did he ask you about your
19    certification?
20         A.      No.  I talked with Joseph.  And Joseph
21    told him everything about me.
22         Q.      Okay.  So how long -- how much did you
23    talk to Jack Brinson before he hired you?
24         A.      Well, we talked a little while.  And
25    then, you know, he -- and he told me, said,
```

1    "Well" -- that he told me what all I had to do.  And

2    then I got on the forklift and started working,

3    started --

4         Q.     Did he give you a forklift test?

5         A.     No.

6         Q.     Okay.  I mean, he didn't walk around

7    with you and --

8         A.     No.  But like I say, you know, Joseph

9    had told him all -- you know, he had told him about

10   me driving a forklift.  Because, see, in Belle

11   Glade, they considered me one of the best.

12        Q.     Right.  Okay.  That's good.

13        A.     They considered me one of the best.  And

14   I figured to myself I am one of the best.

15        Q.     Okay.  There's nothing wrong with that

16   confidence.

17        A.     I know I'm is.

18        Q.     Yeah.  Well, good.  Well, so -- okay.

19   So he didn't give you a test.  He didn't give you

20   any sort of a written test about how to drive a

21   forklift --

22        A.     No.

23        Q.     -- or anything?

24        A.     No.

25        Q.     He just said go work; is that right?

1      A.      Yeah.

2      Q.      Okay.  Didn't go over safety rules or

3   anything like that with you?

4      A.      Yeah.  No, no.

5      Q.      Okay.  Just assumed you knew how to do

6   it?

7      A.      Yeah.

8      Q.      Okay.

9      A.      Because when I got on the fork-- see,

10  one thing about a forklift, you can tell can one

11  drive one when he get on it.  If he don't know -- if

12  he don't know how to crank, go -- what kind of

13  forklift it is, if he can't crank it up, he don't

14  know how to drive that.

15     Q.      What kind of forklift do y'all have out

16  there?

17     A.      Well, you could have -- the ones we got

18  now is Toyota.  So I don't know.  It been so long, I

19  can't tell you what kind it was when I first started

20  working, or what kind -- it was probably Toyota,

21  too.

22     Q.      Right.  Well, let's -- I'm going to

23  switch gears for just a second.

24     A.      All right.

25     Q.      And we'll come back.

```
1          A.      All right.

2          Q.      Now, I'm asking these questions.  I

3    don't mean to embarrass you or anything, but these

4    are just some questions I have to ask.  You ever

5    been arrested before?

6          A.      No.

7          Q.      Okay.  No arrests?

8          A.      Well, you know, I had a DUI.

9          Q.      Okay.

10         A.      That was it.

11         Q.      Okay.  When did you get a DUI?

12         A.      Several years -- I was young then.

13         Q.      Yeah.

14         A.      I was young and wild then.

15         Q.      I hear you.  But, I mean, was it 20

16   years ago, was --

17         A.      No.  I was older.

18         Q.      -- it 40 years ago?

19         A.      Twenty years ago, I still old.  I was --

20   that was in my -- that was in my twenties.

21         Q.      Yeah.

22         A.      That's when that happened.

23         Q.      Okay.  So have you -- have you been

24   arrested in the last ten years?

25         A.      No.  I ain't been arrested -- that's the
```

33

**Deposition of Willie Morman, taken on 7/6/2016**
courtreporter@mixonreportingservice.com

1    only time I ever been arrested.

2        Q.    That's the only time.  You had a DUI

3    back 40-something years ago --

4        A.    Yes.

5        Q.    -- is that right?

6        A.    Yes.

7        Q.    Okay.

8        A.    Yes.

9        Q.    All right.  That's the only conviction

10   you've ever had --

11       A.    Yeah.

12       Q.    -- is that right?

13       A.    But, see, what it was, when I went to --

14   they -- when I first -- when I went to court, they

15   went to -- I went to court for a DUI.  But as I went

16   to court, they didn't charge me with DUI because I

17   wasn't -- I wasn't drunk.

18       Q.    Okay.  What did they charge you with?

19       A.    Driving under the influence of alcohol.

20   See, there's a difference between DUI and

21   driving under the influence --

22       Q.    Was this down in Florida?

23       A.    Yeah, that down in Florida.  See, DUI,

24   they suspend your license and everything.

25       Q.    Okay.

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1          A.      But all they did with me was driving

2    under the influence of alcohol.  See, I was

3    drinking.  That's all they charged me with --

4          Q.      I got you.

5          A.      -- for drinking.  See, it was a Super

6    Bowl night.

7          Q.      Okay.

8          A.      And I was drinking.

9          Q.      Okay.  Must have been one of the first

10   Super Bowls.

11         A.      No.  What happened, my team had lost.

12         Q.      Who's -- which -- who's your team?  The

13   Dolphins?

14         A.      No.  I hate the Dolphins.

15         Q.      Oh.  Uh-oh.

16         A.      I hate the Dolphins.  It was the Cowboys

17   and the Buffalo Bills.

18         Q.      Okay.  Well, that would have been about

19   25 years ago, then --

20         A.      Yeah, it's been while.

21         Q.      -- is that right?

22         A.      It's been a while.  It's been a while.

23         Q.      Okay.  All right.

24         A.      It's been a while.

25         Q.      So the Bills were your team back then,

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    huh?

2        A.    Yeah.  I liked the Bills.

3        Q.    Yeah.

4        A.    But, you know, I just didn't like the

5    Cowboys.

6        Q.    Oh, okay.  It's pretty black and white

7    with the Cowboys, you either love them or you hate

8    them; isn't that right?

9        A.    Yeah.

10       Q.    All right.  So you've never been to jail

11   before?

12       A.    No, that's the only time I --

13       Q.    And you were in jail for that?

14       A.    Yes.

15       Q.    Oh, okay.  For how long?

16       A.    Well, I did a week.

17       Q.    Okay.

18       A.    That's it.

19       Q.    Okay.  Not on probation now?

20       A.    No, no, no, didn't -- none of that.

21       Q.    Did you get probation for that, for that

22   DUI?

23       A.    No.  All I -- all they did, all they

24   did, when I went to court, they changed -- they

25   changed it from DUI to driving under the influence,

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1   because, you know, I was drinking.  But they didn't

2   charge me with DUI.  Because DUI, I'd have had to go

3   to, you know, all kind of schools and all that.

4        Q.     Right.

5        A.     Driving under the influence is -- you

6   know, they had took my license.  But they just took

7   them for six months.  Then, you know, after six

8   months, I got my license back.

9        Q.     Okay.  You ever given a deposition like

10  this before?

11       A.     No.

12       Q.     Ever testified in court?

13       A.     No, sir.

14       Q.     Okay.  Have you ever been sued before?

15       A.     No, sir.

16       Q.     Okay.  You ever been in a car wreck?

17       A.     No, sir.

18       Q.     Okay.  You ever sued anybody else?

19       A.     No, sir.

20       Q.     For any -- no reason?

21       A.     No, I haven't, no.

22       Q.     Okay.  You ever filed for bankruptcy?

23       A.     No, sir.  But I did -- well, now -- but

24  not bankruptcy.  I did with some credit cards.  I

25  know I got a debt collector get -- you know, I had a

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    bunch of credit cards I wasn't able to pay.  So they

2    cleaned it up, Morgan and Drexler, they cleaned it

3    up for me.

4         Q.    I got you.  But you never filed for

5    bankruptcy?

6         A.    No, no.  I ain't never had nothing to

7    file for.

8         Q.    I hear you.

9         A.    Ain't never had nothing to file for.

10        Q.    I hear you.  Now, just so I understand,

11   have you ever -- you've been -- are you divorced,

12   officially divorced?

13        A.    Yes.

14        Q.    Okay.  All right.  You went before a

15   judge, and they --

16        A.    No.  I just signed the papers.

17        Q.    Just signed the papers.

18        A.    Uh-huh (positive response).

19        Q.    Okay.  I got you.  Okay.  When you got

20   your job at Spring Creek, did you fill out any

21   paperwork?

22        A.    Yeah.  I filled out an application.

23        Q.    You did?

24        A.    Yeah.

25        Q.    Okay.  Do you know if they keep a file

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                     229-382-8512

