```
1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF GEORGIA
2                        ALBANY DIVISION
3     MICHAEL NEWCOMB and KATHY    )
      NEWCOMB,                     )
4                                  )
                      Plaintiffs, )
5                                  ) Civil Action File
             vs.                   )
6                                  ) No. 1:15-CV-00080-LJA
      SPRING CREEK COOLER, INC.;   )
7     SPRING CREEK PRODUCE, LLC;   )
      SF FARMS, INC.; SF EXPORTS,  )
8     INC.; T & L FARMS, INC.;     )
      TERRIL SCOTT PROPERTIES,     )
9     LLC; TERRIL SCOTT FARMS,     )
      LLC; WALDINE B. SCOTT FARMS,)
10    LLC; EDDIE T. SCOTT FARMS,   )
      LLC; T S EQUIPMENT LEASING,  )
11    LLC; L & W FARMS, LP; TERRIL)
      SCOTT; and JOHN DOE, Name    )
12    Unknown, Address Unknown,    )
                                   )
13                   Defendants. )
14    -----------------------------------------------------
15
16               Videotaped Deposition of KATHY C.
17    NEWCOMB, called by the Defendants, taken pursuant to
18    the Federal Rules of Civil Procedure, was reported
19    by Debbie Paulk Mixon, Certified Court Reporter,
20    Registered Professional Reporter, Certified Realtime
21    Reporter, and Notary Public, at the offices of
22    Gardner, Willis, Sweat & Handelman, LLP, 2408
23    Westgate Drive, Albany, Georgia, commencing at
24    approximately 3:10 p.m. on the 18th day of November
25    2015 and concluded on the same date.
```

1

```
 1                  A P P E A R A N C E S
 2
      For the Plaintiffs,
 3    MICHAEL NEWCOMB and KATHY NEWCOMB:
 4                      J. JEFFERY HELMS, Esquire
                        JAMES E. DOUGLAS, JR., Esquire
 5                      The Helms Law Firm, P.C.
                        10 North College Street
 6                      P.O. Box 537 (31634-0537)
                        Homerville, Georgia   31634
 7
 8    For the Defendants,
      SPRING CREEK COOLER, INC.; SPRING CREEK PRODUCE,
 9    LLC; SF FARMS, INC.; SF EXPORTS, INC.;T & L FARMS,
      INC.; TERRIL SCOTT PROPERTIES, LLC; TERRIL SCOTT
10    FARMS, LLC; WALDINE B. SCOTT FARMS, LLC; EDDIE T.
      SCOTT FARMS, LLC; T S EQUIPMENT LEASING, LLC; L & W
11    FARMS, LP; TERRIL SCOTT; and JOHN DOE, Name Unknown,
      Address Unknown,
12
                        MARK PICKETT, Esquire
13                      Gardner, Willis, Sweat & Handelman
                        P.O. Drawer 71788 (31708-1788)
14                      2408 Westgate Drive
                        Albany, Georgia   31707
15
16
17    Also Present:  Mr. Michael Newcomb
                     Mr. Jimmy Mixon, Videographer
18    ----------------------------------------------------
19    PRELIMINARIES:
20               (Disclosure submitted to all counsel.)
21    (Videotaping Started)
22                     VIDEOGRAPHER:  Okay.  We're on the
23    record.
24                     MR. PICKETT:  Okay.  This will be the
25    deposition of Kathy Newcomb, taken pursuant to
```

                                                          2

1    notice, by agreement of counsel as to time and

2    place, taken on cross-examination -- she is an

3    adverse party -- for discovery purposes and all

4    other purposes allowed under the Georgia Civil

5    Practice Act.  May we also reserve objections as to

6    this deposition until time of use?

7                    MR. HELMS:  Sure.

8                    MR. PICKETT:  And there are no --

9    there are no objections as to notice, qualification

10    of the court reporter, or qualification of the

11    videographer?

12                    MR. HELMS:  True.

13                    MR. PICKETT:  Is she going to want to

14    read and sign as well?

15                    MR. HELMS:  She will.

16                    MR. PICKETT:  All right.  If you will

17    place her under oath, please.

18

19

20

21

22

23

24

25

3

```
 1                    KATHY C. NEWCOMB

 2     having been first duly sworn, was examined and

 3     testified as follows:

 4                    CROSS-EXAMINATION

 5                    BY:  MR. PICKETT

 6         Q.    Thank you.  Ms. Newcomb, you are a party

 7     to this action?

 8         A.    Yes.

 9         Q.    Okay.  And as the Plaintiff in this

10     action, were you present for all parts of the

11     deposition of your husband, Michael Newcomb?

12         A.    Yes.

13         Q.    Particularly in the beginning I went

14     over with him some rules and guidelines about how we

15     take depositions.  Do you remember that?

16         A.    Yeah.

17         Q.    Okay.  And if you don't, I can go over

18     it all with you.  But to save time, if you were --

19         A.    No.  I can remember.

20         Q.    -- paying attention --

21         A.    Yeah.

22         Q.    Okay.  So if you -- can you follow those

23     same directions?

24         A.    Yes.

25         Q.    Okay.  Can we have the same agreements
```

4

1    that he and I talked about?

2        A.    Yes.

3        Q.    Okay.  Would you state your name for the

4    record, please.

5        A.    Kathy C. Newcomb.

6        Q.    And, Ms. Newcomb, if you could, just

7    fairly briefly give me an educational background.

8        A.    Graduated high school, attended two

9    years of business college for medical office

10   assistant.

11       Q.    Anything else?

12       A.    That's it.

13       Q.    Okay.  I thought that I had understood

14   from mediations that you were -- you worked as a

15   nurse?

16       A.    No.  You guys thought that.

17       Q.    Oh, okay.  Well, I've been wrong before.

18   Now I am again.

19       A.    I actually worked in the hospital --

20       Q.    Okay.

21       A.    -- telemetry tech and then unit

22   secretary.  I had got -- injured my back.  I was an

23   assistant, a nursing assistant.