```
 1    of your paperwork there?
 2         A.       Yeah.  Rhonda have it.
 3         Q.       Rhonda has it?
 4         A.       Yeah.
 5         Q.       Okay.  So you think you have a person--
 6    what would be called like a personnel file there?
 7         A.       Yeah, she should, yeah.
 8         Q.       Okay.  I mean, do you -- have you ever
 9    seen it before?
10         A.       No.
11         Q.       Okay.
12         A.       Because, you know, she get all the
13    information off of that --
14         Q.       Okay.
15         A.       -- you know, for me.
16         Q.       But you got an application there?
17         A.       Yeah.  I filled --
18         Q.       Does it talk about being certified to
19    drive a forklift?
20         A.       Yes, sir, yes, yes.
21         Q.       Yeah?
22         A.       Yes.
23         Q.       Okay.  Does it talk about any
24    training -- I mean, if you remember, does it talk
25    about any training that you had to be a forklift
```

```
 1   driver?
 2        A.      Far as I can remember, I --
 3        Q.      Yeah.
 4        A.      -- think so.
 5        Q.      Yeah.  Okay.  Okay.  Since you've been
 6   at Spring Creek, have you taken any tests about
 7   forklift driving, any sort of written tests or
 8   anything?
 9        A.      No, sir.
10        Q.      Okay.  They ever gone over safety
11   regulations with you there?  Not just forklift, but
12   just -- did they ever go over safety regulations at
13   Spring Creek --
14        A.      No.
15        Q.      -- with you?
16        A.      No, sir.
17        Q.      Okay.  You ever seen a manual or
18   anything, written book, that says, "Here are the
19   safety rules" there?
20        A.      No, sir.
21        Q.      Okay.  Did you ever sign any piece of
22   paper saying, you know, you've gotten a policy book
23   or a safety book or anything like that?
24        A.      No, sir.
25        Q.      Okay.  Tell me what you do out at Spring
```

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    Creek.

2        A.      Well --

3        Q.      What's your job?

4        A.      Well, my job is I'm over the loading

5    dock.  The loading dock, that's where they load the

6    trucks at.  Then I'm over the -- over the dock where

7    they -- when the corn come in out the field, they

8    put it in the pre-cooler and then the guys put it in

9    the cold box.  That's where they keep it at.  And I

10   make sure that he put it in there right and every --

11   you know, stuff like that.

12       Q.      Are you -- are you kind of a

13   supervisor --

14       A.      Yeah.

15       Q.      -- out there?

16       A.      I --

17       Q.      You are a supervisor?

18       A.      Yeah, I'm a supervisor over the dock out

19   there.

20       Q.      Okay.  All right.  So who's your

21   supervisor?  Who's your boss?

22       A.      Jack.

23       Q.      Jack Brinson?

24       A.      Uh-huh (positive response).

25       Q.      All right.  And then who's under you?

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1        A.        Well, you know, we have some -- Smalls,

2    and then we -- then we have some Mexicans.

3        Q.        Okay.  So it's fair to say you're

4    Smalls' supervisor?

5        A.        Yes.

6        Q.        Okay.  And, I mean, I understand that

7    Brinson would be over him, too.

8        A.        Yeah.

9        Q.        But you're --

10       A.        Yeah.

11       Q.        Do you direct Smalls what to do?

12       A.        But really, you know, he knows what to

13   do.

14       Q.        Right.  No.  I understand.

15       A.        Yeah.  But like, you know, just like his

16   job is unload the trucks when they come in out the

17   field.  Now, when he ain't doing nothing and we have

18   a lot of trucks to load around there where I'm at,

19   he'll come around there, you know, and help us.

20       Q.        Okay.  You're the primary loader of the

21   trucks?

22       A.        Yes.

23       Q.        To get -- so they can take the corn

24   where it needs to --

25       A.        Yes.

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
1          Q.     -- go, right?

2          A.     Yes.

3          Q.     Okay.

4          A.     Yes.

5          Q.     All right.  But then Smalls will help

6     you out?

7          A.     Yeah.  Like a lot of trucks be around

8     there and I need some help --

9          Q.     Okay.

10         A.     -- he'll come around there and help me.

11         Q.     Is there anybody else who drives a

12    forklift out there loading those trucks?

13         A.     Well, I have a Mexican do, kind of.

14         Q.     What's his name?

15         A.     I don't know.  I call him Rock.

16         Q.     Okay.  You call him Rock?

17         A.     I call him Rock.

18         Q.     Okay.

19         A.     But I done forgot his name.

20         Q.     Do you know anybody named Javier Lara?

21    Is that his name?  Do you know?

22         A.     I don't -- really I don't -- I don't

23    know his name.

24         Q.     Okay.  Okay.  Okay.

25         A.     See, reason why I don't know his name,
```

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                      229-382-8512

```
 1    because, you know, he can't speak no English --
 2         Q.      Okay.
 3         A.      -- I can't speak no Spanish.
 4         Q.      All right.
 5         A.      So way I -- me and him talk to one
 6    another, I have -- I show him signs.
 7         Q.      Okay.
 8         A.      Something I really don't understand, I
 9    go in there and get Venus and she explain to him in
10    Spanish.
11         Q.      Who?  Who's that?
12         A.      Venus.  That's the girl work in the
13    office.
14         Q.      Venus?
15         A.      Yes.
16         Q.      Is her name Maria?
17         A.      No.  Maria, she didn't come back over --
18         Q.      Okay.  You're talking about Venus.
19    She's a new -- she's new --
20         A.      Yeah.
21         Q.      -- is that right?
22         A.      Yeah, she new.
23         Q.      Okay.
24         A.      Because Maria, she didn't come back
25    because her mama was sick.
```

1        Q.       Okay.  All right.

2        A.       She seeing about her mama.

3        Q.       Okay.  How long has Maria been out

4    there?

5        A.       Maria been there about -- about five or

6    six years, I think.

7        Q.       Okay.  Is she -- are you a supervisor of

8    her as well?

9        A.       No.  She the supervisor over the

10   Mexicans.

11       Q.       Okay.

12       A.       And she knows -- because, you know,

13   she -- and she's the supervisor over the office, you

14   know, where they check the trucks in.  Both us

15   supervisors.  I'm just on the dock, and she's just

16   in the office.

17       Q.       Okay.  So part of your job is to -- is

18   to load the trucks.  Tell me -- tell me how you go

19   about loading a truck out there.

20       A.       Well, first, Maria, she'll sign them in.

21   Then she'll find out -- get the order and them --

22   and everything, what all she need.  Then she'll get

23   the sheet where all the -- where all the orders at.

24   And then she'll find their order number.

25                And then she'll give me the order --

45

1    like I say, she'll find the order number.  The order

2    number say he get 1008 bicolor.  Then she'll write

3    it down on a piece of paper and give it to me and

4    tell me, that truck.  You know, that's the way I

5    tell what they getting.

6         Q.    Okay.  Does she -- does she go find you

7    and say, "Here's this order"?  I mean, I know you're

8    right there --

9         A.    Yeah.  Well, no.

10        Q.    -- together, but --

11        A.    Like sometimes she go -- she find me.

12   Sometimes I goes in there and get it.  Then

13   sometimes I be loading a truck, then she'll see I'm

14   about through, then she'll bring it out and give to

15   me, like that.

16        Q.    Okay.  And when you get the order, you

17   go get on your forklift?

18        A.    No, no.  I'm already -- I'm already --

19   truck driver, truck driver got load locks and stuff,

20   you know, in there, inside the place, because he's

21   not allowed on the dock.

22        Q.    Okay.

23        A.    He's not allowed on the dock.  So what

24   I'll do is I don't feel like picking them up and

25   moving them.  I'll tell him to come in there to get

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    them.  So he'll come in there and get them, but I

2    won't load -- I won't do no -- I won't load no truck

3    until he, you know, leave out the -- off the dock

4    and go back behind the fence.