24       Q.    Okay.

25       A.    Yeah.

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

| | | |
|---|---|---|
| 1 | Q. | Okay.  So have you had some nursing |
| 2 | training? | |
| 3 | A. | Just the -- like CNA part of it. |
| 4 | Q. | Okay. |
| 5 | A. | Like certified nursing assistant. |
| 6 | Q. | Yeah. |
| 7 | A. | Yeah. |
| 8 | Q. | So you have had -- you had some training |
| 9 | as a CNA? | |
| 10 | A. | Yeah. |
| 11 | Q. | All right.  So you had -- what year did |
| 12 | you graduate high school? | |
| 13 | A. | '83. |
| 14 | Q. | And from what high school? |
| 15 | A. | Bordentown Regional High School. |
| 16 | Q. | Borden-- |
| 17 | A. | New Jersey, yeah. |
| 18 | Q. | Bordentown, New Jersey.  And then after |
| 19 | high school, you had two years of -- | |
| 20 | A. | Business community college.  I had that |
| 21 | in Alabama, actually. | |
| 22 | Q. | Okay.  That was when y'all lived in |
| 23 | Oxford? | |
| 24 | A. | Yeah, yes. |
| 25 | Q. | And what sort of training was that, |

6

```
 1    business college training?
 2         A.      Medical office assistant.
 3         Q.      Okay.
 4         A.      Anything to do with the office.
 5         Q.      Medical office assistant was --
 6         A.      Billing, yeah.
 7         Q.      I think you said that.  I just wasn't
 8    paying attention.  And then in addition to that, you
 9    also had training -- you had the certified nursing
10    assistant training?
11         A.      Correct.
12         Q.      Where did you have that?
13         A.      Geisinger Medical Center.
14         Q.      And when was that?
15         A.      I worked there the last ten years.
16         Q.      So you had the training kind of at the
17    beginning of that ten years?
18         A.      Yeah, all throughout.  Like every six
19    months we go for recertifications.
20         Q.      Okay.  To get your initial
21    certification, was there a period of training you
22    had to go through?
23         A.      Yeah, first six weeks of your
24    employment.  So November 2005, I would say.
25         Q.      Okay.  So they put you through that at
```

7

1    the very beginning of your employment --

2          A.      Correct.

3          Q.      -- as part of your job, basically?

4          A.      Uh-huh (positive response).

5          Q.      Other than that training and the two

6    years of business college and high school, any other

7    education that you have?

8          A.      No.

9          Q.      You ever been in the military?

10         A.      No.

11         Q.      Where were you born?

12         A.      Trenton, New Jersey.

13         Q.      Okay.  Other than -- I know Bordentown,

14   obviously, and then you're in Danville,

15   Pennsylvania, now and you lived in Oxford, Alabama,

16   I know, for some years, is there anyplace else that

17   you've lived?

18         A.      As a child I lived in Florida.

19         Q.      Okay.  Where in Florida?

20         A.      I think it was Springfield,

21   Spring-something.  I don't remember.  I was young.

22         Q.      How old were you when you lived in

23   Florida?

24         A.      Like seven.

25         Q.      Okay.  How long were you there?

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1        A.      Like three years, probably.

2        Q.      Other than those three years in Florida

3   and the places that I've already named, have you

4   ever lived anywhere else?

5        A.      No.

6        Q.      Ever lived in Georgia?

7        A.      No.

8        Q.      Any family in Georgia?

9        A.      No.

10       Q.      Do you have any family still in Florida?

11       A.      No.

12       Q.      Was that your dad was just working down

13   there for a while or something?

14       A.      Correct.

15       Q.      Okay.  What was his business?

16       A.      He worked at the gas station, BP gas

17   station, Phillips 66 --

18       Q.      Okay.

19       A.      -- them kind of things.

20       Q.      Did he do that before he went to Florida

21   or --

22       A.      Yes, uh-huh (positive response).

23       Q.      And then he moved to that location doing

24   the same thing?

25       A.      Correct.

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                           229-382-8512

```
 1        Q.     The company moved him down there,

 2   basically?

 3        A.     Well, my grandmother moved down there,

 4   so my mother wanted to move down there.  So he got a

 5   transfer.

 6        Q.     Okay.

 7        A.     Yeah.

 8        Q.     And then ultimately moved back?

 9        A.     Correct.

10        Q.     Now, do you still have any Florida

11   family?

12        A.     No.

13        Q.     Can you give me a brief work history?

14   When I say "brief," I mean not necessarily the

15   number of years but in the amount that you need to

16   tell me about each job.

17        A.     Okay.  My grandmother owned a deli.

18        Q.     Okay.

19        A.     So I worked at the deli from the time I

20   was 16 to the time I was 21, probably.

21        Q.     Okay.

22        A.     Then we moved to -- I met Mike.  I was

23   22.  So moved to Alabama.  I worked -- gosh.  I was

24   a manager of a furniture store.

25        Q.     Okay.
```

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1      A.      And that was it there.  And then worked

2   at the convent in Danville, Pennsylvania, as a

3   nursing assistant --

4      Q.      Okay.

5      A.      -- for about five years.  Then I worked

6   at Geisinger.

7      Q.      Okay?  Now, was -- the convent, which

8   convent was it?

9      A.      Holy Family Convent --

10      Q.      And --

11      A.      -- Christian charity.

12      Q.      Okay.  At that convent, is that where

13   you got your CNA training?

14      A.      I had some there, too, yeah.

15      Q.      Okay.

16      A.      Geisinger trains you to how they want

17   you, regardless of what training you have.

18      Q.      Okay.  So you got your certification

19   while you were at the convent?

20      A.      At Geisinger.

21      Q.      Okay.

22      A.      Yeah.  You didn't have to be certified

23   at the convent.

24      Q.      Okay.  What type of work did you do at

25   the convent?

11

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1        A.        Took care of nuns --

2        Q.        Okay.

3        A.        -- every basic need.

4        Q.        So you were basically a personal

5     caretaker?

6        A.        Correct.

7        Q.        And then when you went to Geisinger,

8     what did you start off doing there?