5        Q.    Okay.  So you invite -- you tell them to

6    come on the dock?

7        A.    Yeah.

8        Q.    And go to the back of their trailer?

9        A.    Yeah.  And get all their --

10       Q.    And get the stuff out?

11       A.    Whatever they -- whatever they got.  And

12   then -- like some of them have stuff on there that

13   need to come off and they'll tell me about -- you

14   know.  And I'll ask them about, you know, the stuff

15   they got in there, do it need to come off the truck

16   before I put that corn in there.

17            But once I get everything together, they

18   put -- I tell them, you know, they have to get off

19   the dock.  If they don't want to get off the dock, I

20   ain't going to put nary pallet on their truck until

21   they get off.

22       Q.    Okay.  Is it your job to make sure no

23   truck drivers are on the dock?

24       A.    Yes.

25       Q.    Okay.

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

```
1          A.      Or either Smalls will tell them, too.
2          Q.      Okay.
3          A.      Whoever out there loading the truck,
4     they'll tell them, say, you know, "You know you not
5     allowed on the dock.  You got to go behind that
6     fence."
7          Q.      Okay.  And if they don't -- if you or
8     Smalls don't tell them not to be out there, would
9     you say that you're not doing your job?
10         A.      Yeah.  But we have to tell them that.
11    Because you don't tell them that, they going to
12    be -- they going to be standing up there in the way.
13    They going to -- they want to -- you know, they want
14    to say they got to -- they want to count the corn.
15                 But you can go behind the fence and
16    count the corn.  Because over there by the office,
17    you can stand right there and see every pallet going
18    in your truck.  Then you can go over there by the
19    cold box and you can see every pallet going in the
20    truck.  You can count it like that.
21                 But, see, a lot of them, you know, they
22    want to stand right there by that -- by that gang
23    board and count their pallets.  No, you can't do
24    that.  You got to be, you know, out the gate.
25         Q.      And if somebody doesn't tell the truck
```

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    driver, "Don't be there," then they're not doing
2    their job; is that right?
3        A.    That's right.
4        Q.    Okay.  Are you aware -- and you may not
5    be -- are the drivers responsible for counting their
6    own corn?
7        A.    Yes.
8        Q.    Okay.
9        A.    But like I say, they have -- you know,
10   they don't have to be inside that fence to count the
11   corn, like I told you.  They got -- they got a place
12   they can stand over there by the office, and every
13   pallet what going in their truck, they can see it.
14   If they don't want to stand there, they can go over
15   there by that cold box.  And every pallet going in
16   their -- every pallet that go in, they don't have to
17   be inside of it to count the pallets.
18       Q.    Do you tell people that, "Hey, you
19   can -- you can count it from other places"?
20       A.    Yeah, yeah.  I tell -- just like what it
21   was the other day, the guy, he told me, say, "I got
22   to count my pallets."
23             I said, "Well, you still can go behind
24   that fence over there and count your pallets."
25             "I ain't.  I ain't."

49

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
 1                 I said, "Well, anyway, I tell you what:
 2      I ain't fixing to argue with you.  I'm going to just
 3      sit right here.  I ain't got nowhere to go."  He can
 4      sit right there until he make his mind up.  Then he
 5      make his mind up, then he going on out.
 6           Q.     And if a driver's on the dock, you're
 7      not supposed to move; is that right?
 8           A.     Huh-uh (negative response).
 9           Q.     You're not supposed to be moving the
10      forklift; is that right?
11           A.     I don't load the truck.
12           Q.     Okay.  Is -- are those the rules out
13      there?
14           A.     That's the rule they got.
15           Q.     Okay.  And Smalls is the same way?
16           A.     Yeah.  Everybody the same way with
17      loading trucks.  When a driver is there, you don't
18      load his truck until he -- you know, until he get
19      off that dock.  Now, once he get off that dock, you
20      go on and load it.  But if he don't want to move, he
21      just sat there.
22           Q.     Okay.  So tell me what you do when you
23      load a truck.  All right?  So Maria -- some -- you
24      or Maria -- of course, I guess now it's Venus.  But
25      you get the order on a piece of paper, right?
```

50

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1       A.      Yeah.

2       Q.      All right.  And you go get on your

3    forklift; is that right?

4       A.      Yeah.

5       Q.      All right.  Tell me about getting --

6    where you go, how you get the corn --

7       A.      Well, see --

8       Q.      -- and how you --

9       A.      -- First --

10      Q.      -- drive back to --

11      A.      -- first thing, when she bring me the --

12   when she -- when she give me the ticket, I go over

13   to the truck.  And then I pull the gang board.

14   That's where I go in on the truck.

15      Q.      Right.

16      A.      And then if I see stuff in there need to

17   be moved, then I -- that's when I get the driver.

18   If he ain't got nothing to be moved -- like a lot of

19   the drivers, they'll be sitting out there in the

20   truck.  And I'll move it for them.  Then I go over

21   to the cold box and get the corn.  Once I load the

22   truck, some -- sometimes I'll put the load locks up,

23   sometimes I won't.

24      Q.      Well, let's talk about actually loading

25   up.  That's what I want to talk about.  So you get

51

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
1    there, you're on your forklift, and you go to the
2    corn, right?
3         A.    Yeah.
4         Q.    How -- you load one pallet at a time,
5    two pallets at a time?
6         A.    Well, I load 24 pallets.  We put 24
7    pallets on a truck.
8         Q.    Okay.
9         A.    Twenty-four pallets going on the truck.
10        Q.    All right.
11        A.    When you put 24 pallets on the truck,
12   the truck -- it's a full load.
13        Q.    Right.  And you're getting -- are you
14   getting two at a time?
15        A.    No.  I get one.
16        Q.    Pallet?
17        A.    Yeah.  I drive a single.
18        Q.    Oh, you drive a single?
19        A.    I drive a single.  Smalls drive a
20   double.
21        Q.    Okay.  So -- all right.  So when you
22   drive a single, you get one pallet at a time?
23        A.    Yes.
24        Q.    All right.  Now, you put your forks
25   under there, get your pallet, right?
```

52

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1          A.     Yeah, carry it in the truck.

2          Q.     Okay.  You -- do you back up and drive

3     backwards?

4          A.     Well, sometimes I back up.  Sometimes I

5     go forward.

6          Q.     Okay.  How do you decide?

7          A.     Well, now, if I'm to the front of the

8     cold box, when I -- like when I goes in there to get

9     the -- to get the corn out the -- out of the pile in

10     there, it's on -- at the front of the cold box, I'll

11     back out, back out the door.

12          Q.     And you turn around and reverse; is that

13     right?

14          A.     Yeah.

15          Q.     You turn --

16          A.     Then when I back out the door, then I

17     turn around and go straight.  Then that's when I go

18     straight to the truck.  But first, before I back out

19     the door, I blow my horn, because you got, you know,

20     other terminals going in there.

21          Q.     Okay.  When you're holding your --

22     because you're on a single and you do one pallet,

23     right?

24          A.     Yeah.

25          Q.     Can you see around your pallet?  If

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                  229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    you're looking -- if you're looking at the pallet,

2    can you see around it?

3         A.    But, see, I'm looking around the pallet,

4    anyway, because when I'm driving, I'm looking like

5    this.

6         Q.    Okay.

7         A.    Looking on -- I'm looking from this side

8    here, and then I look from this side here.

9         Q.    Okay.

10         A.    I'm looking from both sides, you know,

11    when I'm going, because -- see, I'm going in like

12    this here, and I'm looking around the pallet.  If I

13    ain't looking around the pallet, I be looking over

14    the pallet.

15         Q.    So it's -- one pallet -- is it fair to

16    say that one pallet is small enough that you can

17    kind of look around it and make sure nobody's in the

18    way?  Is that right?