9        A.        Nursing assistant.

10        Q.        Doing the same sort of thing in the

11     hospital that you'd been doing?

12        A.        Correct, uh-huh (positive response).

13        Q.        Okay.  How long did you do that?

14        A.        That particular part of that job?

15        Q.        Uh-huh (positive response).

16        A.        Probably five years.

17        Q.        You stayed at Geisinger but in a

18     different position?

19        A.        Yes.

20        Q.        And what was your --

21        A.        I was also a telemetry tech.  We watch

22     the heart monitors --

23        Q.        Okay.

24        A.        -- of each patient on the floor.  And

25     then like I'd tell the nurse or anybody if something

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1    was going on with their heart.  And then --

2        Q.    It there -- I'm sorry.  Is it like a

3    bank of monitors --

4        A.    Yeah.

5        Q.    -- for every room someplace?

6        A.    Yeah.

7        Q.    So --

8        A.    And I'm sitting there watching

9    everybody.

10       Q.    Okay.  So you're watching all of these

11   monitors, and if one of them pops up something a

12   little --

13       A.    Right.

14       Q.    -- abnormal, you'll notify the nurse for

15   that room?

16       A.    Call code, yeah, uh-huh (positive

17   response).

18       Q.    Okay.  And there's some special

19   training, you have to be able to decipher what all

20   those beeps and number and flashes of lights and all

21   that stuff means?

22       A.    Uh-huh (positive response), yes.

23       Q.    Okay.  Geisinger provided that to you?

24       A.    Yes.

25       Q.    Okay.  And what else have you done at

**Mixon Reporting Service, Inc.**

**Albany - Tifton - Valdosta**                              229-382-8512

```
1    Geisinger besides nursing assistant and telemetry
2    tech?
3         A.    Unit secretary.
4         Q.    And what does a unit secretary do?
5         A.    I got ready the admissions, discharges,
6    prescriptions, ordered their lunches, their meals,
7    everything for a patient --
8         Q.    Okay.
9         A.    -- like paperwork-wise.
10        Q.    Okay.  Any kind of paperwork a patient
11   needed, it came through you?
12        A.    Correct.
13        Q.    All right.  What else have you done at
14   Geisinger?
15        A.    That's it.
16        Q.    Okay.  And what are you currently doing
17   there?  Are you still there?
18        A.    No.
19        Q.    Okay.  When did you leave there?
20        A.    The last year.
21        Q.    Okay.  What was the last month that you
22   worked?
23        A.    Let me think.  I think October.
24        Q.    October of 2014?
25        A.    Yes.  I want to say yes.
```

14

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1      Q.      Okay.  So just over a year ago from now?

2      A.      Yeah, yes.

3              THE WITNESS:  Sorry.

4      Q.      And at that point, were you still -- you

5      were still unit secretary?

6      A.      Yes.

7      Q.      And why did you leave?

8      A.      I injured myself in '05 lifting a

9      patient at work.  So I -- Geisinger, I had three

10     back surgeries, then another surgery.  So the time

11     off that I had was coming out of my own bank, like

12     out of my own personal buildup time, which it should

13     have came from Geisinger, because I injured myself

14     at work.

15     Q.      Okay.

16     A.      So ended up, went and talked with a

17     lawyer about Workmen's Comp --

18     Q.      Okay.

19     A.      -- getting paid the time off.  And they

20     covered my medical, and I continued working for the

21     ten years that I was there.  And once the ten-year

22     mark was up -- it just got shady, say.  So went back

23     to court.  I reinjured myself and went back to court

24     to get reinstated Workmen's Comp, the benefits of my

25     time -- I wanted paid time off, not out of my own

Mixon Reporting Service, Inc.
Albany  - Tifton - Valdosta                          229-382-8512

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1    bank.  So ended up in between the weeks before my

2    court, they so-called fired me.  Went to my hearing,

3    the judge seen my way.  And I left, officially

4    resigned from Geisinger.

5        Q.    Okay.  So you reinjured your back at

6    work?

7        A.    Yeah, yeah.  I continually had flare-ups

8    throughout the ten years.  But I liked to work.

9    Like I didn't like to not work.

10       Q.    Okay.

11       A.    During those flare-ups, I had FMLA.  And

12   it was always time I earned.  So I always ended up

13   paying myself instead of the employer paying me.

14       Q.    You were taking vacation time instead of

15   having --

16       A.    Exactly.

17       Q.    -- indemnity benefits from your

18   employer?

19       A.    Correct.

20       Q.    Okay.

21       A.    And that was part of the original

22   agreement when we went to court in the beginning,

23   was they were supposed to take care of my medical

24   plus any flare-ups I would have, I would take my

25   time off.  But I worked.  I really didn't need much

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                                229-382-8512

```
 1    time off.  But it was always a problem.  So finally

 2    they -- we came to a point where we weren't

 3    agreeing.

 4         Q.    Have you sought any work since then?

 5         A.    No.

 6         Q.    Do you intend to go back to work?

 7         A.    Huh-uh (negative response), no.

 8         Q.    Have you --

 9         A.    I really can't.

10         Q.    Because of your back?

11         A.    Uh-huh (positive response).

12         Q.    Do you -- have you applied for Social

13    Security benefits?

14         A.    I just did.

15         Q.    Okay.  So that's in the process as well?

16         A.    Yeah.

17         Q.    What is your date of birth?

18         A.    9/25/65.

19         Q.    Social Security number?

20         A.    xxx-xx-xxxx.

21         Q.    I'm sorry.  Let me write it down for

22    you.  xxx-xx--

23         A.    xxxx.

24         Q.    Okay.

25               MR. HELMS:  You agree, don't you,
```

1    Mark, that we'll --

2                    MR. PICKETT:  Yes, yes, yes.  You can

3    drop -- remove it from the transcript.

4         Q.     Other than your marriage to Robert (sic)

5    Newcomb, have you ever been married to anyone else?

6         A.     Michael Newcomb.

7         Q.     Pardon?

8         A.     You said Robert.

9         Q.     I did.

10        A.     Michael.

11        Q.     Yes, Robert.  Other than -- how many

12   times you been married?