19         A.    Yeah.

20         Q.    Okay.  Okay.  What about the -- what

21    about the one -- the forklift that holds two

22    pallets?

23         A.    Well, I can't say nothing about that,

24    because I don't -- I don't drive that.  Monk --

25         Q.    Okay.

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1        A.      Well, Smalls drive that.

2        Q.      Right.  He goes by Monk sometimes; is

3    that right?

4        A.      That what we call him, Monk.

5        Q.      You call him Monk, M-O-N-K, Monk?

6        A.      Yeah.

7        Q.      Okay.

8        A.      Just like they call me Heavy.

9        Q.      What's your -- what?

10       A.      They call me Heavy.

11       Q.      Heavy?  Well, you're not too heavy.

12       A.      That's what we got by.

13       Q.      That's what you're always known by, huh?

14       A.      Uh-huh (positive response).

15       Q.      All right.  Well, I'm going to call you

16   Mr. Moorman.

17       A.      That's right.

18       Q.      But afterwards I might call you Heavy.

19   Have you ever driven his forklift before?

20       A.      Yeah.

21       Q.      Okay.  Have you carried two pallets

22   before?

23       A.      But, see, I never loaded a truck with

24   his thing.  I never --

25       Q.      You never -- okay.

                                                        55

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
 1           A.      Uh-huh (positive response).  I may be

 2   around there -- he might have went to the store or

 3   somewhere, get him something to eat, and a truck

 4   come in out the field and I unload it, like that.

 5           Q.      Okay.

 6           A.      But far as loading a truck with it, I

 7   never did that.

 8           Q.      Okay.  When it comes out of the field,

 9   are they on pallets --

10           A.      Yeah, they on --

11           Q.      -- in the same way?

12           A.      Yeah, on the pallets.

13           Q.      Two pallets?

14           A.      No, no.  They got 20 pallets, 10 on each

15   side --

16           Q.      Okay.

17           A.      -- of the truck.

18           Q.      So it's not as big as the ones that go

19   onto the truck; is that right?

20           A.      Well, they the same pallet.  The one

21   what come off the truck out the field --

22           Q.      Okay.

23           A.      -- is the same pallet what going in the

24   trailer.

25           Q.      It's the same one?  Does it have the
```

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
 1    same amount --
 2         A.     Yes.
 3         Q.     -- of corn on it?
 4         A.     Yeah, 42.
 5         Q.     Okay.  So it's the same size --
 6         A.     Yeah.
 7         Q.     -- is that right?
 8         A.     Everything the same size.
 9         Q.     Okay.  Well, when you -- when you've
10    done that, when you've been on the two, the forklift
11    that holds two pallets --
12         A.     Yeah.
13         Q.     -- can you see around it?
14         A.     Yeah, you know, because, see, what it
15    is, when you -- when you unloading it, you got to
16    put it in a -- in a line.  And then they got peoples
17    putting stickers on it, and you got to be watching
18    out for them.  So when you -- plus, you blowing your
19    horn, letting them know that you coming so they
20    won't, you know, be in the way.
21              Because they got guys down there, time
22    you set that pallet down, they going to put a
23    sticker on it so they can tell, you know, that -- so
24    the sticker have got a name on it, W-W Produce.  So
25    they got to put that on every one of them boxes on
```

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1    that pallet.

2        Q.    But you've never driven that one and

3    loaded up a truck with it?

4        A.    No, no.

5        Q.    Okay.

6        A.    I ain't never loaded a truck with that.

7    I just -- like I say, it might -- I might take like

8    three or four pallets off a truck and that's it.

9    Then he come and get it.

10       Q.    Okay.  Forklifts can be dangerous, can't

11   they?

12       A.    Yeah.

13       Q.    Have to be careful --

14       A.    Yeah.

15       Q.    -- when you're driving?

16       A.    Yeah.

17       Q.    Might be people walking around, right?

18       A.    Yeah.

19       Q.    You have to keep a clear view when

20   you're driving one, don't you?

21       A.    Yes.

22       Q.    Okay.  And what do you do if you don't

23   have a clear view?

24       A.    But, see, that's why you blows your

25   horn.

1     Q.     Okay.

2     A.     That why -- but, see, most -- now,

3     another thing about a forklift, when you back --

4     when you backing up, it got a bell on it beep, beep,

5     beep, beep, making a noise.

6     Q.     Right.

7     A.     And you could -- you can hear that bell,

8     and you know it's a forklift coming.

9     Q.     Right.  Now, when you're driving the

10    forklift, though, if you're going backwards, you're

11    turned around looking where you're going, though,

12    right?

13    A.     Yeah.

14    Q.     Okay.

15    A.     You looking back, and you steady backing

16    up.  But like I said, that bell steady blowing, plus

17    you're blowing your horn, too.  Because, you know,

18    you -- you know, like I say, you always got to blow

19    your horn because there's more than one forklift

20    going in and out of that -- out of that cold box --

21    Q.     Right.

22    A.     -- to let one know that you coming out

23    and then, one coming in, let you know he coming in,

24    so somebody, you know, won't run into one another.

25    Q.     Right.  Well, I mean, you shouldn't be

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1  driving blind, though, right?

2       A.    No.

3       Q.    I mean, you need to be looking where

4  you're going --

5       A.    Yeah.

6       Q.    -- and being able to see?  You need a

7  clear view, right?

8       A.    Yeah.

9       Q.    And if you don't have a clear view,

10  you're not being safe; is that right?

11       A.    That's right.

12       Q.    Okay.  All right.  Mr. Moorman, do

13  you -- do you know why we're here today?

14       A.    Yeah, about -- you know, about Smalls

15  and that driver.

16       Q.    Okay.  What do you -- what do you know

17  about that?

18       A.    Well, I don't know nothing about that,

19  because I didn't see nothing.  When I come out the

20  cold box, me and Smalls was loading trucks.  When I

21  come out the cold box, I seen Smalls' forklift

22  parked.  And I looked over there, all the people was

23  over there by the office.  And I got off my

24  forklift, see what was going on.

25            So when I came over there, I see the

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1   driver, he had a, you know, a thing, he was

2   bleeding.  And I asked him -- I asked him -- I asked

3   him what happened.  And he said -- that the driver

4   was bending down and said -- he say something about

5   Monk hit him.  That's all I know.

6        Q.    Okay.  So the first thing was -- first

7   of all, the driver's, the truck driver's, name is

8   Mike Newcomb.  Did you know his name?

9        A.    No.  I never --

10       Q.    Okay.

11       A.    I don't even know him.

12       Q.    Okay.

13       A.    I don't even know him.  I ain't even --

14  you know, if I see him right now, I wouldn't even

15  know him.

16       Q.    Okay.  All right.  Now, fair enough.

17  But -- so the first time you saw Mr. Newcomb

18  bleeding, where was he?

19       A.    Well, he was -- all of them was standing

20  up there together.

21       Q.    Okay.  Well, I mean, was he standing by

22  his truck or --

23       A.    No.

24       Q.    -- was he by the office?

25       A.    They was standing there by the -- by

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    the -- by the -- where the gate at.

2         Q.    Okay.  They were standing by the gate?

3         A.    Yeah.

4         Q.    He was not in his truck or anything --

5         A.    No.

6         Q.    -- right?  I mean, he wasn't in the

7    trailer?

8         A.    No, no.

9         Q.    You didn't see him laying on the ground?

10        A.    No.  I didn't see none of that.

11        Q.    All right.

12        A.    But like I say, when I come out the cold

13   box, Maria, Monk, and all of them, him, all of them

14   standing up there.  And I seen Monk.

15        Q.    Standing by the window and by the gate;

16   is that right?

17        A.    Yeah.  They were standing over there.

18        Q.    Okay.

19        A.    So I stopped, want to see what was going

20   on.  That's when I walked over there, and that's

21   what -- that's what they told me.

22        Q.    Okay.  And who -- who told you?

23        A.    Monk told me.

24        Q.    Monk told you that he said that Monk hit

25   him?