13        A.     Once.

14        Q.     Okay.  Other than the children that

15   we've already heard about that you have with

16   Mr. Newcomb, have you -- do you have any other

17   children?

18        A.     No.

19        Q.     What is your maiden name?

20        A.     Cavanaugh.

21        Q.     C-A-V-A-N-A-U-G-H?

22        A.     Correct.

23        Q.     Other than Kathy Newcomb and Kathy

24   Cavanaugh, have you ever gone by any other names?

25        A.     No.

Mixon Reporting Service, Inc.

Albany  - Tifton - Valdosta                    229-382-8512

1       Q.      You have any nicknames?

2       A.      No.

3       Q.      You go by Kathy?

4       A.      Correct.

5       Q.      As the member of the family with the

6    medical background, do you oversee his medical

7    bills, Mr. Newcomb's?

8       A.      All the bills I take care of now, yeah.

9       Q.      Okay.  Do you know:  Has -- does he have

10   any unpaid medical bills?

11      A.      I don't -- I don't know.  He might have

12   a couple of like co-payments or something --

13      Q.      Okay.

14      A.      -- yeah.

15      Q.      What medical bills have you had to pay

16   out of pocket?

17      A.      For his injury?

18      Q.      Yes, ma'am.

19      A.      Out of pocket?

20      Q.      Yes.

21      A.      None.

22      Q.      It's all been covered either by his

23   health insurance or his Workers' Comp?

24      A.      Correct.

25      Q.      Has any of it been paid by health

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

```
 1    insurance or all by Workers' Compensation?
 2           A.     In the beginning it was coming both,
 3    health insurance and Workmen's Comp.  And then that
 4    got straightened out.  I don't know if the health
 5    insurance was reimbursed.  But it's all coming out
 6    of Workmen's Comp now.
 7           Q.     Okay.  And are his -- he's told me he's
 8    continuing to go to the doctor once a month to be
 9    monitored and once every three months for Botox and
10    then may go back for a check on -- make sure his
11    plate's doing okay.
12           A.     Correct.
13           Q.     All that's being paid by Workers' Comp?
14           A.     Correct.
15           Q.     When he goes to see his physicians, do
16    you go with him?
17           A.     Yes, most of the time.
18           Q.     Okay.
19           A.     The independent medical examiner, they
20    came and pick him up, I didn't go with him that
21    time.
22           Q.     Okay.  And that was --
23           A.     I believe you said April, maybe.
24           Q.     Dr. Horchos?
25           A.     I believe so.
```

Mixon Reporting Service, Inc.
Albany - Tifton - Valdosta                    229-382-8512

1      Q.      April of this year at Northeastern

2    Rehab?

3      A.      Correct.

4      Q.      Okay.  That was something his Workers'

5    Comp -- his employer arranged through Workers' Comp

6    for him to go have an IME?

7      A.      Right.

8      Q.      And you did not go with him to that?

9      A.      I did not.

10      Q.      Okay.  And when you go with him to his

11    medical appointments, do you sit out in the lobby

12    and wait on him or do you go in with him as he talks

13    to the doctor?

14      A.      Family doctor, I go in with him.

15      Q.      Okay.  That's Dr. Eckel?

16      A.      Correct.  His neurologist, I sit

17    outside.  I don't really want to watch her give him

18    39 shots of Botox.

19      Q.      Okay.

20      A.      And he has a nurse that accompanied him,

21    went in from Workmen's Comp.  So I felt like he was

22    fine.

23      Q.      Okay.

24      A.      And Azeredo.

25      Q.      Is that Dr. Eckel?

Mixon Reporting Service, Inc.
Albany  - Tifton - Valdosta                    229-382-8512

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1       A.      Eckel is his family doctor.

2       Q.      I'm sorry.

3       A.      The neurologist is Dr. Kelley.

4       Q.      Thank you.  Okay.  And then other than

5    Dr. Kelley, Dr. Eckel, and then the IME physician,

6    Dr. Horchos, what other doctors have you been with

7    him to see?

8       A.      Was it Raju?  I think I attended that

9    IME with Dr. Raju.

10      Q.      That was another IME?

11      A.      Uh-huh (positive response), yes.

12      Q.      When was that one?

13      A.      Probably a year prior to that one, the

14   one in April.

15      Q.      So April of '14, 2014?

16      A.      I would guess.

17      Q.      Okay.

18      A.      I'm not for sure.

19      Q.      Any other doctors that you know about

20   that he's been to?

21      A.      The eye doctor.

22      Q.      And what's his name?

23      A.      I can't recall.

24      Q.      Did you go with him to see him?

25      A.      It's Geisinger, though.

1        Q.      It's at Geisinger?

2        A.      Yes.

3        Q.      Okay.

4        A.      I went with him, but they don't let you

5    go in the back.

6        Q.      Any doctors for his hearing, other than

7    what we've already talked about?

8        A.      No, not -- huh-uh (negative response).

9        Q.      And he had a surgery.  Who performed

10   that surgery?

11       A.      Dr. Azeredo.  For his head?

12       Q.      Yes.

13       A.      Azeredo and a neurologist.  I can't

14   recall his name.

15       Q.      And did you go with him for followup

16   treatments with them?

17       A.      Yes.

18       Q.      When you were at Geisinger, did you work

19   with any of those physicians?

20       A.      No.

21       Q.      Do you have any family members that work

22   at Geisinger now --

23       A.      No.

24       Q.      -- or that have worked at Geisinger

25   during his treatment?

1      A.     No.

2      Q.     Do you have any family members that have

3   worked -- or friends that have worked in any of the

4   offices of any physicians he's been to?

5      A.     No.

6      Q.     Has he, for financial reasons, been

7   unable to get any medical treatment that he needed?

8      A.     No.

9      Q.     Has he for any other reason been unable

10  to get any other -- any medical treatment that he

11  needed?