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1      A.      No.  He said --

2      Q.      No?

3      A.      Monk said he was -- say he was picking

4   up something.  That what Monk told me.

5      Q.      Okay.

6      A.      That was it.

7      Q.      Monk said he was picking up something?

8      A.      Uh-huh (positive response).  So I --

9      Q.      Picking up what?

10     A.      I don't know.

11     Q.      Where?

12     A.      I don't know.

13     Q.      Okay.

14     A.      I don't know.

15     Q.      Well, you just said that they said Monk

16  hit him or -- I mean, I'm not trying to mess up your

17  testimony, but --

18     A.      Yes, they say Monk -- they say Monk hit

19  the driver.

20     Q.      Who said that?

21     A.      Well, Maria and them, they said it.  Say

22  Monk -- said the driver -- they said the driver say

23  Monk hit him.

24     Q.      Okay.  So Maria and maybe some other

25  people --

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
 1          A.      Yeah.

 2          Q.      -- said the driver said Monk hit him?

 3          A.      Yeah.

 4          Q.      Okay.

 5          A.      Yeah.

 6          Q.      That's what you heard?

 7          A.      Exactly what I heard.

 8          Q.      Okay.  Maria said that.  You heard her

 9   say that?

10          A.      Yeah.

11          Q.      Did you ask her, "Hey, what's going on?"

12          A.      No.  I asked Monk.

13          Q.      Well, what did Monk say?

14          A.      He said -- he said the driver say he hit

15   him.  And he say he didn't.  And Maria say -- that

16   when Maria say, "Yeah, the driver say Monk hit him."

17          Q.      Okay.

18          A.      That was it.  Because like I say, I

19   didn't see nothing.  I didn't know -- I don't

20   know -- I don't know what happened.

21          Q.      Okay.

22          A.      All I know, what they -- what they say.

23          Q.      Okay.  You didn't see any of this

24   happening?

25          A.      No, I ain't -- when I come out,
```

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    everything was over with.

2        Q.    Had you seen Mr. Newcomb before?

3        A.    No, I ain't never seen him before.  I

4    really don't know him.

5        Q.    Hadn't noticed him?

6        A.    Huh-uh (negative response).

7        Q.    Okay.  You were -- you were working?

8        A.    Yeah, yeah.

9        Q.    Were you loading a truck?

10       A.    Yeah, I was loading a truck.

11       Q.    Okay.  There was another truck there; is

12   that right?

13       A.    Yeah.  I was loading one, and Monk was

14   loading one.

15       Q.    Okay.  How many docks do y'all have out

16   there?

17       A.    Well, three trucks can back up at one

18   time.

19       Q.    Three at one time?

20       A.    Yeah.

21       Q.    And how many were there that time?  Do

22   you remember?

23       A.    I don't know was it three.  But I know

24   there was two there, because Monk had a truck and I

25   had a truck.

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1      Q.      What time of day was it?  Do you
2    remember?
3      A.      It was in the eveningtime, I believe.
4      Q.      Okay.  Late afternoon, evening?
5      A.      Yeah, somewhere like that.
6      Q.      It wasn't dark?
7      A.      No, it wasn't dark.
8      Q.      Okay.  And you were loading up a truck?
9      A.      Uh-huh (positive response).
10      Q.      So you were doing -- you were just doing
11    your job?
12      A.      Yes.
13      Q.      Do you remember -- I know it's been
14    two -- been almost three years, but -- been over
15    three years.  But do you remember anything about the
16    truck -- the driver you were loading?
17      A.      No.
18      Q.      You don't remember his name or anything
19    like that?
20      A.      No, no.
21      Q.      Okay.
22      A.      See, most -- because like I say, only
23    person know the driver name is Maria, because they
24    have to sign their name on that paper, on the paper
25    when they check in.  You know, but I know drivers

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    and going on.  But the guy I was loading, I don't --

2    I don't remember him.

3        Q.    Okay.  So you were loading the truck.

4    And did you ever see Mr. Newcomb on the dock?

5        A.    No, I never seen him.

6        Q.    Okay.

7        A.    Only time I seen him, when I come out

8    the cold box and everything had done happened.

9        Q.    Uh-huh (positive response).

10       A.    That's the only time I seen him.

11       Q.    Okay.  When y'all are loading up a

12   truck, you don't have a -- like a spotter there

13   saying, "Hey, you know, you're getting close to this

14   edge or getting close to this edge or anything like

15   that"?

16       A.    No.

17       Q.    Y'all just load them up?

18       A.    Yeah.

19       Q.    Yeah.  Okay.  All right.  So did you --

20   were you done loading up the truck when you saw

21   Mr. Newcomb and all of them over there, or were you

22   in the middle of it still?

23       A.    I believe I was -- all I knowed, I

24   wasn't through with it.

25       Q.    Okay.

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

```
 1        A.      Because I had a pallet of corn, and I
 2   was fixing to go in the truck.  But when I come out
 3   the cold box, I had a pallet of corn to go in the
 4   truck.  But after I seen Monk's forklift stopped and
 5   I see all these peoples over there, that's when I
 6   stopped and ran over there.
 7        Q.      Where was Monk's forklift when you saw
 8   it stopped?
 9        A.      Over there by the gang board.
10        Q.      Okay.  I mean, was it on the gang -- is
11   it -- and I'm sorry.  I -- is it gang board?
12        A.      Yeah.
13        Q.      Board?
14        A.      We call them gang boards.
15        Q.      Okay.  Now, was it on the gang board?
16        A.      No.
17        Q.      How close was it?
18        A.      I couldn't tell you that much.  All I
19   know, it was over there by the gang board.
20        Q.      Okay.  I mean, did he have a pallet
21   about flush with the trailer?
22        A.      No.  Really, like I say, I wasn't -- I
23   wasn't paying no attention.  I just went over there
24   to see what was going on.  I wasn't even paying --
25        Q.      Okay.
```

```
1          A.      -- no attention.
2          Q.      Okay.  So you go over there and see
3     what's going on?
4          A.      Uh-huh (positive response).
5          Q.      You see -- I mean, I know you don't know
6     his name, but it was Mr. Newcomb.  He was bleeding;
7     is that right?
8          A.      Yeah.
9          Q.      All right.  And who all was over there?
10         A.      Maria, Monk, I think -- I think Jack was
11    there.  I ain't for sure.  But I know Maria was
12    there.
13         Q.      Okay.  You know Maria was there?
14         A.      Yeah.
15         Q.      And did you talk to Mr. Newcomb?
16         A.      No.
17         Q.      Did you ever talk to Mr. Newcomb?
18         A.      No.
19         Q.      You never spoke with him --
20         A.      No.
21         Q.      -- any -- okay.  Not before, not --
22         A.      Huh-uh (negative response).
23         Q.      -- after?
24         A.      No.
25         Q.      Okay.
```

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
 1        A.      No, sir.
 2        Q.      All right.  So you talked to Maria.  And
 3   what did you say?
 4        A.      I asked them, I said, "What happened?"
 5                And she said, "The driver say Monk hit
 6   him."
 7        Q.      Okay.
 8        A.      That what Maria say.  Like I say, I
 9   don't know.
10        Q.      Did you talk to Monk?  Did you -- did
11   you say anything to Monk?
12        A.      He -- Monk say -- said, "The driver say
13   I hit him."  And Monk say he didn't hit him.  That's
14   what he told me.
15        Q.      Okay.
16        A.      So like I say, I don't know.  Because
17   like I say, when I come out the cold box, everything
18   was over with.
19        Q.      And after you talked to Maria and
20   Monk -- I mean, how long were you there talking with
21   them?
22        A.      Well, I talked with him -- I talked with
23   them for a while, and then I went back to loading
24   the truck I was on.
25        Q.      Okay.  You finished what you were doing?
```