12     A.     No.

13     Q.     Has he for any medical or other --

14  excuse me; financial or other reason been unable to

15  get any test or treatment that he needed?

16     A.     No.

17     Q.     Does he have any concern that anything's

18  going to stop him from getting any future medical

19  treatment that he needs?

20     A.     I think he's concerned about the Botox.

21  It's quite expensive.

22     Q.     Okay.  He's been having those

23  treatments --

24     A.     Correct.

25     Q.     -- already?  And who's been paying for

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

```
 1    those?
 2         A.      Workmen's Comp.
 3         Q.      Is he worried they won't continue to pay
 4    for them?
 5         A.      Correct.
 6         Q.      Do you have any understanding as to why
 7    they wouldn't continue to pay for them?
 8         A.      No.  I just know it's one of his
 9    worries.
10         Q.      Okay.  Do you share that concern?
11         A.      No.  I think everything will work out.
12         Q.      When did you last go with him to the
13    doctor?
14         A.      This month.
15         Q.      Okay.
16         A.      He saw Eckel.
17         Q.      Okay.
18         A.      I want to say the 3rd or the 4th.
19         Q.      And so you went with him for his monthly
20    visit?
21         A.      Correct.
22         Q.      Y'all traveled here from Danville?
23         A.      Correct.
24         Q.      And I think he told us you stopped one
25    night along the way and then drove the rest of the
```

**Mixon Reporting Service, Inc.**
**Albany - Tifton - Valdosta**                              229-382-8512

```
 1    way to Valdosta?
 2         A.     Correct, to, yeah, Georgia, you mean?
 3         Q.     Yeah.  Stopped in, I believe, Gaffney,
 4    South Carolina?
 5         A.     Correct.
 6         Q.     And he drove all the way from Danville
 7    to Gaffney?
 8         A.     Yeah.
 9         Q.     And then --
10         A.     We left on Saturday.  And we've stayed
11    in four motels, so --
12         Q.     Okay.  Where was -- the first one's in
13    Gaffney?
14         A.     I believe so.
15         Q.     Second one was in Valdosta?
16         A.     I believe so.
17         Q.     And where would have been the third and
18    fourth?
19         A.     We stayed three nights in a Super 8 and
20    one night in Econolodge.  That's all I know.  I
21    don't know exactly where.
22         Q.     Okay.  So I'm thinking the one night
23    would have been in Gaffney?
24         A.     Correct.
25         Q.     And the three nights would have been in
```

26

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

```
 1    Valdosta?
 2         A.      Probably.
 3         Q.      Okay.
 4         A.      No.  One night in Albany.  We stayed
 5    here.
 6         Q.      Oh, last night --
 7         A.      Yeah.
 8         Q.      -- you stayed here in Albany?
 9         A.      Yeah.  Sorry.
10         Q.      Okay.  And you will stay here again
11    tonight and travel home tomorrow?  Is that the plan?
12         A.      No.  I'm going to try to head out
13    tonight --
14         Q.      Okay.
15         A.      -- when we're done with you.
16         Q.      As far as driving from Danville to
17    Gaffney, he did all that driving?
18         A.      Correct.
19         Q.      And from Gaffney to Valdosta he did all
20    that driving?
21         A.      Correct.
22         Q.      And from Valdosta to Albany he did all
23    that driving?
24         A.      Correct.
25         Q.      Is there any reason why you wouldn't
```

**Mixon Reporting Service, Inc.**
Albany - Tifton - Valdosta                           229-382-8512

Deposition of Kathy Newcomb, taken  on 11/18/2015
courtreporter@mixonreportingservice.com

```
 1    have done any of that driving?

 2         A.    I -- a month ago I -- like I have this

 3    big -- I hate to give you more typing.  But I have a

 4    big dining room table.  I set my cell phone on -- I

 5    have a big lab, too.  And he jumps up.  I stepped

 6    back.  And my other chocolate lab had laid down

 7    behind me.  When I stepped back, I fell.  And the

 8    black lab brought the bench to the table.  And it

 9    crushed me right here.

10              So I saw I Eckel, and he believes I

11    cracked a rib.  So I really can't drive.  Like I

12    can't do the turning and stuff.  But he like -- it's

13    part of his freedom.  And I think when they took his

14    CDL, they took his freedom.

15         Q.    Right.

16         A.    So for me to be his co-driver -- like I

17    don't sleep in the car.  I'm constantly telling him,

18    making sure he's paying attention, you know.  So he

19    does okay as long as somebody's there to keep him on

20    task.

21         Q.    But by you being in the car with him,

22    that allows him to be able to drive?

23         A.    Yeah.

24         Q.    Okay.  He prefers to drive to have his

25    freedom?
```

28

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

```
 1        A.       Correct.
 2        Q.       You are not working now, so you're home
 3   most all day most days?
 4        A.       24/7.
 5        Q.       And he is not working, so he's also home
 6   most days?
 7        A.       Correct.
 8        Q.       Tell me what he does on a daily basis,
 9   just an average day.
10        A.       Not much.  Let me see.  Some days Mike
11   will sleep the whole 24 hours, from the time he gets
12   up, he'll eat, lay back down, go to sleep.  He'll
13   lay there and watch TV and sleep throughout the
14   whole day.  Other days he is -- the bathroom, want
15   to fix the bathroom.  Goes and we get the material,
16   everything.  Then days go by.  It's another day of
17   he wants to sleep.  Then the next day he's going to
18   put the ceiling fan in.
19             He just cannot stay focused.  So used to
20   he ran the house, maintained the house, did
21   everything.  Now I can't really say he does much.
22   He can't stand if I vacuum.  He can't stand the
23   noise.  He may take a walk, he may go hunting with
24   my son.  But even that changed from -- he can't
25   shoot a rifle or a shotgun.  Like he can't hunt that
```

29

1   way, so he has to hunt bow.  So that's, I guess, a

2   little different.  He's just --

3       Q.      What are some other things that he can

4   no longer do that he used to be able to do?