70

```
 1        A.      Yeah.

 2        Q.      All right.

 3        A.      Because like I -- because all of them

 4   was there, and then they was talking.  And next

 5   thing I know, when I come back out the -- I had

 6   almost loaded the truck.  And I come back out, the

 7   driver was gone.  I asked them where he was, they

 8   say he was going to the hospital.

 9        Q.      Okay.  Had -- did you -- did an

10   ambulance come and get him?

11        A.      I believe.  I don't know.

12        Q.      Okay.  You didn't see an ambulance --

13        A.      No.  I ain't --

14        Q.      -- get him, he was just gone?

15        A.      But when I come back out there, I was --

16   all I know, he was gone.

17        Q.      All right.  So you didn't talk to any of

18   the ambulance drivers --

19        A.      No, I ain't talked to nobody.

20        Q.      -- the EMT's or anybody?

21        A.      Not nobody.

22        Q.      Okay.  After you finished loading that

23   truck and Mr. Newcomb was gone, what did you do --

24        A.      Well --

25        Q.      -- then?
```

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

```
1        A.      -- some more trucks, I had to load --
2        Q.      Yeah.
3        A.      -- another truck.
4        Q.      Okay.
5        A.      There was a lot of trucks out there.
6        Q.      Okay.  Did you -- did you load
7   Mr. Newcomb's truck?  Did you finish loading
8   Mr. Newcomb's truck?
9        A.      No.
10       Q.      Okay.  Did somebody?  Do you know?
11       A.      Monk.  Monk finished loading it.
12       Q.      Monk finished loading?
13       A.      Uh-huh (positive response).
14       Q.      Okay.
15       A.      And they finished loading it, and he
16  pulled it out the dock and closed it up, until --
17  you know, until he come out the hospital.  When he
18  come back, he got in it and left.
19       Q.      Okay.  Did you talk to him when he came
20  back from the hospital?
21       A.      No.  I ain't -- I ain't see him.
22       Q.      Did you talk to Jack Brinson during all
23  this?
24       A.      No.
25       Q.      Did you ever o-- did you ever overhear
```

72

1      Mr. Newcomb say anything?

2          A.     No.

3          Q.     I mean, you didn't hear him say a word?

4          A.     No.  I didn't hear him say nothing.

5          Q.     Okay.  Did he look bad hurt?

6          A.     Well, like I say, he had -- he had a

7      shirt or something around his head.

8          Q.     Yeah.  Did he have Monk's T-shirt?

9          A.     I believe it was Monk's T-shirt.

10         Q.     Okay.

11         A.     All I know, he had --

12         Q.     A shirt?

13         A.     -- a shirt around his head.

14         Q.     Okay.  Was it bleeding?

15         A.     Yeah.  You know, I could see blood on

16     it.

17         Q.     Yeah.  After this happened, did you

18     ever -- I mean, other than -- and I understand you

19     talked to Maria and Monk, you know, right then.

20     Since then, have you ever talked to Monk about it,

21     about this incident?

22         A.     No.

23         Q.     Never talked about it?

24         A.     No.

25         Q.     Did y'all ever have an investigation

73

1    about it?  Mr. Brinson ever come to you and say, you

2    know, "Hey, man, what do you know about this?"

3        A.    No.  This first time ever to really talk

4    about it, right here.  You know, this the first time

5    I ever really talked about it, because -- you know,

6    it's the first time.  But, you know, yeah, this

7    first time I talked about it.  Because, you know,

8    like I say, I ain't seen nothing, so, you know, I

9    don't know nothing.

10        Q.    You're, in some ways, over the dock,

11    right?

12        A.    Yeah.

13        Q.    Is that fair to say?

14        A.    Yeah.

15        Q.    Okay.  Did you ever think -- did you

16    ever ask any questions, "Hey, what happened?"

17        A.    Well, I --

18        Q.    I mean, other than right then.

19        A.    Yeah.  That's the only time I asked what

20    happened --

21        Q.    Yeah.

22        A.    -- was right then.

23        Q.    Did you ever think, you know, "Somebody

24    got injured on our dock.  What -- do we need to make

25    any changes?"  Did you ever think about that?  Did

1    you ever talk to anybody about that?

2        A.    No, no, sir.

3        Q.    Okay.  Have you changed any of the

4    procedures that you have for loading trucks now,

5    after this happened?

6        A.    But, see, only decision we have is, you

7    know, you don't supposed to be on that dock while we

8    loading that truck.  And when you load -- when you

9    come on that dock, we wait until you go do whatever

10   you got to do, then we go unload the truck.  That's

11   the only procedure we got.  Now, you don't want to

12   move, get off the dock, well, we can't load your

13   truck.

14       Q.    Y'all aren't moving forklifts if

15   somebody's standing there at the dock --

16       A.    No.

17       Q.    -- on the dock, right?

18       A.    Yeah, yeah.  I mean, not going to load

19   your truck.

20       Q.    Okay.

21       A.    Just like a -- just like some -- like

22   you loading a truck and a driver for another truck

23   backs up and you see him, you tell him then, say,

24   "Look here, you got to, you know, get off the dock.

25   You ain't allowed in here."  So then when you get

1   through loading the truck, then you tell him, "You

2   can come in here and do what you got to do.  But

3   long as, you know, we loading these trucks, you

4   know, you're not allowed in here."

5          Q.      So Monk -- and again, I'm not trying to

6   put words in your mouth.  Monk said, "Mr. Newcomb

7   said I hit him"?

8          A.      Uh-huh (positive response).

9          Q.      And he said -- and Monk said, "I didn't

10  hit him"; is that right?

11         A.      That's what Monk said.

12         Q.      Did he say anything else about it?

13         A.      No.  Even though, like I say, it been so

14  long.

15         Q.      Uh-huh (positive response).

16         A.      But I remember that.  He was saying --

17  you know, he was saying that he -- you know, he say

18  he told Mr. Newcomb about going to the doctor.  He

19  told Mr. Newcomb -- he said Mr. Newcomb told him,

20  you know, he didn't want to go to the doctor.

21  That's what he told me.  Like I said, all I -- all

22  I'm doing is getting something hearsay, because I

23  ain't seen nothing.

24         Q.      No.  I understand.  I understand.

25                 VIDEOGRAPHER:  Let me change the

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    tape.

2                   MR. DOUGLAS:  Okay.  We need to just

3    take a break.

4    (Videotaping Stopped)

5                   (A recess was taken.)

6    (Videotaping Started)

7                   VIDEOGRAPHER:  We're back on.

8                   MR. DOUGLAS:  Okay.  Back on the

9    record.

10        Q.    All right.  Mr. Moorman, we're almost

11   done here, but I do have a few more questions for

12   you.

13              Did the drivers ever test the corn,

14   truck drivers ever test the corn, for temperature?

15        A.    Some of them do.

16        Q.    Okay.  Tell me about how that's done.

17        A.    Well, they have to go in -- they want to

18   check the temperature, Chris will do it for them.

19        Q.    Who's Chris?

20        A.    Chris, he's the salesman's son.  He the

21   one that sell the corn.

22        Q.    Okay.  And what's his -- what's his

23   name?  Chris?

24        A.    Chris.

25        Q.    What's his last name?

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1      A.     Wade.

2      Q.     Chris Wade?

3      A.     Uh-huh (positive response).

4      Q.     Okay.

5      A.     See, him and his daddy sell it, one who
6 sell the corn.

7      Q.     Okay.  So they work for W-W Produce?

8      A.     W-W Produce is them.

9      Q.     Okay.  And so if a driver needs to test
10 the corn, they get them to do it?

11      A.     Chris and the driver do it together.

12      Q.     Okay.  Oh, Chris and the driver do it.
13 Where do they do it?

14      A.     Well, Chris will get the -- he'll go --
15 sometimes he'll go in and get an ear of corn out
16 that pallet that -- you know, that I'm taking.  Then
17 he'll get the thermometer and stick it -- stick it
18 down in there for the driver.  Then some drivers,
19 they have their own things and they go from there.