5       A.      We have no sex life, intimacy.  He is

6   constantly use -- you probably saw some,

7   argumentative.  He used to pay the bills.  He gets

8   the mail.  He'll -- that's the one thing he does do

9   every single day, is go out and get the mail.  And I

10  don't know what he does with half of it.  So it's

11  been -- it's been a problem.

12      Q.      Anything else that you can think of that

13  he cannot do now that he could do before?

14      A.      He doesn't remember, so it's like I have

15  to be there.  Like it's like my child instead of my

16  husband.  I have to remind him to take his pills,

17  remind him everything.

18      Q.      And the pills he's taking are the

19  OxyContin?

20      A.      Correct.

21              (Mr. Newcomb exited the deposition

22  room.)

23      Q.      And Lexapro and --

24      A.      Oxycodone.  He takes OxyContin and

25  oxycodone.

1      Q.      He takes both?

2      A.      Uh-huh (positive response).

3      Q.      Okay.  At the same time?

4      A.      No.  Takes the 40 milligram OxyContin

5    7:00 in the morning and 7:00 at night.  And then has

6    three oxycodone, 10 milligram, he can take

7    throughout the day for breakthrough.  So usually

8    he'll take two of them, one at night, during the

9    night.

10      Q.      Okay.  And this is for headaches?

11      A.      Yeah.

12      Q.      Does he ever complain about pain

13    anywhere else?

14      A.      No.

15      Q.      And he takes blood pressure medicine?

16      A.      Correct.  Which he's on a very small

17    dose.  I think it's 25 milligrams.

18      Q.      How did you learn that he'd had this

19    accident?

20      A.      He called me.

21      Q.      Where was he when he called you?  Do you

22    know?

23      A.      Georgia.  He was in the ER --

24      Q.      Okay.

25      A.      -- here.

1    Q.    What did he tell you?

2    A.    That he got hit by a forklift and he was

3  getting stitches put in his head and he'd call me

4  back.  And then --

5    Q.    Okay.

6    A.    -- it wasn't much, like -- I thought,

7  "Oh, my God," you know.  And he was like, "No.

8  They're just stitching me up.  So I'm going to --

9  they're coming to pick me up.  After they stitch me

10  up, they're coming to pick me up and take me back to

11  my truck."  So I don't know, in Pennsylvania, what

12  the extent of it was, until he came home.  And that

13  was like terrible.

14    Q.    How was he when he got home?

15    A.    His whole head was like swelled up.  His

16  eye was swelled shut, and he had this bandage around

17  his head.  It was horrible.  So I was like, "Mike, I

18  need to look at your head, like to see what they

19  have underneath there."

20    Q.    Okay.  And what -- in relation to when

21  the accident occurred, what day was this?  Was this

22  the next day?

23    A.    The second or third day.

24    Q.    Second or third day after the accident?

25    A.    Yeah.

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1         Q.     Okay.

2         A.     When he got back to the house.

3         Q.     And had he had any medical treatment

4    since then, after the initial treatment?

5         A.     No.

6         Q.     Okay.  And so go ahead.  I'm sorry.

7         A.     So I said, "I need to see your head."  I

8    took the bandages off.  And I was like, "This

9    doesn't look good."  And I was like, "Let's go to

10   the ER.  I just think this is more involved than

11   stitches."  It was horrible.  And he couldn't hear

12   out of his ear, and he couldn't -- he could not get

13   his eye open.

14               So I took him there.  They cut out some

15   stitches, cleaned it out.  And then we saw Eckel.

16   And then from Eckel, ear, nose, and throat,

17   neurology.

18        Q.     Who was the ear, nose, and throat

19   doctor?

20        A.     Azeredo.

21        Q.     Okay.  And the neurologist was

22   Dr. Kelley?

23        A.     Correct.

24        Q.     Okay.  And then what happened next?

25        A.     I kept -- Mike had gone to a couple of

Mixon Reporting Service, Inc.
Albany  - Tifton - Valdosta                          229-382-8512

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1  his appointments with the nurse from Workmen's Comp.

2  And I wasn't liking the answers all the time, so I

3  started going.

4      Q.      What were you not liking about the

5  answers?

6      A.      He told me, "I'm going to be fine, soon

7  as the stitches come out."

8      Q.      Okay.

9      A.      Like I'm like -- but I could tell the

10 difference in him.  I could tell his personality had

11 changed, too.  Like you could just see.  He was

12 tired.  He actually believed that he was going to be

13 fine.

14          So he talked me into letting him have

15 his knee redone after he fell down the stairs.  I

16 said yeah.  He actually -- we believed basically he

17 could get his knee done for when he went back to

18 work, he would not have that problem.

19     Q.      Uh-huh (positive response).

20     A.      You know, like we didn't -- I didn't

21 think it was going to be as bad as it is.  When they

22 said it was a CSF leak, I -- you know, he had fluid

23 coming out of his ear.  I was like, "That's not

24 normal."  So Azeredo checked the fluid, and it was

25 spinal and brain fluid coming out of his ear.

Mixon Reporting Service, Inc.

Albany - Tifton - Valdosta                    229-382-8512

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1      Q.      Okay.  Let me pause you just a second,
2   go back.  You said you could notice -- you were not
3   happy with the answers because you noticed some
4   personality changes?
5      A.      Correct.
6      Q.      And one you said was because he was
7   tired a lot?
8      A.      Yeah.
9      Q.      What other personality changes did you
10  notice at that point?
11     A.      My son had come home from the Army.  He
12  was gone 5-1/2 years.  And Mike was throwing him out
13  every other day.  Like I don't -- his shoes were in
14  the living room.  And like that's not Mike.  He's so
15  close to his son, Nicholas.  And he was like, "This
16  isn't the army.  You're going to pick up."  Like he
17  would just become this person that was not Mike.
18  And Nick was like -- my children were so confused.
19  I have them coming to me, and I have Mike coming to
20  me.  Couldn't take it.
21     Q.      What else?  Anything else you noticed
22  about his personality changing?
23     A.      Argumentative.  He couldn't stay on
24  task.  He would cry, like with pain.  And not
25  even -- he doesn't remember.  That's what gets me

Mixon Reporting Service, Inc.
Albany  - Tifton - Valdosta                    229-382-8512

1   the most, is he doesn't remember.