20      Q.     Right.  If they have their own things,
21 how do they test the temperature?

22      A.     Well, some of them, they got a -- some
23 of them have a -- have a gun.  And they can -- when
24 that -- when that -- when that -- when that pallet
25 come by that -- by them, they can do it.  But they

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross          229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    can't get a better reading than there is when they
2    stick it down in there.
3          Q.     Right.
4          A.     Because with that gun, it might say 90
5    degrees.  But when you stick it down in that cob
6    like Chris do, that's the real temperature.  That's
7    the temperature right there.
8          Q.     Okay.  Do they go on the dock to do
9    that?
10         A.     Chris and them be standing up there
11   doing it.  See, we don't -- we don't load no truck
12   until Chris and the driver get through with the
13   temperature, because we don't want to put that corn
14   on there and they say it's too hot.  Then you got to
15   take it back off.
16         Q.     Back in 2013, is that how it would have
17   been done, too, three years ago?
18         A.     Well, they check it with that -- with
19   that temperature gauge, yeah --
20         Q.     Yeah.
21         A.     -- stick it -- stick it down in that --
22   in the cob.
23         Q.     I mean, would a driver have to go -- I
24   man, how would a driver know to do that?  How would
25   they know to go --

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1        A.        Well, the --

2        Q.        -- get Wade?

3        A.        -- people -- the broker, whoever, you

4    know, told them to come get that load of corn,

5    they'll tell him to check the temperature on it.

6    And then he'll tell me, say, "Well, I need to check

7    the temperature."

8               I say, "Well, you wait, let me go get

9    Chris."  Because Chris -- that's when I -- him and

10   Chris go and check it.

11       Q.        Where do they go?  So I -- okay.  Well,

12   thank you.  I appreciate that.  So him and, you

13   know, Chris Wade, a driver and Chris Wade, where do

14   they actually go to get the temperature?

15       A.        Well, Chris, like I say, Chris will get

16   an ear of corn out that pallet, out of one of them

17   crates done put on the truck.  And the driver -- he

18   on the dock.  But I'm sitting there with him waiting

19   for Chris and the driver to get through checking the

20   temperature.  He'll take the ear of corn out of

21   the -- out of one of them crates, then peel it back

22   and stick it -- stick it in there, show it to the

23   driver.  He'll be standing -- you know, standing

24   right there.

25       Q.        Right.

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1      A.      And then once Chris get through, Chris

2    and the driver go on back out.

3      Q.      Okay.  No.  And I understand.  But they

4    do -- for that purpose do go past the gate --

5      A.      Yeah.

6      Q.      -- and stand on the dock --

7      A.      Yeah.

8      Q.      -- and then go back?

9      A.      Yeah.

10      Q.      I mean, you don't drive something past

11    the gate and make them stand back there; is that

12    right?

13      A.      No, no, no, no.

14      Q.      Okay.

15      A.      Chris, he'll come over there -- he'll

16    come over there and get an ear of corn out of one of

17    them crates.

18      Q.      Okay.

19      A.      Then he'll show -- see, the driver

20    standing right over -- standing over there by the --

21    over there by the office.  But he -- like I say,

22    then sometimes they'll be outside the gate.  And

23    then sometimes he be right there.  But like I say, I

24    have to -- I wait till he get through, you know,

25    before I go, because like I say, I don't want to put

Deposition of Willie Morman, taken  on 7/6/2016
courtreporter@mixonreportingservice.com

```
 1    that corn on there and he crying about it too hot.
 2    Then I got to take it off.
 3         Q.    I understand.  Okay.  I understand you
 4    never talked to Mr. Newcomb yourself --
 5         A.    No.
 6         Q.    -- right?  All right.  Is it also your
 7    testimony you never heard Mr. Newcomb over-- you
 8    never overheard him say anything --
 9         A.    I ain't --
10         Q.    -- is that right?
11         A.    I ain't heard him say nothing.
12         Q.    I mean, you didn't hear him --
13         A.    No.
14         Q.    -- say how he got hurt or --
15         A.    No.  I ain't heard him --
16         Q.    -- how any --
17         A.    I ain't -- I ain't hear him say nothing.
18    Like I say, when I -- when I -- when I -- when I
19    came up there, Maria and Monk told me.  I got my
20    information from them.
21         Q.    Okay.
22         A.    But then I stayed there a little while,
23    and I went back and finished loading that truck I
24    was loading.
25         Q.    Okay.  And I know it's been three years
```

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    ago, but try to tell me exactly what -- to the best

2    of your memory, exactly what you and Monk talked

3    about when y'all were standing by Mr. Newcomb.

4         A.     All I know, when I -- when I went over

5    there, I say -- when he say -- Monk said the

6    driver -- or Monk said -- Monk said, "The driver was

7    picking up something and say I hit him."  And then

8    Monk say, "I didn't hit him."

9               And then I -- first Maria said it.  And

10   then that when I asked Monk.  And he told me the

11   same thing.  He said, "I ain't hit him.  He say I

12   hit him.  I ain't hit him."  And then -- and Monk

13   say he was doing something in the back of the truck.

14   But like I say, I don't know what he was doing.  He

15   say he was doing something in the back of the truck.

16        Q.     So you never -- Monk never told you,

17   "Hey, this guy slipped -- this guy told me he

18   slipped and fell"?

19        A.     No, no, no, he ain't never told me that.

20   All -- like I say, all he did was told me, "The man

21   say I hit him.  I didn't hit him."

22        Q.     Monk never told you that Mr. Newcomb

23   said, "Man, this wasn't your fault.  It was my

24   fault"?

25        A.     No, no, he ain't never told me that.

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1       Q.      I mean, that's what we're fighting about

2   it, isn't it?

3       A.      Yeah, I reckon so.  I don't know.  Like

4   I say, I don't think what happened.  All I know,

5   when I come out the thing, it was over with.

6       Q.      All right.  Do you know of anybody that

7   saw what happened?

8       A.      No, no.  Really, I couldn't -- I

9   couldn't tell you that.

10      Q.      Okay.

11      A.      I don't know.

12      Q.      Not Maria, not Monk --

13      A.      Huh-uh (negative response).

14      Q.      -- as far as you know?

15      A.      Because Maria, she was in the office.

16      Q.      Yeah.

17      A.      She was in the office checking trucks

18  out.  And she see what had happened the same way I

19  did.  She come out to find out what was going on.

20      Q.      Okay.  I mean, Maria never told you,

21  "Hey, I saw him slip" or anything like that?

22      A.      No, no.  All she say, "The driver say

23  Monk hit him."  That was all Maria said.

24      Q.      Now -- and I know that you speak English

25  and you don't speak Spanish.  But none of the -- as

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1  far as you know, none of the Mexican employees --

2      A.     See, the Mexicans, they was over there

3  putting stickers on corn.

4      Q.     Right.

5      A.     Wasn't nobody over there but -- but then

6  after everything done jumped off, that's when

7  everybody came over there.  But, see, they was over

8  there, they -- they don't be over there where the

9  truck's at.  They be about from here to probably

10 that window right there from where we be at.  They

11 be putting stickers on the corn.  And after

12 everybody was standing up there, then that's when

13 they come over there.

14     Q.     As far as you know, did Monk get in

15 trouble for anything that day?

16     A.     No.  I can't remember that.

17     Q.     Did Ms. -- I mean, you didn't -- you

18 didn't -- do you have the ability -- I mean, can you

19 reprimand him?  Can you write him up or whatever?

20     A.     No.  I can tell Jack.

21     Q.     Yeah.

22     A.     I can tell Jack that, you know, that.

23 But, you know, that's all -- I can tell Jack.

24     Q.     Do you know if Jack did?

25     A.     No.  Like I say, all -- him and Jack

1    talked.  You know, whatever they talked about, you

2    know, I don't know.

3         Q.    Okay.  Him and Jack talked about

4    something?

5         A.    Yeah, whatever, you know.

6         Q.    Okay.

7         A.    If they talked, it was between Jack and

8    him --

9         Q.    I understand.

10         A.    -- what happened.

11         Q.    Okay.

12         A.    He --

13         Q.    But Jack never came to you and told

14    you --

15         A.    No, no.

16         Q.    Okay.

17         A.    Ain't nobody ever came to me and told me

18    nothing.