2          Q.     Was he taking any painkillers at that

3   point?

4          A.     No, not -- I don't believe he -- when he

5   drove the truck home, he was only taking Tylenol.

6          Q.     Okay.

7          A.     Yeah.  He ate the whole bottle.  I was

8   like that's not good, either.

9          Q.     When he went to the emergency room when

10  he first got back two or three days later, did they

11  give him painkillers at that point?

12         A.     I don't -- I don't know.  I don't

13  remember.

14         Q.     Okay.

15         A.     They may have.  They may have give him

16  like a Percocet.

17         Q.     How long was it after that he got back

18  that you noticed his personality changes to start?

19         A.     Days.

20         Q.     Within a few days after he got home?

21         A.     Right.

22         Q.     Did they continue to get worse?

23         A.     Yes.

24         Q.     Were there more of them?

25         A.     Yes.

```
 1                 (Mr. Newcomb re-entered the deposition
 2      room.)
 3          Q.     What other personality changes were
 4      there?
 5          A.     He can't stay on task.  He's -- he gets
 6      irate.  Almost a rage comes about him, where he
 7      cannot control it.  Argues with me, which I would
 8      much rather him argue with me than the children.
 9      But even that is getting to the point where I didn't
10      think I was going to take much more of that myself.
11      So I don't -- I don't know how to explain it.  He's
12      like Dr. Jekyll and Mr. Hyde.  He's totally fine one
13      minute and not the next.
14          Q.     Okay.  And have you discussed those
15      issues with these physicians?
16          A.     Yes.
17          Q.     And what do they say?
18          A.     Eckel put him on Lexapro --
19          Q.     Okay.
20          A.     -- to try to help, maybe that would help
21      the headaches but it would definitely help his mood.
22          Q.     And has it helped?
23          A.     Yes.  He cannot miss a dose of that.
24          Q.     Okay.
25          A.     He -- I forget what you asked me.
```

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1      Q.      Has he seen any other mental health

2   professionals, or any -- has he seen any mental

3   health professional at all, psychologist,

4   psychiatrist, counselor?

5      A.      I don't believe so.

6      Q.      Is there some reason why he would not

7   consult with a mental health provider?

8      A.      I don't think he needs mental health.  I

9   think it's his head injury.  I think I'm going to

10   have to deal with this person who he becomes and

11   ends up being.  But he'll always, I think, be

12   medicated, with the antidepressant, at least.

13      Q.      So you don't think he needs the services

14   of a psychiatrist or psychologist or mental health

15   counselor?

16      A.      What could they do for him?

17      Q.      I don't know.  I'm asking you.

18      A.      I don't know, either.

19      Q.      Other than that initial phone call, what

20   else has he told you about how this occurred, about

21   the actual way the accident happened?

22      A.      Pretty much the same way he told you.

23      Q.      What has he told you?

24      A.      That he was standing there at the dock,

25   he'd counted his corn, he -- the guy hit him, he

**Mixon Reporting Service, Inc.**
Albany - Tifton - Valdosta                    229-382-8512

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1    went flying into the tractor-trailer.  If he didn't

2    yell and get his attention, the guy would have cut

3    him in half, is what Mike had originally said.  And

4    everybody there was nice, they called the ambulance,

5    somebody there picked him up, brought him back to

6    his truck, everything was complete, ready for him to

7    go.  Pretty much the same thing he told you.

8         Q.    Okay.  Did he tell you that he had

9    watched the forklift driver make this same route two

10   or three times before the accident happened?

11        A.    I believe he said, "I just don't know

12   why the guy didn't stop this time."

13        Q.    Okay.

14        A.    Like he stopped.  Mike said that to me.

15        Q.    Did he tell you that he could see the

16   forklift driver for his whole route?

17        A.    No, he didn't.  He just said the

18   forklift.  He never said driver.

19        Q.    Okay.  Right.  But did he say he could

20   see the forklift as it traveled towards him the

21   whole way coming out of the cooler?

22        A.    Uh-huh (positive response), yes.

23        Q.    Did he tell you any reason why he didn't

24   move out of the way sooner?

25        A.    He couldn't -- what he told me was he

Mixon Reporting Service, Inc.
Albany  - Tifton - Valdosta                    229-382-8512

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

```
 1    didn't have time to react.
 2         Q.      Okay.  Other than time, did he give you
 3    any other reason why he didn't move any sooner?
 4         A.      No.
 5         Q.      Have you been to this location --
 6         A.      No.
 7         Q.      -- where it happened?  You talked to any
 8    witnesses?
 9         A.      No.
10         Q.      Other than Mr. Newcomb?
11         A.      Oh.  Correct.
12         Q.      Yeah.  But nobody else?
13         A.      Nobody else.
14         Q.      You know that where this happened was an
15    industrial-type area?
16         A.      I'd assumed that, yes.
17         Q.      Yeah.  And you'd agree with me that it's
18    important in an industrial-type environment to be
19    careful what's going on around you?
20         A.      Correct.  Also, but Mike's been a truck
21    driver for how many years?
22         Q.      And truck driving safety is a major
23    issue, is it not?
24         A.      And he is like the biggest safety nut.
25    He even is very cautious with us driving.  He --
```

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                           229-382-8512

1    like my children are the most defensive drivers,

2    because of the education Mike had.  Like he's taught

3    them you don't drive for yourself, you drive

4    watching out for the other guy --

5        Q.    Okay.

6        A.    -- like always.

7        Q.    Okay.

8        A.    So safety is a big issue with Mike.

9    Like he's a safety nut, I would say.

10       Q.    Okay.  And you'd agree with me that in

11   an industrial environment where there are forklifts

12   and heavy loads moving around, it's important there

13   to be careful as well?