19         Q.    Okay.  Do you know who called the

20    ambulance?

21         A.    I don't know nothing.  Like I say, all I

22    know, when I come -- I don't know nothing.  When I

23    come out that cold box, he was gone.  He was gone.

24         Q.    Do you know somebody named Chris

25    Struthoff?  Does that name sound familiar?

```
 1         A.      No.  Only Chris I know is Chris Wade.

 2         Q.      Okay.  Who works for W-W Produce?

 3         A.      That's his daddy.

 4         Q.      Okay.  How long has he been working

 5    there?

 6         A.      Who that?

 7         Q.      Chris Wade.  I mean, was he there at the

 8    time?

 9         A.      No.

10         Q.      No?

11         A.      No, not as I know of.  I don't --

12         Q.      Well, let me -- let me back up.  Was

13    Chris Wade working in 2013, out there?

14         A.      No, no, he weren't working out there,

15    no, no, no.

16         Q.      He's been there recently --

17         A.      Yeah.

18         Q.      -- is that right?

19         A.      He just came there.

20         Q.      Okay.

21         A.      They had a -- his daddy had another

22    salesman there.  And I don't know was it --

23         Q.      Was his name Chris Struthoff?  Do you

24    know?

25         A.      His name was Chris, yeah.
```

1       Q.      It was Chris?

2       A.      Yeah.

3       Q.      Okay.  But you don't know his last name?

4       A.      No.  His name was Chris.  Yeah, that's

5    his -- yeah, that's right, his name was Chris.

6       Q.      Okay.  Do you know anything about the

7    injuries Mr. Newcomb is claiming?

8       A.      No.

9       Q.      Okay.

10      A.      Because, you know, I never -- I never

11   won -- you know, wondered about it, asked about it,

12   simple as that.  Because once he got hit, you know,

13   I went back to work, because I couldn't do nothing.

14   I don't know nothing, I couldn't do nothing, so I

15   just went on back and finished loading that truck I

16   was loading.

17      Q.      Just finished doing your job?

18      A.      Yeah.  What could I do?  I ain't no

19   doctor.  I don't know what happened or nothing.  All

20   I know, what somebody said.

21      Q.      When this happened -- okay.  We were

22   talking about how the drivers test the corn, and you

23   said Chris Wade would come out.  Well, three years

24   ago Chris Wade wasn't there, right?

25      A.      Yeah, right.

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1        Q.      So how would the drivers test the corn

2    then?

3        A.      Same way.  Whoever the salesman is was

4    in that office at that time his daddy had working

5    for him, they would test it for him.

6        Q.      Okay.

7        A.      They would -- because he had -- since

8    I've been there, he had -- I done forgot the

9    salesmen.  I know he had Chris.  He had -- he had a

10   salesman named Gerald.  Then he had -- and he had

11   another salesman.  Now, it was like -- you know,

12   they test the corn.  Because, you know, they got the

13   thermometer to test it with.  See, we don't have no

14   thermometer.  But the salesmen have the thermometer

15   to test.

16       Q.      They stick it in the crate, or they

17   actually pull out an ear?

18       A.      No.  They pull out an ear of corn.

19       Q.      Yeah.

20       A.      And they shuck the corn.  They shuck the

21   corn, and then they stick it in the cob of the corn.

22   And that will tell you how cold it is.  See, that

23   will give you a better temperature than that gun.

24   Now, you aiming that gun at it, it might register

25   90.  But you stick that -- stick it in that cob, it

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    down in there where it supposed to be, it might be

2    registering 60.

3        Q.    But somebody -- but people do use the

4    gun?

5        A.    Yeah.

6        Q.    How close you got to be to do that, if

7    you know?

8        A.    I don't know.  You know, they can stand

9    about from here to that chair right there and aim it

10   at it and -- you know, when I'm going in the truck

11   with it, aim it at it.  But you get a better reading

12   when they stick it down in that cob.  And that what

13   Chris do.  See, he said he -- with that gun, he

14   might say it hot.  And Chris -- I tell Chris.  He

15   say, "Hey, man, that corn hot," then I go get Chris.

16       Q.    I got you.  When you were loading the

17   truck, did you ever hear anybody yell, "Hey,

18   Monk" --

19       A.    Like I say --

20       Q.    -- "watch out," or anything?

21       A.    -- when -- when I come out -- when I

22   come out that cold box, all -- everybody was over

23   there talking.

24       Q.    So you didn't hear anybody --

25       A.    I didn't --

Mixon Reporting Service, Inc.
Albany - Perry - Tifton - Valdosta - Waycross                 229-382-8512

Deposition of Willie Morman, taken  on 7/6/2016
courtreporter@mixonreportingservice.com

1        Q.        -- yell anything?

2        A.        -- hear nothing.  I didn't hear nothing.

3    I didn't hear nothing, I ain't seen nothing.  When I

4    come out, I stopped.  I seen Monk's tow motor.  I

5    said, "What's going on?"  Then I looked over --

6        Q.        I'm sorry.  You saw Monk's what?

7        A.        Forklift.

8        Q.        Oh, yeah, yeah.

9        A.        And I got off, and I went over there

10   where they was.  They were -- all of them standing

11   up there.  And that's when I see the driver.  That's

12   when they told me what had happened.  I stood there,

13   stood there.  And the next thing I know, I went back

14   to loading that truck I was on.

15       Q.        Did Monk -- Monk's forklift, did it

16   still have the corn on it?

17       A.        Yeah.

18       Q.        Two pallets?

19       A.        Yeah.  He never went in the truck with

20   it.  Far as I know of, he never went in there.

21   Because when I come out there, he was parked and had

22   two pallets of corn on it.

23       Q.        And where was it parked?

24       A.        Over there by the -- you know, the gang

25   board was right here.  And I -- like I say, I don't

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

Deposition of Willie Morman, taken on 7/6/2016
courtreporter@mixonreportingservice.com

1    know how far it was away from that gang board.  But

2    I know he was getting ready to go up in the truck

3    with it.  That's all I know.  But how far it is from

4    that gang board, I don't know.  But I know he was

5    getting ready to go up in that truck with it.

6        Q.    Did you ever hear from Monk or anybody

7    else that somebody yelled a warning?

8        A.    No, no.

9        Q.    Never heard that?

10       A.    No, ain't nobody say nothing to me about

11   that.

12       Q.    I believe that's all the questions I

13   have.

14       A.    All right.

15       Q.    Thank you for your time.

16            MR. DOUGLAS:  Mark?

17            MR. PICKETT:  I have no questions.

18            MR. DOUGLAS:  All right.  That

19   concludes the deposition.

20   (Videotaping Stopped)

21            (Whereupon, neither the deponent nor any

22   party having specifically reserved reading and

23   signing of the deposition, signature was effectively

24   waived and the taking of the deposition was

25   concluded at 2:10 p.m. the same date.)

**Mixon Reporting Service, Inc.**
Albany - Perry - Tifton - Valdosta - Waycross                    229-382-8512

1                    C E R T I F I C A T E

2    STATE OF GEORGIA,

3    COUNTY OF TIFT:

4              I hereby certify that the foregoing

5    transcript was taken down, as stated in the caption,

6    and the questions and answers thereto were reduced

7    to typewriting by computer-aided transcription under

8    my direction; that the foregoing pages 1 through 92

9    represent a true, complete, and correct transcript

10   of the evidence given; and I further certify that I

11   am not of kin or counsel to the parties in the case,

12   am not in the regular employ of counsel for any of

13   said parties, and am in no wise interested in the

14   result of said case.

15              I further certify that the original of

16   this deposition will be filed with J. Jeffery Helms,

17   Esquire, Counsel for the Plaintiffs.

18              This the 31st day of July 2016.

19

20

21
     _____
22   DEBBIE PAULK MIXON, CCR-B-652
     Notary Public
23   My Commission Expires 06/06/2020

24

25