14       A.    Yes.

15       Q.    Just like out on a highway?

16       A.    Yes.

17       Q.    Okay.  If there -- an area where there

18   was a wet floor, that would be another area it would

19   be important to be careful --

20       A.    Correct.

21       Q.    -- on a wet floor?  It's important to

22   look out for those kind of things, to be aware of

23   that there are either wet floors or moving vehicles

24   or heavy loads around, right?

25       A.    Correct.

1       Q.      If you're -- you've got to associate --

2    or not associate but familiarize yourself with your

3    surroundings in that kind of situation, correct?

4       A.      Correct.

5       Q.      It's important to look out for any signs

6    and warnings in the area?

7       A.      Correct.

8       Q.      And if there are signs and warnings,

9    it's important to obey those warnings, correct?

10      A.      Correct.

11      Q.      The signs and warnings are there to

12   protect us, right?

13      A.      Correct.

14      Q.      So if we disobey those, then we are

15   putting ourselves at risk?

16              MR. HELMS:  Object to the form.  You

17   can answer the question.

18      Q.      Would you agree with me that if you

19   disobey --

20      A.      Correct.

21      Q.      -- a sign or warning, you're putting

22   yourself at some risk?

23              MR. HELMS:  Object to the form.

24      A.      Yes.

25      Q.      And that by seeing a sign or warning, it

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1    should put you on notice of whatever that sign is

2    warning you about?

3        A.    Correct.

4        Q.    If there are rules, it's important that

5    we follow the rules?

6        A.    Yes.

7        Q.    Especially safety rules?

8        A.    Yes.

9        Q.    And if there's a rule or a sign that we

10   don't understand, it's important to ask questions so

11   that you know what the risks are?

12       A.    Yes.

13       Q.    That's -- understanding what the sign

14   means is part of being safe, is it not?

15       A.    I would say.

16       Q.    Okay.  In the hospital, y'all have rules

17   that you have to follow, correct?

18       A.    Correct.

19       Q.    Regulations that you have to abide by?

20       A.    (Witness nods head affirmatively.)

21       Q.    Yes?

22       A.    Yes.

23       Q.    And if you're working in the hospital

24   and there's a rule or regulation or a warning and

25   you don't understand, you would stop and ask

**Mixon Reporting Service, Inc.**
**Albany - Tifton - Valdosta**                    229-382-8512

Deposition of Kathy Newcomb, taken on 11/18/2015
courtreporter@mixonreportingservice.com

1    questions to be safe to make sure you understood it,

2    correct?

3         A.    Correct.

4         Q.    I believe that is all that I have,

5    Ms. Newcomb.  I appreciate your time.

6         A.    Thank you.

7    (Videotaping Stopped)

8              (Whereupon, the deponent or a party

9    having specifically reserved reading and signing of

10   the deposition, the taking of the deposition was

11   concluded at 3:55 p.m. the same date.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                                    229-382-8512

1                     C E R T I F I C A T E

2    STATE OF GEORGIA,

3    COUNTY OF TIFT:

4              I hereby certify that the foregoing

5    transcript was taken down, as stated in the caption,

6    and the questions and answers thereto were reduced

7    to typewriting by computer-aided transcription under

8    my direction; that the foregoing pages 1 through 44

9    represent a true, complete, and correct transcript

10   of the evidence given; and I further certify that I

11   am not of kin or counsel to the parties in the case,

12   am not in the regular employ of counsel for any of

13   said parties, and am in no wise interested in the

14   result of said case.

15             I further certify that the original of

16   this deposition will be filed with Mark Pickett,

17   Esquire, Counsel for the Defendants.

18             This the 17th day of December 2015.

19

20

21

        _____

22      DEBBIE PAULK MIXON, CCR-B-652
        Notary Public
23      My Commission Expires 06/05/2016

24

25

```
 1   Deposition of KATHY C. NEWCOMB
 2                   ERRATA SHEET
 3           I do hereby certify that I have read all
     questions propounded to me and all answers given by
 4   me and that:
     _____ 1)  There are no changes noted.
 5   _____ 2)  The following changes are noted:
     Corrections to be made pursuant to Rule 30(7)(e) of
 6   the Federal Rules of Civil Procedure and/or Georgia
     Code Annotated 9-11-30(e), both of which read in
 7   part:  Any changes in form or substance which you
     desire to make shall be entered upon the
 8   deposition...with a statement of the reasons
     given...for making them.  Accordingly, to assist you
 9   in effecting corrections, please use the form below:
10
     Page No. _____ Line No. _____ should read: _____
11   _____
     _____
12   And the reason for the change is:_____
     _____
13   Page No. _____ Line No. _____ should read: _____
     _____
14   _____
     And the reason for the change is: _____
15   _____
     Page No. _____ Line No. _____ should read: _____
16   _____
     _____
17   And the reason for the change is: _____
     _____
18   Page No. _____ Line No. _____ should read: _____
     _____
19   _____
     And the reason for the change is: _____
20   _____
     Page No. _____ Line No. _____ should read: _____
21   _____
     _____
22   And the reason for the change is: _____
     _____
23   Page No. _____ Line No. _____ should read: _____
     _____
24   _____
     And the reason for the change is: _____
25   _____
```

**Deposition of Kathy Newcomb, taken on 11/18/2015**
**courtreporter@mixonreportingservice.com**

1    Page No. _____ Line No. _____ should read: _____
     _____
2    _____
     And the reason for the change is: _____
3    _____
     Page No. _____ Line No. _____ should read: _____
4    _____
     _____
5    And the reason for the change is: _____
     _____
6    Page No. _____ Line No. _____ should read: _____
     _____
7    _____
     And the reason for the change is: _____
8    _____
     Page No. _____ Line No. _____ should read: _____
9    _____
     _____
10   And the reason for the change is: _____
     _____
11   If supplemental or additional pages are necessary,
     please furnish same in typewriting annexed to this
12   deposition.
13
14
15          _____
                    KATHY C. NEWCOMB
16
17
18          Signed before me this _____ day of
19          _____ 2 _____
20
            _____
21          Witness
22
23
24
25

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**